# EXHIBIT B

# In The Matter Of:

*Elizabeth Lowing v.*
*Justin Visser, Newaygo County, et. al.*

---

*Dale Gibbs*
*Vol. I*
*June 5, 2018*
*Dale Gibbs*

---

*Court Reporting Services*
*Oakland County, Clarkston, Michigan*
*www.courtreportingservices.org*

Original File Gibbs, Dale.txt

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MICHIGAN
 3  ELIZABETH LOWING,
 4          Plaintiff,
 5                            Case No. 1:17-cv-650
 6  -vs-                      Hon. Gordon J. Quist
 7  JUSTIN VISSER, NEWAYGO COUNTY,
    DALE GIBBS, and VILLAGE OF HESPERIA,
 8  in their individual and official capacities,
 9          Defendants.
10  _____
11
12          DEPOSITION OF DALE GIBBS,
13  Taken by the Plaintiff, before Jayne M. Jones, Court
14  Reporter (CSR-2457, RPR) and Notary Public for the
15  County of Ingham, Acting in the County of Newaygo,
16  on Tuesday, June 5, 2018, at 33 E. Michigan Avenue,
17  Hesperia, Michigan, at 10:00 a.m.
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2  SHAWN C. CABOT (P42449)
 3  CHRISTOPHER TRAINOR & ASSOCIATES
 4  9750 Highland Road
 5  White Lake, Michigan  48386
 6  (248) 886-8650
 7  shawn.cabot@cjtrainor.com
 8      Appearing on behalf of the Plaintiff.
 9
10  MATTHEW W. CROSS (P77526)
11  CUMMINGS, MCCLOREY, DAVIS & ACHO
12  400 W. Front Street, Ste. 200
13  Traverse City, Michigan  49684
14  (231) 922-1888
15  mcross@cmda-law.com
16      Appearing on behalf of Defendants Visser and
17          Newaygo.
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  APPEARANCES CONTINUED:
 2  HEIDI D. HUDSON (P32495)
 3  ZAUSMER, AUGUST & CALDWELL, PC
 4  31700 Middlebelt Road, Ste. 150
 5  Farmington Hills, Michigan  48334-2301
 6  (248) 851-4111
 7  hhudson@zacfirm.com
 8      Appearing on behalf of Defendants of Village of
 9          Hesperia & Dale Gibbs.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                  INDEX
 2  WITNESS                                    Page
 3  DALE GIBBS,
 4      EXAMINATION BY MR. CABOT                 5
 5  EXHIBITS                                   Page
 6  Exhibit 1      Photo                        30
 7  Exhibit 2      Photo                        30
 8  Exhibit 3      Photo                        30
 9  Exhibit 4      Photo                        30
10  Exhibit 5      Photo                        30
11  Exhibit 6      Crash Report                 32
12  Exhibit 7      Diagram                      44
13  Exhibit 8      Police Report                62
14  Exhibit 9      Handwritten Statement        68
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1  Hesperia, Michigan
2  Tuesday, June 5, 2018
3
4              R E C O R D
5       COURT REPORTER: Do you solemnly swear
6  the testimony you're about to give in the cause now
7  pending will be the truth, the whole truth, and nothing
8  but the truth?
9       THE WITNESS: Yes.
10           DALE GIBBS,
11       (at 10:00 a.m., sworn as a witness,
12  testified as follows:
13           EXAMINATION
14  BY MR. CABOT:
15  Q.  Will you please state your full name?
16  A.  Dale Gibbs. G-I-B-B-S.
17           MR. CABOT: Please let the record
18      reflect that this is the deposition of Dale Gibbs taken
19      pursuant to Notice and agreement of counsel, and to be
20      used for any and all purposes consistent with the
21      Federal Court Rules and the Federal Rules of Evidence.
22  BY MR. CABOT:
23  Q.  Good morning.  As you know, my name is Shawn Cabot.
24      I'm one of the attorneys representing Elizabeth Lowing
25      regarding an incident that took place back on December

Page 6

1      15 of 2015.
2           As I'm sure your attorney has told you,
3      this is a discovery deposition, which is just a fancy
4      lawyerly way of saying I'm going to ask you a bunch of
5      questions today.
6  A.  Um-hum.
7  Q.  Have you ever had your deposition taken before?
8  A.  Yes.  Out in Wyoming.
9  Q.  Okay.  So it sounds like it might have been pretty -- a
10      while ago?
11  A.  Quite a while ago.
12  Q.  Okay.  So let me just go over the ground rules.  And
13      these rules are what you can expect from me and what I
14      expect from you, too.  To my right, and your left, is a
15      court reporter.  Her job is to take down every word
16      that's spoken keep in the room today.  So to that end
17      it's important that you always provide me with a verbal
18      response.  Even though it's kind of informal and you,
19      know, there's no judge and no jury, sometimes in normal
20      conversation we'll nod our head or shrug our shoulders,
21      or things like that.  And I may know what you're saying
22      sitting across from you, but somebody reading a
23      transcript won't.  So please try to remember to always
24      make your responses verbal.
25           If I ask a question that requires a yes

Page 7

1      or no, please try to say yes or no versus um-hum or
2      un-huh.
3  A.  Uh-hum.
4  Q.  Or things like that.  Because, again, my goal is to get
5      a clear record of your testimony so that there's no
6      confusion of it.  And when we say uh-hum and uh-huh, it
7      kind of gets lost in translation.  And I'm getting
8      pretty good over the years to catch you when you do
9      that, and if I do, please don't be offended or be upset
10      if I say:  Is that a yes or is that a no.  Again, I'm
11      just trying to make everybody's lives easier when we
12      read this thing in knowing what you said.
13           If I ask you a question that you don't
14      understand or you think:  Oh, my goodness, he's talking
15      Chinese or Russian, tell me you don't understand my
16      question and I'll rephrase it.  I'm not here to try to
17      ask you tricky questions or anything like that.  So
18      just tell me if you don't understand and I'll rephrase
19      it.  Otherwise, if you answer the question, I'll
20      presume that you understood it.
21  A.  Yeah.
22  Q.  Okay.  If at any time you need to take a break, it's
23      certainly fine.  Take as many of those as you need.  I
24      just ask that you answer any question that may be
25      pending before you take that break.

Page 8

1           And one final thing.  A lot of my
2      questions you're going to know what the question is as
3      I ask it.  And the tendency will be to answer the
4      question while I'm asking it, but for the sake of the
5      court reporter who has to take down everything, please
6      wait until my question is done before you answer.  And,
7      likewise, I'll give you that same courtesy and I'll do
8      my best not to ask a question until I think your answer
9      is done.  And then that way everybody is happy, and the
10      court reporter is happy, and we have a clean record,
11      and it's a good day.
12  A.  Okay.
13  Q.  All right?
14  A.  All right.
15  Q.  Prior to your deposition have you discussed this matter
16      with anyone other than your attorneys?
17  A.  No.
18  Q.  Okay.  Have you reviewed anything?  Like police
19      reports, depositions?  Anything like that?
20  A.  Just went over my own report.
21  Q.  Okay.  And for the record, I believe that's a
22      three-page report that you prepared, is that correct?
23      From the Hesperia Police Department?
24  A.  The answer to that is I don't have a copy of it with
25      me, but I would say that sounds correct.

Elizabeth Lowing v.                    **Dale Gibbs**                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                                  June 5, 2018

Page 9

1 Q. Okay. Nothing else that you reviewed other than your
2      police report?
3 A. Repeat.
4 Q. Nothing else that you reviewed other than your police
5      report?
6 A. No.
7 Q. Is that correct?
8 A. Correct.
9 Q. Have you ever been sued before?
10 A. No.
11 Q. Any background in the military?
12 A. No.
13 Q. When you were with the Hesperia Police Department, did
14      you have any training regarding use of force or
15      intervention in force situations that you recall?
16 A. I'm trying to recall, but I don't believe the use of
17      force other than deadly force, which was in the
18      firearms training.
19 Q. Okay. And how long were you employed most recently
20      with the Hesperia Police Department?
21 A. Most recently?
22 Q. Yeah.
23 A. Let's see. 2011.
24 Q. And that was 2011 till when?
25 A. Till last month.

Page 10

1 Q. Okay. So April of 2016 -- I mean 2018?
2 A. 2018, yes.
3 Q. And what was the nature of that separation?
4 A. Not reappointed.
5 Q. And was that a decision by like the city council or
6      something?
7 A. Yeah. Yes.
8 Q. Did they give a reason?
9 A. No.
10 Q. Were you surprised?
11 A. No.
12 Q. I was looking at some of your performance evaluations,
13      and I understand you give a self-performance evaluation
14      and the council also evaluates you.
15           Did you have some people on the council
16      that didn't necessarily, let's say, agree with you
17      perhaps?
18 A. Yes.
19 Q. Who were those?
20 A. Joyce McDonald, Jim Smith, and Bob Farber.
21 Q. How large is the city council? At least at the time --
22 A. There are seven, but two -- one wasn't there on health
23      reasons and the other one passed away. So we have a
24      five-council board.
25 Q. What is your opinion as to why they didn't reappoint

Page 11

1      you?
2           MS. HUDSON: I'm going to object and
3      instruct him not to answer because there is potential
4      litigation. He has retained another attorney to
5      represent him and give him advice and counsel with
6      respect to potential litigation against the Village on
7      that topic.
8 BY MR. CABOT:
9 Q. Okay. Is that accurate?
10 A. Yes.
11 Q. Okay.
12           MS. HUDSON: Off the record for a
13      minute.
14           (Conversation held off the record.)
15 BY MR. CABOT:
16 Q. Is there currently any filed action that you've taken
17      with respect to your --
18 A. No.
19 Q. -- separation?
20 A. No.
21           MR. CABOT: Off the record.
22           (Conversation held off the record.)
23 BY MR. CABOT:
24 Q. In your opinion, do you think your separation has
25      anything to do with this case?

Page 12

1 A. No.
2 Q. Okay. Now, my understanding in reading some of the
3      records is that you indicated you were recently
4      employed from 2011 until 2018. If I'm not mistaken,
5      there was also another period of time that you were
6      also employed with Hesperia?
7 A. Just a little over a year. I was employed from 2009 to
8      2010, and I was with the same individuals. Not
9      appointed for one year, but then I was recalled.
10      Things went amuck.
11 Q. Okay. And you were in Wyoming for a period of time.
12      And I believe you worked for a sheriff's department out
13      there?
14 A. Two sheriffs offices. Albany County and Sheridan
15      County.
16 Q. And other than the non-reappointment issues, have you
17      ever been terminated from employment?
18 A. No.
19 Q. Okay. Have you ever been the subject of any type of
20      internal affairs investigation?
21 A. No.
22 Q. Are you currently working in any type of law
23      enforcement or security-type capacity?
24 A. I guess I can answer that is that I've been requested
25      and offered job positions. I just haven't accepted

Elizabeth Lowing v.                    **Dale Gibbs**                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                                  June 5, 2018

Page 13

1       those positions.
2  Q.   So you're not currently working?
3  A.   I'm not currently working.
4  Q.   You're enjoying retirement?
5  A.   I didn't realize it was going to be this great.
6  Q.   Or you would have done it years ago?
7  A.   Yeah.
8  Q.   That's what my dad said after 44 years in the plant.
9          All right.  I want to go over your
10      education a little bit.
11 A.   Okay.
12 Q.   Do you have a college degree from anywhere?
13 A.   Kalamazoo Valley Community College in police
14      administration -- not police administration -- law
15      enforcement.  That's where I graduated from the academy
16      the second time.
17 Q.   Okay.  And when was that?
18 A.   Oh, let's see.  I left Wyoming in --
19 Q.   If it's easier to give a decade, you can give a decade.
20 A.   I was going to say somewhere around '87 to '88.
21 Q.   And why did you go to the academy twice?
22 A.   Well, the first time that I went I was with the --
23      part-time for the Kent County Sheriff's Office, and
24      they put on their own academy.
25 Q.   Right.

Page 14

1  A.   They required us to go to -- back then it was MELOTC
2       before it became MCOLES.
3  Q.   Do you currently retain your MCOLES certification?
4  A.   Yes.
5  Q.   Do you currently belong to any professional
6       organizations related to law enforcement?
7  A.   No.  Retract that.  Would the Chiefs of Police
8       Association count?
9  Q.   Sure.  That would be one.
10 A.   Yeah, then I do belong to one.
11 Q.   Do you have any other endorsements?  Like firefighter
12      or anything like that?  First aid responder?  EMT?
13      Paramedic?
14 A.   No.  Just my training as a firearms instructor.  FTO
15      officer.  Streets administrator.  Zoning administrator.
16      Planning commission administrator.
17 Q.   I was going to say, when I read through your personnel
18      file, the Chief of Police of Hesperia wears many, many,
19      hats.  More than I think I've ever seen in any
20      municipality.
21 A.   The joke is that when they call me up from my back
22      office to come up front, I have to either put my police
23      hat on, turn my collar around for Father Dale, or come
24      up ready to go to Duke City.
25 Q.   Sure.  So one of the answers to a question that you

Page 15

1       mentioned, and I saw in the file, was a streets
2       administrator.  I don't really understand what that is.
3  A.   That basically is 302 money.  Act 51 money.  You have
4       to have a, quote, appointed streets administrator that
5       signs all the affidavits that come in from the state.
6       Like, what are your major streets, what are your minor
7       streets, are they still operable.  Somebody has to sign
8       for those.
9  Q.   Okay.  So kind of recapping that.
10         As a chief of police, on a day-to-day
11      basis, if you had to summarize your role in five
12      sentences or less, how would you describe your job when
13      you were still appointed as the chief?
14         MS. HUDSON: And I presume you're asking
15      what he was doing on a daily basis?
16         MR. CABOT: Yes.  In a nutshell back in
17      2015.
18         THE WITNESS: Okay.  Basically, you
19      start out the day enforcing any calls that come in at
20      federal, state, county.  And then of course being a
21      zoning administrator, would be Village ordinances.  Any
22      emergency medical that would come up.
23 BY MR. CABOT:
24 Q.   How large was the police department back in 2015?
25 A.   2015?  Full and part-time, I'd say six.  It's been --

Page 16

1  Q.   Including you or --
2  A.   Including me, yeah.
3  Q.   So how many full-time and how many part-time out of
4       that six?  Approximately?
5  A.   Approximately, it would be two full-time.  Myself and
6       one other full-time.  And the other would be part-time.
7  Q.   Now, when you say part-time, does that mean like on
8       call part-time, or --
9  A.   No.  They're assigned X. amount of days a month.  It's
10      one of the hideous jobs that this is is that you have
11      to work around, because most of my officers are
12      certified with other agencies.  So you work around
13      their schedules.
14 Q.   Gotcha.
15 A.   And like Deputy Visser, not him, but other deputies
16      work for Fremont, Newaygo, Grant and we have to work
17      around the sheriff's office schedule, which gets to be
18      a nightmare.
19 Q.   It sounds like a scheduling fiasco.
20 A.   Um-hum.
21 Q.   So unlike probably a lot of municipality police chiefs,
22      it sounds like you're a 24/7 police chief?
23 A.   Right.
24 Q.   I mean active?
25 A.   Right.  We take the car home --

Elizabeth Lowing v.                    **Dale Gibbs**                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                                           June 5, 2018

---

Page 17

1          MS. HUDSON: You can just answer his
2     question.
3          THE WITNESS: Okay. Yeah.
4          MS. HUDSON: He'll ask you more
5     questions if he wants.
6          THE WITNESS: Okay. Yes.
7     BY MR. CABOT:
8   Q. So I would take that to mean that you also do street
9     patrol when you're chief of police, and things like
10    that?
11  A. Yes.
12  Q. Did you, prior to December 15, 2015, did you know
13    Elizabeth Lowing, who used to be known as Elizabeth
14    Sanborn?
15  A. You mean personally or have I heard of her?
16  Q. Either way.
17  A. I've heard of her.
18  Q. Okay. What's the means that you heard of her? Like --
19  A. Her ex-husband, I guess.
20  Q. So you heard about Elizabeth through her ex-husband?
21  A. Yes.
22  Q. And what was the knowledge that you obtained through
23    him?
24  A. He requested help on what to do with his problem, soon
25    to be ex-wife, and I explained to him that he should

---

Page 18

1     seek counsel.
2   Q. Were you friends with her ex-husband?
3   A. No. Acquainted, but not --
4   Q. Did you ever have a police run to the Sanborn house?
5   A. Never. No.
6   Q. Were you aware of any police activity, maybe county or
7     other, that frequented the Sanborn house?
8   A. I heard of calls out there, yes.
9   Q. And what were the nature of the calls that you heard
10    about?
11         MS. HUDSON: And, again, this is before
12    December of 2015?
13         MR. CABOT: At any time.
14         MS. HUDSON: Okay.
15         THE WITNESS: Oh, yeah. I'm going to
16    say mostly domestics.
17    BY MR. CABOT:
18  Q. By domestic meaning -- who tended to be the aggressor?
19  A. That I don't know.
20  Q. Okay. Were you ever -- was your police agency ever
21    called to assist?
22  A. I recall once one of my part-time officers backed up
23    the state out there. Or the county. I'm not sure
24    which.
25  Q. Do you have a general time frame of when that was?

---

Page 19

1   A. No.
2   Q. So my understanding is the Sanborn house is not a house
3     that this police agency frequented?
4   A. No.
5   Q. Is that correct?
6   A. Correct.
7   Q. Would you have recognized Ms. Sanborn if she was
8     walking on the sidewalk back in 2015?
9   A. I don't know. I don't think I would recognize her now,
10    so...
11  Q. Okay. Do you know if there is any familial relation to
12    you or Mr. Sanborn or Ms. Sanborn at all?
13  A. No.
14  Q. Kind of backtracking a little bit.
15         I understand Hesperia is a relatively
16    small community. Obviously, based on the size of the
17    police department. Do you frequently request or have
18    the assistance of other police agencies?
19  A. Yes.
20  Q. Who frequently assists Hesperia PD?
21  A. Basically which side of the street? Division Street
22    right here is the county line.
23  Q. Right. I see Oceana is one side.
24  A. You're in Newaygo now. You go across the street,
25    you're in Oceana.

---

Page 20

1   Q. All right. So it sounds like probably 50/50?
2   A. Yes.
3   Q. Depending on which side of the street?
4   A. Yes.
5   Q. I thought it was kind of funny how that works.
6          All right. Were you aware that
7     Ms. Lowing and her husband were in the process of
8     getting a divorce?
9   A. I wasn't aware that there was procedures, no, but I
10    knew that he was going in that direction.
11  Q. And how did you know that?
12         MS. HUDSON: He asked how did you know
13    that.
14         THE WITNESS: Oh. How did I know that?
15         MR. CABOT: Yes.
16         THE WITNESS: From the conversations.
17    BY MR. CABOT:
18  Q. How many conversations did you have with Mr. Sanborn
19    prior to December 15, 2015?
20  A. Two or three.
21  Q. Okay. And did they usually involve the domestic
22    concerns regarding his wife?
23  A. At least one for sure, yeah.
24  Q. Okay. Did you ever have any of those discussions with
25    Ms. Sanborn, or Ms. Lowing now?

---

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs – Vol. I
June 5, 2018

Page 21

1 A. No.
2 Q. So on December 15, 2015, you were on duty as an officer
3    with the Hesperia Police Department, correct?
4 A. Yes.
5 Q. Okay. And how did you become aware of some type of
6    incident involving my client?
7 A. The Village clerk, Peggy Miller, came back to get me
8    and explained that there was a domestic going on in
9    front of the Village Hall, and a man and woman were
10    involved in a physical altercation.
11 Q. Did Peggy say it was a physical altercation?
12 A. She said, if I remember right, you better get up there.
13    They're at each other.
14 Q. Now, "at each other" probably could mean a lot of
15    different things to different people; physical, verbal.
16    Do you agree with me?
17 A. Right.
18 Q. Okay. Do you know what she meant by at each other?
19 A. Nope. I just come up.
20 Q. Okay. And when you came out, you then went outside the
21    police department, which is, for the record, right next
22    door to the Village and --
23 A. It's right out that front door, yeah.
24 Q. Right. The Village Hall there. What did you see?
25 A. I saw a red pickup with Mr. Sanborn in the driver's

Page 22

1    seat and Mrs. Sanborn reaching in through the driver's
2    window punching at Mr. Sanborn. And he was leaning
3    back, you know, dodging the punches.
4 Q. Did she ever make contact with him?
5 A. I don't believe so.
6 Q. Was her fist clenched?
7 A. Yes.
8 Q. How many times did you see her punching at her husband?
9    Or ex-husband?
10 A. More than twice.
11 Q. Was she saying anything?
12 A. Yes, but it was pretty profane and --
13 Q. So she was using swear words?
14 A. Yes.
15 Q. Was she saying the F. word?
16 A. I can't remember.
17 Q. Was she using the A. word?
18 A. Most of the profanity was --
19 Q. Well, if he doesn't want to say it, I'm trying to
20    respect him on that.
21       MS. HUDSON: You can use the words. The
22    court reporter has heard them before. So have we all.
23    Go ahead. Otherwise we are going to have to guess.
24       THE WITNESS: She was calling him about
25    everything, but a white man.

Page 23

1 BY MR. CABOT:
2 Q. Okay.
3 A. So all of the above, I would say.
4 Q. Was she screaming at the top of her lungs? Her voice
5    elevated?
6 A. Yes. Yes.
7 Q. Yes to which one?
8 A. To all of the above.
9 Q. Okay. Was Mr. Sanborn reciprocating either verbally or
10    physically?
11 A. No. He was dodging, it looked like to me.
12 Q. You don't know what occurred before you got out there,
13    though, is that correct? Whether he had tried to hit
14    her or do something to her?
15 A. I have no idea.
16 Q. Okay. You had a police uniform on?
17 A. Yes.
18 Q. And just so I understand. So in the Village Hall, next
19    door is the police department. You kind of can park
20    out front of the Village Hall and the police
21    department. Is that where they were parked?
22 A. Yes.
23 Q. And according to your police report, this occurred at
24    about one o'clock p.m.?
25 A. If that's what is reported, yes.

Page 24

1 Q. Your report says 1300 hours. That's one o'clock?
2 A. That would be correct, yeah.
3 Q. Okay.
4 A. Yes.
5 Q. Was there a crowd being gathered?
6 A. Not that I recall.
7 Q. Do you know if there were any witnesses other than
8    yourself and Ms. Miller?
9 A. Not that I recall.
10 Q. What did you initially do when you went outside and saw
11    that?
12 A. I give the verbal order to stop. And I come up behind
13    Ms. Lowing and grabbed her by the waist, and pulled her
14    away from the truck.
15 Q. When you -- so did you say stop?
16 A. Yes.
17 Q. Or something to that effect?
18 A. Yes.
19 Q. And did she stop punching him when you said stop?
20 A. I can't recall if she stopped. I know she stopped when
21    I grabbed onto her.
22 Q. Okay. Did she ever -- again, we're going to take this
23    sequentially.
24 A. Okay.
25 Q. Now we're at the initial contact with each other.

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

**Dale Gibbs**

Dale Gibbs - Vol. I
June 5, 2018

Page 25

1 A. Okay.

2 Q. When you grabbed her by the waist, did she try to swat

3 you off or anything?

4 A. No.

5 Q. Did she try to flee?

6 A. No.

7 Q. Did she call you any naughty names?

8 A. There, again, just about all the above.

9 Q. She called you names?

10 A. Yes.

11 Q. Okay.

12 A. Along with a recap, short recap, of what went wrong on

13 the divorce court.

14 Q. Okay. So she was telling you about her experience,

15 which would appear to have been negative at whatever

16 proceeding involving the divorce with her and her ex

17 that day?

18 A. Yes.

19 Q. Can you recall generally what she was saying?

20 A. My point right there was to separate the two of them.

21 So I had her somewhat in a bear hug, but took most over

22 to the Village Hall, and I sat her on the chairs in the

23 hallway there, but she was still creating such a

24 disturbance that it was somewhat irritating to the

25 clerk and the treasurer. So I put her right under that

Page 26

1 first picture over there. There was a chair. And I

2 sat her there and I told her to stay put. I was going

3 to talk to her ex, and then I would be getting her side

4 of the issue.

5 Q. All right. So let the record reflect -- and I'm going

6 to just kind of give a narrative here and see if you

7 agree with me, because obviously, other than any us

8 here, we don't know the setup of the Hesperia City

9 Council Village Hall. But basically when you come into

10 the doors, there are some seats there that people can

11 sit in.

12 A. Yes.

13 Q. That's where you initially tried to sit Ms. Lowing?

14 A. Right. It was the closest place.

15 Q. And you never left her, but your testimony is she was

16 creating a disturbance?

17 A. Yup.

18 Q. And you decided to basically bring her down a little

19 bit of a hallway there in the Village chambers and

20 bring her to a large conference, which is where we are

21 at today?

22 A. Yeah. Right.

23 Q. And there's a nice pretty wooden wall with some

24 pictures on it, and you sat her under the picture

25 closest to the door that you brought her in. Is that

Page 27

1 correct?

2 A. That's where the chair was, yes.

3 Q. Okay. Did anybody request that you move her back here

4 or did you do that on your own because --

5 A. I did that on my own, if I recall, yes.

6 Q. And was she crying?

7 A. Yes.

8 Q. Was it kind of a sob cry or just a watery-eye cry?

9 A. Yelling and screaming crying.

10 Q. And did you have an understanding of what this yelling

11 and crying was for?

12 MS. HUDSON: Are you asking him --

13 MR. CABOT: His opinion.

14 MS. HUDSON: Well, was she saying

15 anything?

16 MR. CABOT: Well, did you have an

17 understanding of why she was yelling and crying?

18 THE WITNESS: Because of the way the

19 divorce court went that day.

20 BY MR. CABOT:

21 Q. When you brought her into the Village Hall, did you try

22 to calm her down at all or say anything?

23 A. If I remember correctly, when she was in here --

24 Q. And for the record, that's the conference room?

25 A. The conference room. I explained that I was going out

Page 28

1 to talk to her ex to get his side of the story, and

2 then if she wouldn't calm down, that possibly I would

3 have to take action against her. And she did calm down

4 a little bit.

5 Q. Did she ever refuse to come into the Village Hall or

6 the conference room?

7 A. Not that I know of, because I pretty much carried her

8 in here.

9 Q. Not that you know of?

10 A. Not that I know of.

11 Q. Did she ever try to leave without you telling her she

12 could leave?

13 A. No.

14 Q. When you left and left her in the conference room and

15 went outside, could you hear her?

16 A. No, I didn't hear her.

17 Q. Did you offer her any water or anything?

18 A. No.

19 Q. And what did you do when you went outside?

20 A. I tried to get Mr. Lowing's statement and advised him

21 to leave and come back after I calmed the situation

22 down.

23 Q. When you tried to get a statement, is that a verbal or

24 a written statement?

25 A. A verbal.

Page 29

1  Q.  Did you get that?
2  A.  Yes, I did.
3  Q.  And what was the nature of that statement?
4  A.  That she had been ramming him all the way from White
5      Cloud with her vehicle in the back of his truck.
6  Q.  Was that his words:  Ramming him all the way from White
7      Cloud?
8  A.  Yes.
9  Q.  Did you ever see any evidence that she was, "ramming
10     him all the way from White Cloud" on either of the
11     vehicles?
12 A.  He showed me the rear of his truck, which had a big
13     Reese hitch on it with a ball and an extender, and then
14     I looked at her car and she had three or four holes in
15     the grill.
16 Q.  Okay.
17 A.  Synonymous of what I, as an accident investigator,
18     looked like she hit him and punched holes in the grill.
19 Q.  As an accident investigator, you weren't present at the
20     scene?
21 A.  No.
22 Q.  So you cannot conclude if those holes were caused by
23     her ramming into him, or if he would brake and she made
24     contact because he braked abruptly.  Is that true?
25 A.  Possible.

Page 30

1  Q.  Did you ever ask him if that's what occurred?
2  A.  Yes.
3  Q.  And what did he say?
4  A.  No.
5  Q.  Did you ever take pictures of the vehicles?
6  A.  No.
7  Q.  You said there were two or three holes, I think you
8      said in the grill?
9  A.  At least, yes.
10 Q.  Were there any holes in the bumper?
11 A.  No.
12         (Exhibits 1 through 5 were marked.)
13 BY MR. CABOT:
14 Q.  All right.  I'm going to show you a couple of pictures,
15     which are pictures of the Equinox.  I want you to look
16     at Exhibit 1, after your attorney looks at it, and see
17     if you recognize that vehicle?
18 A.  Uh-hum.
19 Q.  Yes?
20 A.  Yes.
21 Q.  And whose vehicle was that?
22 A.  That would be Ms. Lowing's.
23 Q.  I also want you to take a look at Exhibits 2 and 3 and
24     tell me if you recognize the truck.
25 A.  This looks like Mr. Lowing's.

Page 31

1  Q.  Okay.
2  A.  I don't know what this is of.
3         MS. HUDSON: So when you say "this looks
4      like Mr. Lowing's vehicle", what exhibit is that?
5         MR. CABOT: What exhibit number?
6         THE WITNESS: Oh.  Exhibit No. 2.
7         MS. HUDSON: And you said for No. 3,
8      what?
9         THE WITNESS: I can't recognize what
10     that is.
11 BY MR. CABOT:
12 Q.  Okay.  Looking at the first exhibit with the Equinox.
13     Do you see any damage to the grill or is it to the
14     bumper?
15 A.  The bumper.
16 Q.  Okay.  When you saw the vehicle on December 15th, was
17     there damage to the actual grill, or does what you see
18     exhibited in Exhibit 1 refresh your recollection of
19     what you actually saw, which was to the bumper?
20 A.  This is basically what I saw.  When I say the "grill",
21     the front end of the car.
22 Q.  Okay.  And Exhibit 4.  Do you recognize that vehicle?
23 A.  It looks to be the same as Exhibit No. 1.
24 Q.  Okay.  Did you ever -- and look at Exhibit 5.  Do you
25     recognize that document which purports to be the rear

Page 32

1      of the Equinox?
2  A.  No, I can't make out what that is.
3  Q.  And you completed a UD-10 for this encounter, correct?
4  A.  Yes.
5         MR. CABOT: And we are going to mark
6      that as Exhibit 6.
7         (Exhibit 6 was marked.)
8  BY MR. CABOT:
9  Q.  Can you confirm to me that you recognize Exhibit 6 as
10     being the UD-10 that you completed with respect to this
11     incident?
12 A.  Yes.
13         MS. HUDSON: Take a minute and read it,
14     unless you are already comfortable with it.
15         THE WITNESS: It hasn't been altered so
16     I --
17         MR. CABOT: Well, that's good.
18 BY MR. CABOT:
19 Q.  Is there any particular reason why in the narrative
20     portion on page two of that report you only got
21     Mr. Lowing's version of what occurred versus also
22     incorporating Ms. Lowing's version of what occurred?
23 A.  No.
24 Q.  Did you ever ask Ms. Lowing what occurred with respect
25     to that vehicle encounter?

Page 33

1 A.   When I had her in the office, I asked her the
2       questions: How did the ramming start?  Because he said
3       that she was ramming him.  And she said: I was trying
4       to get his attention.  That's all I can remember.
5 Q.   Okay.
6 A.   And it wasn't a dispute as to how the accident
7       happened.  My investigation at that time was trying to
8       either go complain narrative on this.  I was trying not
9       to lock anybody up.  And there was no physical
10      touching.
11 Q.  Did you ever ask her if she in fact rammed the back of
12      him without him braking?  Does that make sense?  You
13      can ram -- the front of your car can ram somebody
14      because you speed up and hit them while they're moving.
15      Or the front of a vehicle can ram the back of another
16      vehicle because they brake?
17 A.  Right.
18 Q.  And you don't brake fast enough.  Did you ever ask her
19      which one of those scenarios occurred?
20 A.  I don't remember if I did.
21 Q.  Okay.  Did you ever ask Mr. Sanborn to write out any
22      type of statement?
23 A.  No, other than what he gave me to the accident report.
24 Q.  Okay.  So you never asked him to write out a
25      handwritten statement?

Page 34

1 A.   No.
2 Q.   Okay.  Were any tickets issued?
3 A.   No.
4 Q.   And I believe you said you didn't take pictures, right?
5 A.   That's right.
6 Q.   Any estimate of time as to how long you were out
7       talking with Mr. Sanborn from the time you left
8       Mrs. Sanborn to the time you returned?
9 A.   No estimates, other than it wasn't very long.  I wanted
10      him out of there.
11 Q.  Do you think it was less than 15 minutes?
12 A.  Less than 15 minutes, yeah.  I told him to come back
13      and I'd get his statement.
14 Q.  And did he?
15 A.  Yes.
16 Q.  And did he give a written statement at that time?
17 A.  No.
18 Q.  He gave you a verbal?
19 A.  Verbal.
20 Q.  And is that what you wrote down in the police report?
21      The UD-10?
22 A.  Yup.  Yes.
23 Q.  Do you know when he came back?  Was it an hour later?
24      A day later?  A month later?
25 A.  I can't recall.  It was after that we went to the jail.

Page 35

1       So it was a while.
2 Q.   All right.  Same day, though?
3 A.   The same day, yes.
4 Q.   So in less than 15 minutes you came back to Ms. Lowing,
5       is that correct?
6 A.   Yes.
7 Q.   And was she still in the conference room where you left
8       her?
9 A.   Yes.
10 Q.  She hadn't destroyed anything or had she?
11 A.  No.
12 Q.  You didn't hear her out in the street creating a
13      ruckus, did you?
14 A.  No.
15 Q.  What happened when you came back to Ms. Lowing?
16 A.  I'm trying to remember.  I know that she wanted a
17      cigarette.  And I says: As long as she was being nice,
18      we would go out to her car.  And she asked where her
19      cigarettes were.
20 Q.  So did she go out to her car at that point?
21 A.  Yes.
22 Q.  Had there been any discussion by you up to this point
23      of not wanting her to drive because of her condition?
24 A.  Not up until then, no.
25 Q.  So she asked for a cigarette.  And what do you say?

Page 36

1 A.   Yes, she could.  So I walked her to her car.
2 Q.   Okay.  Where were the keys to the car?
3 A.   In the car.
4 Q.   When you walked her to the car, was she having any
5       difficulty walking for any reason?
6 A.   No.  She had a walking cast, if I remember right.
7 Q.   Do you know which leg or foot?
8 A.   I'm thinking the left, but that's just from what I
9       recall.
10 Q.  You've got a 50/50 chance, right?
11 A.  Yup.
12 Q.  When you walked her to the car, was she screaming and
13      hollering at this point?
14 A.  No.
15 Q.  And Mr. Sanborn had left, correct?
16 A.  He's left, right.
17 Q.  When you walked Ms. Sanborn to the car, did you tell
18      her she couldn't leave?
19 A.  Not at that point, no.
20 Q.  Were the keys in the car?
21 A.  Yes.
22 Q.  How does she get in the -- well, does she get in the
23      vehicle?
24 A.  She got in.  If I remember correctly, she reached over
25      at some point in the car to retrieve the cigarettes and

Page 37

1     was sitting in the driver's seat.
2 Q. Okay. Did she have to do anything with the driver's
3     seat to get in?
4 A. No. If I remember.
5 Q. So she got -- did she put both legs in the vehicle?
6 A. I have to say I don't remember. I believe so, but I
7     can't say for certain.
8 Q. Okay. And did she proceed to smoke a cigarette?
9 A. Started to, yes.
10 Q. Did you have any concerns that she was going to start
11     her car and run you over?
12 A. Any concerns?
13 Q. Yeah.
14 A. No. At that time, no.
15 Q. Otherwise, presumably you wouldn't let her in the car,
16     right?
17 A. Right.
18 Q. When you got back to the conference room to get
19     Ms. Lowing, was she still crying?
20 A. I don't remember. It doesn't jump out at me that she
21     still was.
22 Q. And you don't recall any conversation about following
23     her home or anything like that because of her
24     condition?
25 A. Oh yes.

Page 38

1 Q. What was the nature of that conversation, and where was
2     that?
3 A. When we were in the -- when she was in the front seat
4     with a cigarette.
5 Q. Okay.
6 A. She made -- was adamant that she was going to retrieve
7     her dogs that day. And I explained to her in that
8     condition, she shouldn't be going over, because the
9     dogs evidently were controlled by her ex-husband. And
10     I says that could be taken care of, you know, the next
11     day. And I didn't feel it was good for her to drive.
12     At that point I says: You're too upset. And then
13     things --
14 Q. Was she still crying at that point?
15 A. Now she's crying, combative, swearing and -- just like
16     she exploded.
17 Q. Was she swinging at you in the car?
18 A. No. Not there she wasn't.
19 Q. Okay. Where was she parked in relation to the police
20     department and the Village Hall? More in front of the
21     Village Hall or more in front of the police department?
22     Because I notice on the side of the police department
23     it's gravely.
24 A. The vehicle was on the pavement part, but the very edge
25     of the pavement.

Page 39

1 Q. Okay.
2 A. To the farthest side of the building, but not on the
3     gravel part.
4 Q. How far was the car from the gravel?
5 A. From the gravel?
6 Q. Yeah. Like within a couple of feet?
7 A. I'm going to say the length of this table.
8 Q. And this is probably, what, an eight-foot table?
9 A. Seven, I'd say.
10 Q. Okay. Had you -- at this point Ms. Lowing is seated in
11     the vehicle. Had she lit up a cigarette?
12 A. I don't remember if she lit it or was trying to light
13     it. I can't remember.
14 Q. Did she ever try to burn you?
15 A. No.
16 Q. Okay. Up to this point -- so now we're the initial you
17     hear something, see something, she's in the conference
18     room. Now she's in the car.
19 A. Um-hum.
20 Q. At any time up to this point, where she's now seated in
21     the car, did you ever call for backup or assistance?
22 A. Well, I called for civil standby before I even brought
23     her out to the car, when Mr. Lowing and her were still
24     there.
25 Q. So you called for civil standby when she was in the

Page 40

1     conference room?
2 A. Yes.
3 Q. And what is civil standby, for somebody who might not
4     know what that means?
5 A. For lack of a better word, a witness.
6 Q. And that's to another police agency, correct?
7 A. That's true.
8 Q. And that was to --
9 A. Newaygo County.
10 Q. Newaygo?
11 A. Yes.
12 Q. And civil standby, that means somebody -- that's the
13     code word for basically somebody: Please physically
14     come and see what's going on?
15 A. Yeah, backup.
16 Q. Why didn't you call for the other officer that would
17     have been on full-time duty that day?
18 A. Well, none of my officers live in town.
19 Q. Okay. So if you have -- but on this day, would there
20     have been you and another full-time officer who would
21     have been working the streets?
22 A. I would have to say I don't know on that, but if it was
23     a normal day, there wouldn't be one on until five or
24     six.
25 Q. When you called for civil standby, did you say

Elizabeth Lowing v.                    Dale Gibbs                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                                June 5, 2018

---

Page 41

1  anything?  Why you were requesting it or did you just
2  request civil standby, and they know that means
3  somebody comes?
4  A.  Of course I called 911 and I said that I needed an
5  officer there.  I had a domestic.  And I was requesting
6  assistance.
7  Q.  Did you ever see, while Ms. Lowing was in the vehicle,
8  did you ever see her put her hands on the steering
9  wheel and put her head on the steering wheel?
10 A.  Well, that's two parts.  She put her hands on the
11 steering wheel.  Yes, I observed that.  And, yes, I
12 observed her trying to turn the keys.
13 Q.  Did you ever see her put her head on the steering
14 wheel?
15 A.  No.
16 Q.  What do you mean try to turn the keys?
17 A.  Start the vehicle.
18 Q.  Did she ever start it?
19 A.  No.  I grabbed the keys.
20 Q.  Did you tell her anything first?  Like don't turn that
21 car on or anything before you grabbed them?
22 A.  Before that, yes, Deputy Visser and I tried to calm her
23 down.
24 Q.  No.  We're not there.
25 A.  Okay.

---

Page 42

1  Q.  Okay?  Like I said, we're going to go real slow.
2  A.  Okay.
3  Q.  Like a half a puzzle piece.
4  A.  Okay.
5  Q.  So right now we're still before Visser gets there.
6  A.  Oh, he's right there.
7         MS. HUDSON:  Well, he wants to back you
8  up to before Visser got there.
9         THE WITNESS:  Oh, right.  Before he got
10 there?
11        MR. CABOT:  Yeah.
12        MS. HUDSON:  So I think Shawn is trying
13 to back you up to where she's just sitting in the car
14 as you previously described with a cigarette.  I think.
15 But I'll let Shawn do it.
16        MR. CABOT:  That's true.  She's in the
17 car.  Visser is not here yet.
18        THE WITNESS:  No.  No, he's here.
19 BY MR. CABOT:
20 Q.  Okay.  When did he get there in relationship to her
21 getting in the car?
22 A.  Well before we went over to the car.
23 Q.  So he got there when she was still in the conference
24 room?
25 A.  Yes.

---

Page 43

1  Q.  Okay.  And where was he at when you guys -- when the
2  two of you came out of the conference room?
3  A.  Where was he at when we came out of the conference
4  room?  He was in the front doorway to the Village Hall.
5  Q.  So when you took Ms. Lowing to her car, you had to pass
6  Visser?
7  A.  Yes.
8  Q.  Okay.  Did he assist you in any way in getting her to
9  the car?
10 A.  Just walked alongside.
11 Q.  You took Ms. Lowing to the car, though?
12 A.  Yes.
13 Q.  You were the one who --
14 A.  To get her to --
15 Q.  -- escorted her to the car?
16 A.  Escorted her, right.
17 Q.  Was Visser behind you when you did that or was he
18 alongside the two of you?
19 A.  I'm going to say he was alongside of us.
20 Q.  So when she gets into the car and you believe she put
21 both legs in, where -- what's the position of you and
22 Visser?
23 A.  Okay.  The car -- this is the car.
24        MS. HUDSON:  You have to explain it
25 because she can't write down what you're pointing to.

---

Page 44

1         THE WITNESS:  The door is like this.
2  This is the passenger seat and the door is open.  She's
3  here.  I'm here.  Visser is right on my right shoulder.
4         MR. CABOT:  Well, let's do this.
5         THE WITNESS:  Okay.
6         MR. CABOT:  I'm going to give you the
7  instructions on the record, and I'll let you draw it
8  off sitting next to counsel.  Basically, I want you to
9  show me on paper what you just told us.  Okay?
10        THE WITNESS:  Okay.  Sure.
11        MR. CABOT:  We'll have you draw it and
12 we'll make it Exhibit 7.
13        (Exhibit 7 was marked.)
14 BY MR. CABOT:
15 Q.  All right.  Back on.
16        So, Mr. Gibbs, you've been kind enough
17 to draw us, obviously, a rough sketch.  Not drawn to
18 scale.  A general diagram of Ms. Lowing's car and the
19 initial position when she was in the car of her, and
20 you and Deputy Visser.  And it looks like the car was
21 open at that time?
22 A.  Yes.
23 Q.  The car door?
24 A.  Yes.
25 Q.  And when she went in the car and proceeded to smoke a

---

Page 45

1   cigarette, did you guys retreat from the vehicle or --
2 A. I don't know if she actually smoked it or not. I mean
3      I know she was getting it out.
4 Q. So when she got in the car, and you believe she
5      actually proceeded to get one?
6 A. Yes.
7 Q. Did you guys retreat from the vehicle and step back or
8      did you stay right there?
9 A. Stayed right there.
10 Q. Okay. Did Officer Visser say anything at this point?
11 A. From what I can remember was that he was trying to calm
12     her down. Also, when she found out that she wasn't
13     going to be able to retrieve her dogs, and then I
14     thought it was unsafe for her to drive home in her
15     condition, he offered to drive her home and help her
16     retrieve the dogs the next day or have somebody else do
17     it, and she was not having any part of that at all.
18 Q. What was she doing that -- was she saying: No. That's
19     not acceptable. Or what was she doing?
20 A. Verbally chastising him for interfering. I mean the
21     exact words, I don't know.
22 Q. Sure.
23 A. But she was escalating back up.
24 Q. So she was basically verbally saying: That's not going
25     to happen. I'm going to get them today?

Page 46

1 A. Yes.
2 Q. Was she crying at this point?
3 A. At this time she's crying, yelling, screaming.
4 Q. So, obviously, emotionally upset?
5 A. Yes. I believe the dogs were the key factor. And then
6      the second factor was she wasn't going to be able to
7      drive.
8 Q. Okay. Did she put her seatbelt on?
9 A. I don't recall that she did.
10 Q. Did can she ever close the door?
11 A. No.
12 Q. Did she ever get on her cell phone, either to make a
13     call or to receive a call, at any time while she was in
14     that car?
15 A. I don't remember.
16 Q. So at some point -- how long had the three of you been
17     at the car then when you allege she tried to turn the
18     car on? I mean are we talking five, ten minutes? Are
19     we talking a minute or two? Can you kind of give me --
20 A. Under five minutes.
21 Q. So from the time she gets in the car, she's sitting in
22     the car, and you and Visser are standing within the
23     door opening?
24 A. Uh-hum.
25 Q. What's going on for that five minutes? I mean I

Page 47

1      understand it's an estimate, but five minutes is a long
2      time. Were you talking to her? Were you just standing
3      there watching her?
4 A. Trying to calm her down.
5 Q. Okay.
6 A. At one point she stated that she'd lost a child. And
7      that mostly set her off more. And Deputy Visser, if I
8      recall right, he explained that he had just lost his
9      mother and he knew how she felt. And then she really
10     went off on him.
11 Q. What do you mean she went off on him? Verbally again?
12 A. Verbally, because of the fact that losing a child is
13     worse than a mother.
14 Q. Okay. So then what happens? So there's this
15     discussion about loss of family.
16 A. Somewheres between there and that, she reached to
17     put -- turn the key. I reached, grabbed the key.
18 Q. So is that after the discussion about loss of family
19     members that she goes to turn the key?
20 A. Yes.
21 Q. Was the key already in the ignition when she got in or
22     did she at some point reach somewhere and put it in
23     while you guys were standing there?
24 A. I think she put it in sometime before that.
25 Q. Did you see her?

Page 48

1 A. Did I see her?
2 Q. Yeah.
3 A. Yes.
4 Q. Did you say: Get that key out of there?
5 A. No. I don't remember the exact time that she put the
6      key. All I know is when she reached for the key, is
7      when I grabbed her.
8 Q. So she reaches her hand either, you believe, to turn
9      the car on?
10 A. Yes.
11 Q. And so you reach in the car and grabbed what?
12 A. The keys.
13 Q. Okay. Did you grab her hand?
14 A. No.
15 Q. Where was her hand when you got the keys?
16 A. Coming off the keys to my chest.
17 Q. Did she strike you?
18 A. Yes.
19 Q. With a closed fist? An open hand?
20 A. I don't remember.
21 Q. A scratch?
22 A. It felt like an open hand.
23 Q. Did it knock you off balance?
24 A. No.
25 Q. Did it hurt?

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

**Dale Gibbs**

Dale Gibbs - Vol. I
June 5, 2018

---

Page 49

1 A.  No.
2 Q.  Did you have to seek any type of medical treatment?
3 A.  No.
4 Q.  File any type of workmans' comp claim?
5 A.  No.
6 Q.  So when she made contact with your chest, was your hand
7      still on the keys at the ignition?
8 A.  Yes.
9 Q.  Then what happened?
10 A.  I pulled them out.
11 Q.  The keys?
12 A.  The keys. And this time Deputy Visser took control of
13      her with the head up. And he went from -- I was like
14      this.
15 Q.  So you were leaned into the car with your hand towards
16      the ignition with the keys?
17 A.  Yup. Yup.
18 Q.  And then he leaned in?
19 A.  And got her.
20 Q.  Okay. It seems like a tight squeeze.
21 A.  It's a pretty fair opening in that car.
22 Q.  Okay. So you were -- if I still understand the
23      positioning, you were closest to the crook of the door?
24 A.  The crook of the door, right.
25 Q.  It's probably not very police terminology, but --

---

Page 50

1 A.  Yeah.
2 Q.  For a lay person, crook of the door works?
3 A.  Yup.
4 Q.  And did he have to move you to get to her at all? Like
5      kind of push you aside or --
6 A.  Not that I -- not that I recall.
7 Q.  Okay. So he might have. You don't remember?
8 A.  That's right, but I don't remember.
9 Q.  Okay. What does he do when he moves in? Is his body
10      moving in? Is his arm moving in?
11 A.  His arm were in -- my head was down like this with the
12      keys, and I'm starting to pull out. And he's already
13      got control of her from the chest up.
14 Q.  How does he have control?
15 A.  He's putting an orbital move on her.
16 Q.  A what?
17 A.  Orbital move.
18 Q.  What's an orbital move?
19 A.  A pain compliant.
20 Q.  Well, I understand that. But if you can describe the
21      physical maneuver. What -- and it looked like you took
22      your hand --
23 A.  You come across. You go underneath the nose, and you
24      bring them back like this.
25 Q.  Okay. So basically you put the person's nose between

---

Page 51

1      your thumb and your index finger?
2 A.  Um-hum.
3 Q.  Put it under their nose and lift up and back? That's
4      kind of how you do it?
5 A.  You can do it that way, yes. You have to remember this
6      all happened quick.
7 Q.  I understand that. That's why I'm taking it real slow.
8      Probably much to your chagrin, but that's why I do it
9      because I know --
10 A.  Yeah.
11 Q.  What reaction, if any, does she have to that maneuver?
12 A.  Well, the first maneuver is when he reached over to
13      keep her from striking me again, I'm assuming, because
14      my head was down like this when she caught me right
15      here. And then somewhere in there I saw her hand go
16      back like this. And I'm assuming that's when she hit
17      Deputy Visser.
18 Q.  Did you ever see her hit him?
19 A.  Well, I heard something, but I didn't see anything.
20 Q.  Okay. When the hand went back up, was that after he
21      had -- was in the process of doing that?
22 A.  No. No. The orbital move and everything else was when
23      she was under arrest for assaulting two police
24      officers.
25 Q.  But I'm asking did the hand go back in the process of

---

Page 52

1      that orbital maneuver being done?
2 A.  No. No.
3 Q.  Or was it after?
4 A.  No, that was done after.
5            MS. HUDSON: Well, so the record is
6      clear. What was done after what?
7            THE WITNESS: Well, he put the orbital
8      move on her after she struck him.
9            MS. HUDSON: Okay.
10 BY MR. CABOT:
11 Q.  So let's go through the sequence, according to your
12      testimony, just so that the record is clear.
13            You reach in to get the keys and she
14      makes contact initially with your chest.
15 A.  Yes.
16 Q.  You have your hands on your keys -- on her keys, and
17      then Deputy Visser does the pain --
18 A.  No.
19 Q.  Okay. What happens next? So you got the contact with
20      chest.
21 A.  He reaches to block her from punching at me. I'm
22      assuming that's what he was doing, but he hasn't got
23      her in the orbital move.
24 Q.  Okay. Now, after the contact with the chest, did you
25      see her try to strike you again?

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs - Vol. I
June 5, 2018

Page 53

1 A. No.
2 Q. But you believe she was and that's why he reached in?
3 A. I'm assuming.
4 Q. But you don't know?
5 A. No.
6 Q. So then what happens next? He reaches in?
7 A. He's got the orbital move on her now.
8 Q. So he reaches in and then he does that orbital move,
9    right?
10 A. After she makes contact with him, right.
11 Q. Okay. How does she do that? We're missing that piece.
12 A. She hits me.
13 Q. Right.
14 A. He tries to stop her.
15 Q. Yup.
16 A. She comes back like that.
17 Q. Okay. And with her -- which hand? Left or right?
18 A. I'm thinking it's right.
19 Q. Okay. So does she move it in front of her or move it
20    behind her, her right hand?
21 A. It looks like she was coming back to her head here.
22 Q. Well, then how would she get -- she'd have to go around
23    the whole back of her body to get him, wouldn't she, if
24    she used her right hand?
25 A. No. I can -- from here, I can pretty much put you out.

Page 54

1    Just that close.
2 Q. Yeah, but he was still in the driver's side door,
3    right?
4 A. I was here. He was here. She's here. She strikes me.
5    He tries to stop her. She comes back like that. He
6    comes in. Now he's bringing her out.
7 Q. Does her right arm go in front of her or behind her?
8 A. I couldn't tell which way it went. All I can hear was
9    the sound of her hitting him.
10 Q. That's your assumption?
11 A. Assumption.
12 Q. You didn't see contact?
13 A. No. I didn't see the contact, no.
14 Q. And then that's when he basically puts his hand under
15    her nose?
16 A. Yup.
17 Q. Okay. And does she come out of the car at that point?
18 A. Yes.
19 Q. And how does she come out of the car? On her two feet?
20    Is she pulled out? How does she get out of the car?
21 A. She was being pulled out.
22 Q. By whom?
23 A. Deputy Visser.
24 Q. How? Still with that pain thing?
25 A. Pain. And he's also got his arm around her.

Page 55

1 Q. Okay.
2 A. As she come out, I grabbed her legs because she had the
3    cast on it. And as we set her on her rear end on the
4    ground, I put the legs down, Deputy Visser turned her
5    over and put the cuffs on her.
6 Q. Okay. Did she land on her buttocks from the car?
7 A. Yeah. She was sat down on her buttocks, yes.
8 Q. Okay. Did her head ever come in contact with the
9    concrete?
10 A. Never.
11 Q. Any reason to pull her out and slam her head on the
12    concrete?
13 A. No.
14 Q. That would be unreasonable or excessive force, wouldn't
15    it?
16 A. Yes, it would be.
17 Q. So she sat on her buttocks. Does she ever go to her --
18    lay on her side or is she caused to lay on her side?
19 A. Only when he turned her to pick her up.
20 Q. After she's cuffed?
21 A. Yeah. After she's cuffed, right.
22 Q. Who cuffed her?
23 A. Deputy Visser.
24 Q. Was there any warning given to Ms. Lowing prior to the
25    force being used by Visser? Did you hear anything? A

Page 56

1    warning given? You know what? If you don't calm
2    down --
3 A. Well, I told her that through the very first
4    conversation with her when her husband was there, that
5    if she didn't calm down, it could wind up in her being
6    arrested.
7 Q. Okay. But was she ever warned that force could be used
8    against her if she didn't calm down by you or Visser in
9    the moments before?
10 A. Right when she started -- when he started pulling her
11    out: Quit resisting.
12 Q. What was she doing to resist?
13 A. Anything and everything.
14 Q. Well --
15 A. I mean she was squirming. She didn't want to come.
16 Q. Did she ever brace her feet in the car?
17 A. She could have, but I grabbed the one with the -- I
18    think it was a walking cast, and the other one, and
19    held those while he set her down on her butt.
20 Q. So she could have, but she didn't, that you're aware
21    of?
22 A. That I am aware of that did she brace her foot?
23 Q. Um-hum.
24 A. I think at one time she might have gotten underneath
25    the brake pedal.

Elizabeth Lowing v.
Justin Visser, Newago County, et. al.

**Dale Gibbs**

Dale Gibbs - Vol. I
June 5, 2018

---

Page 57

1  Q.  Do you know if that was deliberate or a natural
2      reaction of getting pulled out of the car?
3           MS. HUDSON: Object to form.
4           THE WITNESS: I can't say.
5  BY MR. CABOT:
6  Q.  You don't know?
7  A.  Uh-huh.
8  Q.  Okay.  Is that a no?
9  A.  No.
10 Q.  So after -- did it -- it didn't take two of you to
11     handcuff her, did it?
12 A.  No.
13 Q.  What happens after she's handcuffed?
14 A.  Deputy Visser helped her up.
15 Q.  Okay.
16 A.  Took her over to his vehicle and placed her in the back
17     seat.  Placed the seatbelt on her.  I told Deputy
18     Visser to stand by.  I was going to get my car and
19     follow him to the jail because if she decided to have a
20     problem, at least I would be there to back him up.
21 Q.  So you followed him to the jail?
22 A.  Yes, I did.
23 Q.  Any problems?
24 A.  No.  That I could see.
25 Q.  When Visser was -- they were having this discussion

---

Page 58

1      about the loss of loved ones --
2  A.  Uh-hum.
3  Q.  -- how close would you estimate he was from Ms. Lowing?
4  A.  I'm going to say between -- about like this.  The heads
5      are pretty close together.
6  Q.  So within 12 to 18 inches?
7  A.  I'm in what you call the crook of the car at this time.
8  Q.  So 12 to 18 inches face-to-face?
9  A.  I guess so.  I can't remember.
10 Q.  I don't -- you can disagree with me.  That's okay.  You
11     wouldn't be the first.
12           MS. HUDSON: What do you mean by close?
13     How close?
14           THE WITNESS: I'm going to say about
15     from me to you.  So whatever.  What is that?  About 12
16     to --
17 BY MR. CABOT:
18 Q.  Twelve to 18 inches?
19 A.  Yeah.
20 Q.  Was his voice raised?  Or don't you remember?
21 A.  I don't remember.
22 Q.  Did he ever yell at her?
23 Q.  Did he ever yell at her?
24 Q.  Yeah.
25 A.  I remember him yelling to quit resisting.

---

Page 59

1  Q.  And what was going on when he said those words?
2  A.  She was flaying being pulled out of the car.
3  Q.  So we talked about this earlier.  This was done
4      right -- basically, right outside the police
5      department?
6  A.  Yes.
7  Q.  Is there any surveillance camera?
8  A.  No.
9  Q.  Was there a surveillance camera there?
10 A.  No.  We're lucky to have cameras in our car.
11 Q.  Did anybody ask Ms. Lowing to get out of her vehicle?
12 A.  The patrol car vehicle or her vehicle?
13 Q.  Her vehicle.  When you and Visser are there.  Did
14     anybody say --
15 A.  I don't recall.
16 Q.  Did she ever indicate to you and Visser the condition
17     of her foot or that she had a broken foot, or anything
18     like that?
19 A.  I don't recall if she ever said anything.
20 Q.  Did she ever indicate to the two of you that before she
21     got out of the car, she had to move her seat back?
22 A.  No.
23 Q.  And the car door was open this entire time, is that
24     correct?
25 A.  Yes.

---

Page 60

1  Q.  When Ms. Lowing actually got out of the vehicle, did
2      she ever have to fix her boot or did her boot look like
3      it had partially come off, or didn't you pay attention?
4  A.  I didn't pay attention.  Because the last time I had a
5      hold of it was when she was being set on the ground,
6      and nothing jumped out at me coming off.
7  Q.  Did she ever ask you for any help during this encounter
8      with Visser while you were there?
9  A.  No.
10 Q.  Did you ever see any injuries on Ms. Lowing?  Like
11     maybe an ear bleeding or anything like that?
12 A.  None.
13 Q.  Did you ever hear Ms. Lowing complain that the cuffs
14     were too tight?
15 A.  No.
16 Q.  If Ms. Lowing had asked -- had complained that the
17     cuffs were too tight, even though you didn't put them
18     on, would you -- would you have checked them?  Were you
19     under a duty to at least check them to see if they're
20     too tight?
21 A.  If she complained that they were too tight, I'm sure
22     Deputy Visser would have checked them, but I would --
23     if he didn't, you know, I would have asked him to check
24     them, but that complaint never come about.
25 Q.  Okay.

Elizabeth Lowing v.  
Justin Visser, Newago County, et. al.

Dale Gibbs

Dale Gibbs - Vol. I  
June 5, 2018

Page 61

1 A.  That I recall.

2 Q.  Did you ever see Deputy Visser double lock or check the

3      cuffs for tightness?  You never saw that, did you?

4 A.  No.  I didn't see that, no.

5 Q.  You would agree with me that an officer is supposed to

6      double lock and check for tightness?

7 A.  Oh, yes.

8 Q.  How was Ms. Lowing put in the squad car?

9 A.  In the squad car?

10 Q.  Yes.  Did you assist in escorting her there?

11 A.  I assisted in escorting her over there.  Deputy Visser

12      sit her down in the car.

13 Q.  Was she in an upright position?

14 A.  Upright position and placed the seatbelt on her.

15 Q.  No reason to toss her long ways in the car, was there?

16 A.  No.

17 Q.  That wouldn't be necessary, would it?

18 A.  No.

19 Q.  That wouldn't be reasonable, would it?

20 A.  No.

21 Q.  Did you go into the jail with them?

22 A.  When we pulled up, the Sally port door opened up, there

23      was three or four jail personnel there as Deputy Visser

24      pulled in, and I just advised him that I was leaving.

25      There was no need for me to be there.

Page 62

1 Q.  If you would have saw a problem, you would have stuck

2      around and helped, right?

3 A.  Right.

4 Q.  And you didn't see any problem, correct?

5 A.  No.

6 Q.  That's why you didn't stick around, correct?

7 A.  That's right.

8 Q.  I'm going to show you a copy of your police report.

9         (Exhibit 8 was marked.)

10  BY MR. CABOT:

11 Q.  Let me give you and your attorney a copy of that, and

12      ask you if you recognize it?

13 A.  Yes.

14 Q.  And it's a three-page police report, correct?

15 A.  Yes.

16 Q.  And that's your initials on the first page at the

17      bottom right corner?

18 A.  Right.

19 Q.  And your signature indicates that it's complete and

20      accurate, correct?

21 A.  Yes.

22 Q.  The first question I have is when did you draft this

23      report?

24 A.  It was after the fact, but I don't remember the time.

25 Q.  According to the first page -- and this is after 15

Page 63

1      years of reading these things, but feel free to correct

2      me if I'm incorrect -- there's an original date which

3      says Wednesday, January 20th, 2016.  That normally

4      indicates the date that the report is drafted.

5 A.  Right.

6 Q.  Does that comport with your recollection of when you

7      would have sat down to draft this report?

8 A.  No.  I don't exactly know the date that it was drafted,

9      but the change was done at the direction of the

10      prosecutor.

11 Q.  What change?

12 A.  That went to December 15th.  This is the time and date

13      that this was supposed to be happening.

14         MS. HUDSON:  You're looking at two

15  different parts of the police report.

16         MR. CABOT:  I want you to go up at the

17  very top.

18         MS. HUDSON:  He's asking you to look

19  here.  The original date.

20         THE WITNESS:  Right.

21         MS. HUDSON:  He asked you if that was

22  the date that you drafted it.

23         THE WITNESS:  No.  I doubt that, but I

24  can't remember.

25  BY MR. CABOT:

Page 64

1 Q.  So do you know if you -- but you didn't draft it that

2      day?

3 A.  No.  No.

4 Q.  Did you draft it before the end of the year?

5 A.  I'm assuming I did, but I don't remember.

6 Q.  Because the other part that gets confusing to me, thus

7      why I'm asking you, we can agree on one thing:  The

8      incident involving Ms. Lowing happened on December 15,

9      2015?

10 A.  Right.

11 Q.  Now, if you look down a little bit further on the first

12      page in the section called Date and Time?

13 A.  Um-hum.

14 Q.  It says on or after Thursday, January 14, 2016.

15 A.  Uh-hum.

16 Q.  So, help me out.  We've got at the very top January 20,

17      2016.

18 A.  Uh-hum.

19 Q.  We have the day of the incident, which is December 15,

20      2015.

21 A.  Uh-hum.

22 Q.  And then a little bit later we have this date of

23      January 14, 2016.  What are all these different dates

24      in this police report for an incident that took place

25      on December 15, 2015?

Elizabeth Lowing v.      **Dale Gibbs**      Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.      June 5, 2018

---

Page 65

1          MS. HUDSON: I'll just object to the
2  form, because it also contains a handwritten correction
3  of the date on the lower part of the page. Go ahead
4  and answer if you can.
5          THE WITNESS: And I don't really
6  remember.
7  BY MR. CABOT:
8  Q.  What change was made? You mentioned the prosecutor had
9     you make a change. What change was that?
10  A.  Right. He instructed that that should have been
11     December the 15th.
12  Q.  Okay.
13          MR. CABOT: Let me see yours.
14          MS. HUDSON: (Indicating.)
15  BY MR. CABOT:
16  Q.  How did that change come about? Did he give you a call
17     or did he come to the office or --
18  A.  When I was over there to go over the report with him,
19     that's when he brought it to my attention.
20  Q.  Okay. So we know the report wasn't written on the day
21     of the incident?
22  A.  No.
23  Q.  You don't recall when it was written, correct?
24  A.  That's correct. Which date, no.
25  Q.  When you went down to write it, did you have any notes?

---

Page 66

1     Did you take any notes regarding this incident? Like,
2     I know a lot of officers have a little notepad or a
3     spiral-bound thing?
4  A.  No, not on this. Other than the police report that
5     I've used as far as the horsepower, the names, the
6     dates, the date of births, location, addresses.
7  Q.  How would you know that stuff?
8  A.  That would all be on the file check of everybody
9     involved.
10  Q.  What do you mean file check?
11  A.  It means a criminal case history, accident report, LEIN
12     messages.
13  Q.  Okay. How old were you at the time this incident
14     occurred?
15  A.  Well, let's see. Two and a half -- I would have been
16     72.
17  Q.  Any issues with your memory that you were aware of?
18  A.  Not that I recall.
19  Q.  Were you on any medications at the time that may have
20     an effect on memory.
21  A.  No.
22  Q.  As I read -- as I read through this, if you didn't take
23     notes on it, how -- how would you remember more of
24     these details? Like, for example, Mr. Sanborn telling
25     you that Ms. Sanborn was allegedly heavy into drugs and

---

Page 67

1     that she needed help? Or where they exactly were on
2     Highway M-20 by the Dollar General Store when the
3     incident took place? How did you remember all those
4     things without taking notes?
5  A.  Well, obviously, he's -- with previous testimony here
6     is he contacted me about her using drugs and his
7     efforts to get a divorce, and then he reaffirmed it
8     here. On the UD-10 I got information about where they
9     were at and what happened.
10  Q.  Okay. Did you ever do any measurements from the
11     trailer hitch to the truck versus the damage to the car
12     to see if in fact it would line up to cause the damage
13     to the Equinox?
14  A.  No.
15  Q.  Did you have any training on accident reconstruction
16     through a college or anything like that?
17  A.  Other than accident investigator training that we have
18     from the Academy, I'm not an accident reconstruction
19     specialist.
20  Q.  And when did you have that class in the Academy?
21  A.  Oh --
22  Q.  A decade is good.
23  A.  Well, I've gone through classes post training in
24     Wyoming, MSP in Lansing, and Kent County Sheriff's
25     Office.

---

Page 68

1  Q.  When was that?
2  A.  Kent County Sheriff's Office?
3  Q.  (Nods head.)
4  A.  That would have been -- let's see. I was working for
5     the City of Rockford. So that would have been 1982 to
6     '84.
7  Q.  When Mr. Sanborn allegedly told you that Ms. Sanborn
8     was heavy into drugs, did he indicate -- I mean it kind
9     of makes one think -- make it seem like it was street
10     drugs. Do you know if it was street drugs or
11     prescribed medication, or don't you know?
12  A.  I recall that most of the medications that he stated
13     that she was taking was medications.
14  Q.  Did you ever mention to Ms. Lowing that you would
15     follow her home or that you would get her a ride home?
16  A.  I said that I would make sure that she could get her
17     dogs the following day. Deputy Visser is the one that
18     said he would drive her home. I never mentioned that I
19     would follow her home.
20          (Exhibit 9 was marked.)
21  BY MR. CABOT:
22  Q.  I am going to show you a handwritten statement by --
23     purportedly by Mr. Sanborn. I'm just curious if you've
24     ever seen that handwritten statement before and if you
25     had, if you requested that he write that?

---

Page 69

1 A.   I don't remember asking him to make out a handwritten
2       statement.
3 Q.   And did you ever ask Ms. Lowing to give a handwritten
4       statement?
5 A.   No.
6 Q.   Okay.  Did you, at any time prior to Visser's arrival,
7       indicate to Visser what had gone on between Ms. Sanborn
8       and her ex-husband that day?
9              MS. HUDSON: I'm going to object to the
10      form because you said before he arrived did he tell
11      Visser what had gone on that day.
12 BY MR. CABOT:
13 Q.   Yeah.  Before Visser physically got there, had you
14      talked to him and tell him that they were involved in
15      some court hearing and any of that?
16 A.   No.  I didn't even know who was showing up until he
17      arrived.
18 Q.   When he arrived, did you ever have a conversation
19      before you got to the car about that they were involved
20      in some --
21 A.   Just that I had an ongoing domestic.
22 Q.   Did Ms. Sanborn ever talk to him in your presence about
23      what had transpired earlier that day in court?
24 A.   Not that I recollect.
25 Q.   Did Visser ever tell -- well, did you ever hear Visser

Page 70

1       tell Ms. Sanborn that she was going to be given a ride
2       home and that he felt it was unsafe that she drive?
3 A.   Did --
4 Q.   Visser?
5 A.   Did Visser tell her that I was going to give her a
6       ride?
7 Q.   Did you ever hear a discussion between Visser and my
8       client about getting a ride home somehow?
9 A.   Yes.  Yes.
10 Q.   And when did that occur?
11 A.   That was when she was in the front seat of the car, and
12      he tried to say that he would get her a ride home.
13      That's when we were telling her that she was too
14      distraught to be driving.
15 Q.   Was she screaming at him at that point?
16 A.   Boy, she was up and down, but I would say that she was
17      on her way up.  But she wasn't screaming yet.  She was
18      after that.
19 Q.   Okay.  Do you know why Deputy Visser would write in his
20      report that when he reached into the car, you were on
21      his right side?
22              MR. CROSS: Object to foundation.
23 BY MR. CABOT:
24 Q.   That doesn't comport with your memory and version, is
25      that correct?

Page 71

1 A.   That's right.
2 Q.   Did you ever see Visser reach into the car in an
3       attempt to help her out of the car and assist her?
4 A.   To help her out?  You mean this is before she was
5       arrested?
6 Q.   Yes.
7 A.   No.
8 Q.   Where do you claim she struck you?
9 A.   Right up in here someplace.
10 Q.   In the chest somewhere?
11 A.   Yes.
12 Q.   Okay.  Did you ever see Visser get struck?
13              MS. HUDSON: Objection.  Asked and
14      answered.
15              MR. CABOT: I forgot what your answer
16      was.
17              MS. HUDSON: He said he did not.
18 BY MR. CABOT:
19 Q.   Did Visser ever tell you he got struck by Ms. Lowing?
20 A.   I don't recall.
21 Q.   Would you characterize Ms. Lowing as screaming so bad
22      that you guys couldn't get a word in edge-wise?
23 A.   At times, yes.
24 Q.   And your understanding of that was because of what
25      happened in court?

Page 72

1 A.   Right.
2 Q.   With the now ex-husband?
3 A.   Yes.
4 Q.   Prior to Visser reaching into the car, did he ever
5       indicate that he was going to try to assist her out of
6       the vehicle?
7 A.   No.
8 Q.   Did you ever hear any verbal commands by Visser after
9       he reached in the car for her to get out of the car?
10              MS. HUDSON: Other than what he's
11      already testified to?
12              THE WITNESS: Yeah.
13 BY MR. CABOT:
14 Q.   Other than -- when he reached in, and we're at that
15      point, did you ever hear him give commands at that
16      point to get out of the car?
17              MS. HUDSON: Well, I'm going to object.
18      Asked and answered.  He's already testified to what
19      Visser said.
20 BY MR. CABOT:
21 Q.   Go ahead.  Did he?  After he reached in the car?
22 A.   After he reached in the car --
23 Q.   Did he ever say -- tell her to get out?  And if so, how
24      many times?  If you heard that?
25 A.   I know he said -- my words, recollection -- quit

Page 73

1  resisting and -- long before that, he actually putting
2  the habeas grabus on her and pulling her out of the
3  car, you know, he made mention that she should get out
4  of the car and he would give her a ride home. In that
5  context, I don't know when that was, but it was long
6  before the physical part came in.
7  Q. Did you ever speak with Ms. Lowing about this incident
8     after it occurred?
9  A. No.
10 Q. Did you ever testify at any court hearings?
11 A. No.
12 Q. Why did you in your Interrogatory Answers definitively
13    state that Ms. Lowing hit Deputy Visser? And you said
14    today you didn't know if he did or didn't?
15 A. Well, you asked me if I saw it. I said I didn't see
16    it. I heard it.
17 Q. Okay. But you don't know that what you heard could
18    have been many other things?
19 A. She struck something and it wasn't -- it was knowing.
20 Q. Did you hear any type of physical response from Visser?
21    Like ouch or don't hit me?
22 A. No.
23        MR. CABOT: I don't have anything
24    further at this time. Some of the other counsel might.
25        MR. CROSS: I don't have any questions.

Page 74

1        MS. HUDSON: I don't. We're all set.
2    (Deposition concluded at 11:45 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 75

1              CERTIFICATE
2  STATE OF MICHIGAN)
3                   ) SS:
4  COUNTY OF INGHAM )
5
6        I certify that this transcript,
7  consisting of 75 pages, is a complete, true, and
8  correct record of the testimony of DALE GIBBS, held in
9  this case on June 5, 2018.
10       I also certify that prior to taking this
11  deposition, DALE GIBBS, was duly sworn to tell the
12  truth.
13
14  _____
15  JAYNE M. JONES, CSR2457
    Notary Public, Ingham County, Michigan
    Acting in Newaygo County, Michigan
    My Commission Expires: 12-31-2019.
    Dated: This 5th day of June, 2018
16
17
18
19
20
21
22
23
24
25

Case 1:17-cv-00650-GJQ-RSK   ECF No. 47-3 filed 11/28/18   PageID.1011   Page 22 of 31

Elizabeth Lowing v.                    Dale Gibbs                    Dale Gibbs – Vol. I
Justin Visser, Newaygo County, et. al.                              June 5, 2018

## 1

1 (4)
   30:12,16;31:18,23
10:00 (1)
   5:11
11:45 (1)
   74:2
12 (3)
   58:6,8,15
1300 (1)
   24:1
14 (2)
   64:14,23
15 (11)
   6:1;17:12;20:19;21:2;
   34:11,12;35:4;62:25;
   64:8,19,25
15th (3)
   31:16;63:12;65:11
18 (3)
   58:6,8,18
1982 (1)
   68:5

## 2

2 (2)
   30:23;31:6
20 (1)
   64:16
2009 (1)
   12:7
2010 (1)
   12:8
2011 (3)
   9:23,24;12:4
2015 (12)
   6:1;15:17,24,25;
   17:12;18:12;19:8;20:19;
   21:2;64:9,20,25
2016 (5)
   10:1;63:3;64:14,17,23
2018 (4)
   5:2;10:1,2;12:4
20th (1)
   63:3
24/7 (1)
   16:22

## 3

3 (2)
   30:23;31:7
302 (1)
   15:3

## 4

4 (1)
   31:22
44 (1)

13:8

## 5

5 (3)
   5:2;30:12;31:24
50/50 (2)
   20:1;36:10
51 (1)
   15:3

## 6

6 (3)
   32:6,7,9

## 7

7 (2)
   44:12,13
72 (1)
   66:16

## 8

8 (1)
   62:9
84 (1)
   68:6
87 (1)
   13:20
88 (1)
   13:20

## 9

9 (1)
   68:20
911 (1)
   41:4

## A

able (2)
   45:13;46:6
above (1)
   23:3,8;25:8
abruptly (1)
   29:24
academy (5)
   13:15,21,24;67:18,20
acceptable (1)
   45:19
accepted (1)
   12:25
accident (8)
   29:17,19;33:6,23;
   66:11;67:15,17,18
according (3)
   23:23;52:11;62:25
accurate (2)
   11:9;62:20
Acquainted (1)

18:3
across (3)
   6:22;19:24;50:23
Act (1)
   15:3
action (2)
   11:16;28:3
active (1)
   16:24
activity (1)
   18:6
actual (1)
   31:17
actually (5)
   31:19;45:2,5;60:1;
   73:1
adamant (1)
   38:6
addresses (1)
   66:6
administration (2)
   13:14,14
administrator (6)
   14:15,15,16;15:2,4,21
advice (1)
   11:5
advised (2)
   28:20;61:24
affairs (1)
   12:20
affidavits (1)
   15:5
again (8)
   7:4,10;18:11;24:22;
   25:8;47:11;51:13;52:25
against (3)
   11:6;28:3;56:8
agencies (2)
   16:12;19:18
agency (3)
   18:20;19:3;40:6
aggressor (1)
   18:18
ago (3)
   6:10,11;13:6
agree (5)
   10:16;21:16;26:7;
   61:5;64:7
agreement (1)
   5:19
ahead (3)
   22:23;65:3;72:21
aid (1)
   14:12
Albany (1)
   12:14
allege (1)
   46:17
allegedly (2)
   66:25;68:7
Along (1)
   25:12
alongside (3)

43:10,18,19
altercation (2)
   21:10,11
altered (1)
   32:15
always (2)
   6:17,23
amount (1)
   16:9
amuck (1)
   12:10
answered (2)
   71:14;72:18
appear (1)
   25:15
appointed (3)
   12:9;15:4,13
Approximately (2)
   16:4,5
April (1)
   10:1
arm (4)
   50:10,11;54:7,25
around (9)
   13:20;14:23;16:11,12,
   17;53:22;54:25;62:2,6
arrest (1)
   51:23
arrested (2)
   56:6;71:5
arrival (1)
   69:6
arrived (3)
   69:10,17,18
aside (1)
   50:5
assaulting (1)
   51:23
assigned (1)
   16:9
assist (5)
   18:21;43:8;61:10;
   71:3;72:5
assistance (3)
   19:18;39:21;41:6
assisted (1)
   61:11
assists (1)
   19:20
Association (1)
   14:8
assuming (5)
   51:13,16;52:22;53:3;
   64:5
assumption (2)
   54:10,11
attempt (1)
   71:3
attention (4)
   33:4;60:3,4;65:19
attorney (4)
   6:2;11:4;30:16;62:11
attorneys (2)

5:24;8:16
aware (7)
   18:6;20:6,9;21:5;
   56:20,22;66:17
away (2)
   10:23;24:14

## B

back (35)
   5:25;14:1,21;15:16,
   24;19:8;21:7;22:3;27:3;
   28:21;29:5;33:11,15;
   34:12,23;35:4,15;37:18;
   42:7,13;44:15;45:7,23;
   50:24;51:3,16,20,25;
   53:16,21,23;54:5;57:16,
   20;59:21
backed (1)
   18:22
background (1)
   9:11
backtracking (1)
   19:14
backup (2)
   39:21;40:15
bad (1)
   71:21
balance (1)
   48:23
ball (1)
   29:13
based (1)
   19:16
basically (12)
   15:3,18;19:21;26:9,
   18;31:20;40:13;44:8;
   45:24;50:25;54:14;59:4
basis (2)
   15:11,15
bear (1)
   25:21
became (1)
   14:2
become (1)
   21:5
behind (4)
   24:12;43:17;53:20;
   54:7
belong (2)
   14:5,10
best (1)
   8:8
better (2)
   21:12;40:5
big (1)
   29:12
births (1)
   66:6
bit (6)
   13:10;19:14;26:19;
   28:4;64:11,22
bleeding (1)

Case 1:17-cv-00650-GJQ-RSK  ECF No. 47-3 filed 11/28/18  PageID.1012  Page 23 of 31

Elizabeth Lowing v.                    Dale Gibbs                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                              June 5, 2018

60:11
**block (1)**
52:21
**board (1)**
10:24
**Bob (1)**
10:20
**body (2)**
50:9;53:23
**boot (2)**
60:2,2
**both (2)**
37:5;43:21
bottom (1)
62:17
**Boy (1)**
70:16
**brace (2)**
56:16,22
**brake (4)**
29:23;33:16,18;56:25
**braked (1)**
29:24
**braking (1)**
33:12
**break (2)**
7:22,25
**bring (3)**
26:18,20;50:24
**bringing (1)**
54:6
**broken (1)**
59:17
**brought (4)**
26:25;27:21;39:22;
65:19
**building (1)**
39:2
**bumper (4)**
30:10;31:14,15,19
**bunch (1)**
6:4
**burn (1)**
39:14
**butt (1)**
56:19
**buttocks (3)**
55:6,7,17

---

**C**

**CABOT (50)**
5:14,17,22,23;11:8,15,
21,23;15:16,23;17:7;
18:13,17;20:15,17;23:1;
27:13,16,20;30:13;31:5,
11;32:5,8,17,18;42:11,
16,19;44:4,6,11,14;
52:10;57:5;58:17;62:10;
63:16,25;65:7,13,15;
68:21;69:12;70:23;
71:15,18;72:13,20;73:23
**call (9)**

---

14:21;16:8;25:7;
39:21;40:16;46:13,13;
58:7;65:16
**called (7)**
18:21;25:9;39:22,25;
40:25;41:4;64:12
**calling (1)**
22:24
**calls (3)**
15:19;18:8,9
**calm (9)**
27:22;28:2,3;41:22;
45:11;47:4;56:1,5,8
calmed (1)
28:21
**came (8)**
21:7,20;34:23;35:4,
15;43:2,3;73:6
**camera (2)**
59:7,9
**cameras (1)**
59:10
**can (24)**
6:13;12:24;13:19;
17:1;22:21;23:19;25:19;
26:10;32:9;33:4,13,13,
15;45:11;46:10,19;
50:20;51:5;53:25,25;
54:8;58:10;64:7;65:4
**capacity (1)**
12:23
**car (79)**
16:25;29:14;31:21;
33:13;35:18,20;36:1,2,3,
4,12,17,20,25;37:11,15;
38:17;39:4,18,21,23;
41:21;42:13,17,21,22;
43:5,9,11,15,20,23,23;
44:18,19,20,23,25;45:4;
46:14,17,18,21,22;48:9,
11;49:15,21;54:17,19,
20;55:6;56:16;57:2,18;
58:7;59:2,10,12,21,23;
61:8,9,12,15;67:11;
69:19;70:11,20;71:2,3;
72:4,9,9,16,21,22;73:3,4
**care (1)**
38:10
**carried (1)**
28:7
**case (2)**
11:25;66:11
**cast (3)**
36:6;55:3;56:18
**catch (1)**
7:8
**caught (1)**
51:14
**cause (2)**
5:6;67:12
**caused (2)**
29:22;55:18
**cell (1)**

---

46:12
**certain (1)**
37:7
**certainly (1)**
7:23
**certification (1)**
14:3
**certified (1)**
16:12
**chagrin (1)**
51:8
**chair (2)**
26:1;27:2
chairs (1)
25:22
**chambers (1)**
26:19
**chance (1)**
36:10
**change (6)**
63:9,11;65:8,9,9,16
**characterize (1)**
71:21
**chastising (1)**
45:20
**check (6)**
60:19,23;61:2,6;66:8,
10
**checked (2)**
60:18,22
**chest (7)**
48:16;49:6;50:13;
52:14,20,24;71:10
**Chief (5)**
14:18;15:10,13;16:22;
17:9
**Chiefs (2)**
14:7;16:21
**child (2)**
47:6,12
**Chinese (1)**
7:15
**cigarette (7)**
35:17,25;37:8;38:4;
39:11;42:14;45:1
**cigarettes (2)**
35:19;36:25
**city (5)**
10:5,21;14:24;26:8;
68:5
**civil (6)**
39:22,25;40:3,12,25;
41:2
**claim (2)**
49:4;71:8
**class (1)**
67:20
**classes (1)**
67:23
**clean (1)**
8:10
**clear (3)**
7:5;52:6,12

---

**clenched (1)**
22:6
**clerk (2)**
21:7;25:25
**client (2)**
21:6;70:8
**close (6)**
46:10;54:1;58:3,5,12,
13
**closed (1)**
48:19
**closest (3)**
26:14,25;49:23
**Cloud (3)**
29:5,7,10
**code (1)**
40:13
**collar (1)**
14:23
**college (3)**
13:12,13;67:16
**combative (1)**
38:15
**comfortable (1)**
32:14
**Coming (3)**
48:16;53:21;60:6
**commands (2)**
72:8,15
**commission (1)**
14:16
**Community (3)**
13:13;19:16
**comp (1)**
49:4
**complain (2)**
33:8;60:13
**complained (2)**
60:16,21
**complaint (1)**
60:24
**complete (1)**
62:19
**completed (2)**
32:3,10
**compliant (1)**
50:19
**comport (2)**
63:6;70:24
**concerns (3)**
20:22;37:10,12
**conclude (1)**
29:22
**concluded (1)**
74:2
**concrete (2)**
55:9,12
**condition (5)**
35:23;37:24;38:8;
45:15;59:16
**conference (12)**
26:20;27:24,25;28:6,
14;35:7;37:18;39:17;

---

40:1;42:23;43:2,3
**confirm (1)**
32:9
**confusing (1)**
64:6
**confusion (1)**
7:6
**consistent (1)**
5:20
**contact (11)**
22:4;24:25;29:24;
49:6;52:14,19,24;53:10;
54:12,13;55:8
contacted (1)
67:6
**contains (1)**
65:2
**context (1)**
73:5
**control (3)**
49:12;50:13,14
**controlled (1)**
38:9
**conversation (7)**
6:20;11:14,22;37:22;
38:1;56:4;69:18
**conversations (2)**
20:16,18
**copy (3)**
8:24;62:8,11
**corner (1)**
62:17
**correction (1)**
65:2
**correctly (2)**
27:23;36:24
**council (5)**
10:5,14,15,21;26:9
**counsel (5)**
5:19;11:5;18:1;44:8;
73:24
**count (1)**
14:8
**County (10)**
12:14,15;13:23;15:20;
18:6,23;19:22;40:9;
67:24;68:2
**couple (2)**
30:14;39:6
**course (2)**
15:20;41:4
**COURT (12)**
5:5,21;6:15;8:5,10;
22:22;25:13;27:19;
69:15,23;71:25;73:10
**courtesy (1)**
8:7
**creating (1)**
25:23;26:16;35:12
**criminal (1)**
66:11
**crook (4)**
49:23,24;50:2;58:7

**CROSS (2)**
70:22;73:25
**crowd (1)**
24:5
**cry (2)**
27:8,8
**crying (9)**
27:6,9,11,17;37:19;
38:14,15;46:2,3
**cuffed (3)**
55:20,21,22
**cuffs (4)**
55:5;60:13,17;61:3
**curious (1)**
68:23
**currently (6)**
11:16;12:22;13:2,3;
14:3,5

**D**

**dad (1)**
13:8
**daily (1)**
15:15
**DALE (4)**
5:10,16,18;14:23
**damage (4)**
31:13,17;67:11,12
**date (11)**
63:2,4,8,12,19,22;
64:12,22;65:3,24;66:6
**dates (2)**
64:23;66:6
**day (20)**
8:11;15:19;25:17;
27:19;34:24;35:2,3;
38:7,11;40:17,19,23;
45:16;64:2,19;65:20;
68:17;69:8,11,23
**days (1)**
16:9
**day-to-day (1)**
15:10
**deadly (1)**
9:17
**decade (3)**
13:19,19;67:22
**December (11)**
5:25;17:12;18:12;
20:19;21:2;31:16;63:12;
64:8,19,25;65:11
**decided (2)**
26:18;57:19
**decision (1)**
10:5
**definitively (1)**
73:12
**degree (1)**
13:12
**deliberate (1)**
57:1
**Department (14)**

**8:**23;9:13,20;12:12;
15:24;19:17;21:3,21;
23:19,21;38:20,21,22;
59:5
**Depending (1)**
20:3
**deposition (5)**
5:18;6:3,7;8:15;74:2
**depositions (1)**
8:19
**deputies (1)**
16:15
**Deputy (19)**
16:15;41:22;44:20;
47:7;49:12;51:17;52:17;
54:23;55:4,23;57:14,17;
60:22;61:2,11,23;68:17;
70:19;73:13
**describe (2)**
15:12;50:20
**described (1)**
42:14
**destroyed (1)**
35:10
**details (1)**
66:24
**diagram (1)**
44:18
**different (4)**
21:15,15;63:15;64:23
**difficulty (1)**
36:5
**direction (2)**
20:10;63:9
**disagree (1)**
58:10
**discovery (1)**
6:3
**discussed (1)**
8:15
**discussion (5)**
35:22;47:15,18;57:25;
70:7
**discussions (1)**
20:24
**dispute (1)**
33:6
**distraught (1)**
70:14
**disturbance (2)**
25:24;26:16
**Division (1)**
19:21
**divorce (5)**
20:8;25:13,16;27:19;
67:7
**document (1)**
31:25
**dodging (2)**
22:3;23:11
**dogs (6)**
38:7,9;45:13,16;46:5;
68:17

**Dollar (1)**
67:2
**domestic (5)**
18:18;20:21;21:8;
41:5;69:21
**domestics (1)**
18:16
**done (8)**
8:6,9;13:6;52:1,4,6;
59:3;63:9
**door (15)**
21:22,23;23:19;26:25;
44:1,2,23;46:10,23;
49:23,24;50:2;54:2;
59:23;61:22
**doors (1)**
26:10
**doorway (1)**
43:4
**double (2)**
61:2,6
**doubt (1)**
63:23
**down (25)**
6:15;8:5;26:18;27:22;
28:2,3,22;34:20;41:23;
43:25;45:12;47:4;50:11;
51:14;55:4,7;56:2,5,8,
19;61:12;63:7;64:11;
65:25;70:16
**draft (4)**
62:22;63:7;64:1,4
**drafted (3)**
63:4,8,22
**draw (3)**
44:7,11,17
**drawn (1)**
44:17
**drive (7)**
35:23;38:11;45:14,15;
46:7;68:18;70:2
**driver's (5)**
21:25;22:1;37:1,2;
54:2
**driving (1)**
70:14
**drugs (5)**
66:25;67:6;68:8,10,10
**Duke (1)**
14:24
**during (1)**
60:7
**duty (3)**
21:2;40:17;60:19

**E**

**ear (1)**
60:11
**earlier (2)**
59:3;69:23
**easier (2)**
7:11;13:19

**edge (1)**
38:24
**edge-wise (1)**
71:22
**education (1)**
13:10
**effect (2)**
24:17;66:20
**efforts (1)**
67:7
**eight-foot (1)**
39:8
**either (7)**
14:22;17:16;23:9;
29:10;33:8;46:12;48:8
**elevated (1)**
23:5
**Elizabeth (4)**
5:24;17:13,13,20
**else (4)**
9:1,4;45:16;51:22
**emergency (1)**
15:22
**emotionally (1)**
46:4
**employed (4)**
9:19;12:4,6,7
**employment (1)**
12:17
**EMT (1)**
14:12
**encounter (3)**
32:3,25;60:7
**end (4)**
6:16;31:21;55:3;64:4
**endorsements (1)**
14:11
**enforcement (3)**
12:23;13:15;14:6
**enforcing (1)**
15:19
**enjoying (1)**
13:4
**enough (2)**
33:18;44:16
**entire (1)**
59:23
**Equinox (4)**
30:15;31:12;32:1;
67:13
**escalating (1)**
45:23
**escorted (2)**
43:15,16
**escorting (2)**
61:10,11
**estimate (3)**
34:6;47:1;58:3
**estimates (1)**
34:9
**evaluates (1)**
10:14
**evaluation (1)**

10:13
**evaluations (1)**
10:12
**Even (4)**
6:18;39:22;60:17;
69:16
**everybody (2)**
8:9;66:8
**everybody's (1)**
7:11
**Evidence (2)**
5:21;29:9
**evidently (1)**
38:9
**ex (3)**
25:16;26:3;28:1
**exact (2)**
45:21;48:5
**exactly (2)**
63:8;67:1
**EXAMINATION (1)**
5:13
**example (1)**
66:24
**excessive (1)**
55:14
**Exhibit (16)**
30:16;31:4,5,6,12,18,
22,23,24;32:6,7,9;44:12,
13;62:9;68:20
**exhibited (1)**
31:18
**Exhibits (2)**
30:12,23
**ex-husband (7)**
17:19,20;18:2;22:9;
38:9;69:8;72:2
**expect (2)**
6:13,14
**experience (1)**
25:14
**explain (1)**
43:24
**explained (5)**
17:25;21:8;27:25;
38:7;47:8
**exploded (1)**
38:16
**extender (1)**
29:13
**ex-wife (1)**
17:25

**F**

**face-to-face (1)**
58:8
**fact (4)**
33:11;47:12;62:24;
67:12
**factor (2)**
46:5,6
**fair (1)**

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs - Vol. I
June 5, 2018

49:21
**familial (1)**
  19:11
**family (2)**
  47:15,18
**fancy (1)**
  6:3
**far (2)**
  39:4;66:5
**Farber (1)**
  10:20
**farthest (1)**
  39:2
**fast (1)**
  33:18
**Father (1)**
  14:23
**Federal (3)**
  5:21,21;15:20
**feel (2)**
  38:11;63:1
**feet (3)**
  39:6;54:19;56:16
**felt (3)**
  47:9;48:22;70:2
**fiasco (1)**
  16:19
**file (5)**
  14:18;15:1;49:4;66:8,
  10
**filed (1)**
  11:16
**final (1)**
  8:1
**fine (1)**
  7:23
**finger (1)**
  51:1
**firearms (2)**
  9:18;14:14
**firefighter (1)**
  14:11
**first (12)**
  13:22;14:12;26:1;
  31:12;41:20;51:12;56:3;
  58:11;62:16,22,25;64:11
**fist (2)**
  22:6;48:19
**five (6)**
  15:11;40:23;46:18,20,
  25;47:1
**five-council (1)**
  10:24
**fix (1)**
  60:2
**flaying (1)**
  59:2
**flee (1)**
  25:5
**follow (3)**
  57:19;68:15,19
**followed (1)**
  57:21

**following (2)**
  37:22;68:17
**follows (1)**
  5:12
**foot (4)**
  36:7;56:22;59:17,17
**force (7)**
  9:14,15,17,17;55:14,
  25;56:7
**forgot (1)**
  71:15
**form (3)**
  57:3;65:2;69:10
**found (1)**
  45:12
**foundation (1)**
  70:22
**four (2)**
  29:14;61:23
**frame (1)**
  18:25
**free (1)**
  63:1
**Fremont (1)**
  16:16
**frequented (2)**
  18:7;19:3
**frequently (2)**
  19:17,20
**friends (1)**
  18:2
**front (14)**
  14:22;21:9,23;23:20;
  31:21;33:13,15;38:3,20,
  21;43:4;53:19;54:7;
  70:11
**FTO (1)**
  14:14
**full (2)**
  5:15;15:25
**full-time (1)**
  16:3,5,6;40:17,20
**funny (1)**
  20:5
**further (2)**
  64:11;73:24

**G**

**gathered (1)**
  24:5
**gave (2)**
  33:23;34:18
**general (3)**
  18:25;44:18;67:2
**generally (1)**
  25:19
**gets (6)**
  7:7;16:17;42:5;43:20;
  46:21;64:6
**GIBBS (4)**
  5:10,16,18;44:16
**G-I-B-B-S (1)**

5:16
**given (3)**
  55:24;56:1;70:1
**goal (1)**
  7:4
**goes (1)**
  47:19
**Good (6)**
  5:23;7:8;8:11;32:17;
  38:11;67:22
**goodness (1)**
  7:14
**Gotcha (1)**
  16:14
**grab (1)**
  48:13
**grabbed (10)**
  24:13,21;25:2;41:19,
  21;47:17;48:7,11;55:2;
  56:17
**grabus (1)**
  73:2
**graduated (1)**
  13:15
**Grant (1)**
  16:16
**gravel (3)**
  39:3,4,5
**gravely (1)**
  38:23
**great (1)**
  13:5
**grill (6)**
  29:15,18;30:8;31:13,
  17,20
**ground (3)**
  6:12;55:4;60:5
**guess (4)**
  12:24;17:19;22:23;
  58:9
**guys (5)**
  43:1;45:1,7;47:23;
  71:22

**H**

**habeas (1)**
  73:2
**half (2)**
  42:3;66:15
**Hall (11)**
  21:9,24;23:18,20;
  25:22;26:9;27:21;28:5;
  38:20,21;43:4
**hallway (2)**
  25:23;26:19
**hand (15)**
  48:8,13,15,19,22;49:6,
  15;50:22;51:15,20,25;
  53:17,20,24;54:14
**handcuff (1)**
  57:11
**handcuffed (1)**

57:13
**hands (3)**
  41:8,10;52:16
**handwritten (6)**
  33:25;65:2;68:22,24;
  69:1,3
**happen (1)**
  45:25
**happened (7)**
  33:7;35:15;49:9;51:6;
  64:8;67:9;71:25
**happening (1)**
  63:13
**happens (4)**
  47:14;52:19;53:6;
  57:13
**happy (2)**
  8:9,10
**hat (1)**
  14:23
**hats (1)**
  14:19
**head (10)**
  6:20;41:9,13;49:13;
  50:11;51:14;53:21;55:8,
  11;68:3
**heads (1)**
  58:4
**health (1)**
  10:22
**hear (12)**
  28:15,16;35:12;39:17;
  54:8;55:25;60:13;69:25;
  70:7;72:8,15;73:20
**heard (11)**
  17:15,17,18,20;18:8,9;
  22:22;51:19;72:24;
  73:16,17
**hearing (1)**
  69:15
**hearings (1)**
  73:10
**heavy (2)**
  66:25;68:8
**held (3)**
  11:14,22;56:19
**help (7)**
  17:24;45:15;60:7;
  64:16;67:1;71:3,4
**helped (2)**
  57:14;62:2
**Hesperia (10)**
  5:1,8;23:9;13,20;12:6;
  14:18;19:15,20;21:3;
  26:8
**hideous (1)**
  16:10
**Highway (1)**
  67:2
**history (1)**
  66:11
**hit (7)**
  23:13;29:18;33:14;

51:16,18;73:13,21
**hitch (2)**
  29:13;67:11
**hits (1)**
  53:12
**hitting (1)**
  54:9
**hold (1)**
  60:5
**holes (5)**
  29:14,18,22;30:7,10
**hollering (1)**
  36:13
**home (12)**
  16:25;37:23;45:14,15;
  68:15,15,18,19;70:2,8,
  12;73:4
**horsepower (1)**
  66:5
**hour (1)**
  34:23
**hours (1)**
  24:1
**house (4)**
  18:4,7;19:2,2
**HUDSON (32)**
  11:2,12;15:14;17:1,4;
  18:11,14;20:12;22:21;
  27:12,14;31:3,7;32:13;
  42:7,12;43:24;52:5,9;
  57:3;58:12;63:14,18,21;
  65:1,14;69:9;71:13,17;
  72:10,17;74:1
**hug (1)**
  25:21
**hurt (1)**
  48:25
**husband (3)**
  20:7;22:8;56:4

**I**

**idea (1)**
  23:15
**ignition (3)**
  47:21;49:7,16
**important (1)**
  6:17
**inches (3)**
  58:6,8,18
**incident (11)**
  5:25;21:6;32:11;64:8,
  19,24;65:21;66:1,1,13;
  67:3;73:7
**Including (2)**
  16:1,2
**incorporating (1)**
  32:22
**incorrect (1)**
  63:2
**index (1)**
  51:1
**indicate (5)**

Case 1:17-cv-00650-GJQ-RSK   ECF No. 47-3 filed 11/28/18   PageID.1015   Page 26 of 31

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs -  Vol. I
June 5, 2018

59:16,20;68:8;69:7;
72:5
**indicated (1)**
12:3
**indicates (2)**
62:19;63:4
**Indicating (1)**
65:14
**individuals (1)**
12:8
**informal (1)**
6:18
**information (1)**
67:8
**initial (1)**
24:25;39:16;44:19
**initially (3)**
24:10;26:13;52:14
**initials (1)**
62:16
**injuries (1)**
60:10
**instruct (1)**
11:3
**instructed (1)**
65:10
**instructions (1)**
44:7
**instructor (1)**
14:14
**interfering (1)**
45:20
**internal (1)**
12:20
**Interrogatory (1)**
73:12
**intervention (1)**
9:15
**into (12)**
26:9;27:21;28:5;
29:23;43:20;49:15;
61:21;66:25;68:8;70:20;
71:2;72:4
**investigation (2)**
12:20;33:7
**investigator (1)**
29:17,19;67:17
**involve (1)**
20:21
**involved (4)**
21:10;66:9;69:14,19
**involving (3)**
21:6;25:16;64:8
**irritating (1)**
25:24
**issue (1)**
26:4
**issued (1)**
34:2
**issues (2)**
12:16;66:17

**J**

**jail (5)**
34:25;57:19,21;61:21,
23
**January (4)**
63:3;64:14,16,23
**Jim (1)**
10:20
**job (3)**
6:15;12:25;15:12
**jobs (1)**
16:10
**joke (1)**
14:21
**Joyce (1)**
10:20
**judge (1)**
6:19
**jump (1)**
37:20
**jumped (1)**
60:6
**June (1)**
5:2
**jury (1)**
6:19

**K**

**Kalamazoo (1)**
13:13
**keep (2)**
6:16;51:13
**Kent (3)**
13:23;67:24;68:2
**key (8)**
46:5;47:17,17,19,21;
48:4,6,6
**keys (16)**
36:2,20;41:12,16,19;
48:12,15,16;49:7,11,12,
16;50:12;52:13,16,16
**kind (13)**
6:18;7:7;15:9;19:14;
20:5;23:19;26:6;27:8;
44:16;46:19;50:5;51:4;
68:8
**knew (2)**
20:10;47:9
**knock (1)**
48:23
**knowing (2)**
7:12;73:19
**knowledge (1)**
17:22
**known (1)**
17:13

**L**

**lack (1)**

40:5
**land (1)**
55:6
**Lansing (1)**
67:24
**large (3)**
10:21;15:24;26:20
**last (2)**
9:25;60:4
**later (4)**
34:23,24,24;64:22
**law (3)**
12:22;13:14;14:6
**lawyerly (1)**
6:4
**lay (3)**
50:2;55:18,18
**leaned (2)**
49:15,18
**leaning (1)**
22:2
**least (5)**
10:21;20:23;30:9;
57:20;60:19
**leave (4)**
28:11,12,21;36:18
**leaving (1)**
61:24
**left (11)**
6:14;13:18;26:15;
28:14,14;34:7;35:7;
36:8,15,16;53:17
**leg (1)**
36:7
**legs (4)**
37:5;43:21;55:2,4
**LEIN (1)**
66:11
**length (1)**
39:7
**less (4)**
15:12;34:11,12;35:4
**lift (1)**
51:3
**light (1)**
39:12
**likewise (1)**
8:7
**line (2)**
19:22;67:12
**lit (2)**
39:11,12
**litigation (2)**
11:4,6
**little (8)**
12:7;13:10;19:14;
26:18;28:4;64:11,22;
66:2
**live (1)**
40:18
**lives (1)**
7:11
**location (1)**

66:6
**lock (3)**
33:9;61:2,6
**long (9)**
9:19;34:6,9;35:17;
46:16;47:1;61:15;73:1,5
**look (6)**
30:15,23;31:24;60:2;
63:18;64:11
**looked (4)**
23:11;29:14,18;50:21
**looking (3)**
10:12;31:12;63:14
**looks (6)**
30:16,25;31:3,23;
44:20;53:21
**losing (1)**
47:12
**loss (3)**
47:15,18;58:1
**lost (3)**
7:7;47:6,8
**lot (5)**
8:1;16:21;21:14;66:2
**loved (1)**
58:1
**lower (1)**
65:3
**Lowing (30)**
5:24;17:13;20:7,25;
24:13;26:13;32:24;35:4,
15;37:19;39:10,23;41:7;
43:5,11;55:24;58:3;
59:11;60:1,10,13,16;
61:8;64:8;68:14;69:3;
71:19,21;73:7,13
**Lowing's (7)**
28:20;30:22,25;31:4;
32:21,22;44:18
**lucky (1)**
59:10
**lungs (1)**
23:4

**M**

**M-20 (1)**
67:2
**major (1)**
15:6
**makes (3)**
52:14;53:10;68:9
**man (2)**
21:9;22:25
**maneuver (4)**
50:21;51:11,12;52:1
**many (9)**
7:23;14:18,18;16:3,3;
20:18;22:8;72:24;73:18
**mark (1)**
32:5
**marked (5)**
30:12;32:7;44:13;

62:9;68:20
**matter (1)**
8:15
**may (3)**
6:21;7:24;66:19
**maybe (2)**
18:6;60:11
**McDonald (1)**
10:20
**MCOLES (2)**
14:2,3
**mean (17)**
10:1;16:7,24;17:8,15;
21:14;41:16;45:2,20;
46:18,25;47:11;56:15;
58:12;66:10;68:8;71:4
**meaning (1)**
18:18
**means (5)**
17:18;40:4,12;41:2;
66:11
**meant (1)**
21:18
**measurements (1)**
67:10
**medical (2)**
15:22;49:2
**medication (1)**
68:11
**medications (3)**
66:19;68:12,13
**MELOTC (1)**
14:1
**members (1)**
47:19
**memory (3)**
66:17,20;70:24
**mention (2)**
68:14;73:3
**mentioned (3)**
15:1;65:8;68:18
**messages (1)**
66:12
**Michigan (1)**
5:1
**might (5)**
6:9;40:3;50:7;56:24;
73:24
**military (1)**
9:11
**Miller (2)**
21:7;24:8
**minor (1)**
15:6
**minute (3)**
11:13;32:13;46:19
**minutes (7)**
34:11,12;35:4;46:18,
20,25;47:1
**missing (1)**
53:11
**mistaken (1)**
12:4

**moments (1)**
56:9
**money (2)**
15:3,3
**month (3)**
9:25;16:9;34:24
**More (6)**
14:19;17:4;22:10;
38:20,21;47:7
**morning (1)**
5:23
**most (6)**
9:19,21;16:11;22:18;
25:21;68:12
**mostly (2)**
18:16;47:7
**mother (2)**
47:9,13
**move (13)**
27:3;50:4,15,17,18;
51:22;52:8,23;53:7,8,19,
19;59:21
**moves (1)**
50:9
**moving (3)**
33:14;50:10,10
**Mrs (2)**
22:1;34:8
**MSP (1)**
67:24
**much (3)**
28:7;51:8;53:25
**municipality (2)**
14:20;16:21
**Myself (1)**
16:5

**N**

**name (2)**
5:15,23
**names (3)**
25:7,9;66:5
**narrative (3)**
26:6;32:19;33:8
**natural (1)**
57:1
**nature (4)**
10:3;18:9;29:3;38:1
**naughty (1)**
25:7
**necessarily (1)**
10:16
**necessary (1)**
61:17
**need (3)**
7:22,23;61:25
**needed (2)**
41:4;67:1
**negative (1)**
25:15
**Newaygo (4)**
16:16;19:24;40:9,10

**next (7)**
21:21;23:18;38:10;
44:8;45:16;52:19;53:6
**nice (1)**
26:23;35:17
**nightmare (1)**
16:18
**nod (1)**
6:20
**Nods (1)**
68:3
**none (2)**
40:18;60:12
**non-reappointment (1)**
12:16
**Nope (1)**
21:19
**normal (2)**
6:19;40:23
**normally (1)**
63:3
**nose (4)**
50:23,25;51:3;54:15
**notepad (1)**
66:2
**notes (4)**
65:25;66:1,23;67:4
**Notice (2)**
5:19;38:22
**number (1)**
31:5
**nutshell (1)**
15:16

**O**

**object (6)**
11:2;57:3;65:1;69:9;
70:22;72:17
**Objection (1)**
71:13
**observed (2)**
41:11,12
**obtained (1)**
17:22
**Obviously (5)**
19:16;26:7;44:17;
46:4;67:5
**occur (1)**
70:10
**occurred (9)**
23:12,23;30:1;32:21,
22,24;33:19;66:14;73:8
**Oceana (2)**
19:23,25
**o'clock (2)**
23:24;24:1
**Off (13)**
11:12,14,21,22;25:3;
44:8;47:7,10,11;48:16,
23;60:3,6
**offended (1)**
7:9

**offer (1)**
28:17
**offered (2)**
12:25;45:15
**Office (7)**
13:23;14:22;16:17;
33:1;65:17;67:25;68:2
**officer (7)**
14:15;21:2;40:16,20;
41:5;45:10;61:5
**officers (5)**
16:11;18:22;40:18;
51:24;66:2
**offices (1)**
12:14
**old (1)**
66:13
**once (1)**
18:22
**one (27)**
5:24;8:1;10:22,23;
12:9;14:9,10,25;16:6,10;
18:22;19:23;20:23;23:7,
24;24:1;33:19;40:23;
43:13;45:5;47:6;56:17,
18,24;64:7;68:9,17
**ones (1)**
58:1
**ongoing (1)**
69:21
**only (2)**
32:20;55:19
**onto (1)**
24:21
**open (5)**
44:2,21;48:19,22;
59:23
**opened (1)**
61:22
**opening (2)**
46:23;49:21
**operable (1)**
15:7
**opinion (3)**
10:25;11:24;27:13
**orbital (9)**
50:15,17,18;51:22;
52:1,7,23;53:7,8
**order (1)**
24:12
**ordinances (1)**
15:21
**organizations (1)**
14:6
**original (2)**
63:2,19
**Otherwise (3)**
7:19;22:23;37:15
**ouch (1)**
73:21
**Out (54)**
6:8;12:12;15:19;16:3;
18:8,23;21:20,23;23:12,

20;27:25;32:2;33:21,24;
34:6,10;35:12,18,20;
37:20;39:23;43:2,3;
45:3,12;48:4;49:10;
50:12;53:25;54:6,17,19,
20,20,21;55:2,11;56:11;
57:2;59:2,11,21;60:1,6;
64:16;69:1;71:3,4;72:5,
9,16,23;73:2,3
**outside (5)**
21:20;24:10;28:15,19;
59:4
**over (17)**
6:12;7:8;8:20;12:7;
13:9;25:21;26:1;36:24;
37:11;38:8;42:22;51:12;
55:5;57:16;61:11;65:18,
18
**own (4)**
8:20;13:24;27:4,5

**P**

**page (5)**
32:20;62:16,25;64:12;
65:3
**pain (4)**
50:19;52:17;54:24,25
**paper (1)**
44:9
**Paramedic (1)**
14:13
**park (1)**
23:19
**parked (2)**
23:21;38:19
**part (6)**
38:24;39:3;45:17;
64:6;65:3;73:6
**partially (1)**
60:3
**particular (1)**
32:19
**parts (2)**
41:10;63:15
**part-time (7)**
13:23;15:25;16:3,6,7,
8;18:22
**pass (1)**
43:5
**passed (1)**
10:23
**passenger (1)**
44:2
**patrol (2)**
17:9;59:12
**pavement (2)**
38:24,25
**pay (2)**
60:3,4
**PD (1)**
19:20
**pedal (1)**

56:25
**Peggy (2)**
21:7,11
**pending (2)**
5:7;7:25
**people (3)**
10:15;21:15;26:10
**performance (1)**
10:12
**perhaps (1)**
10:17
**period (2)**
12:5,11
**person (1)**
50:2
**personally (1)**
17:15
**personnel (2)**
14:17;61:23
**person's (1)**
50:25
**phone (1)**
46:12
**physical (7)**
21:10,11,15;33:9;
50:21;73:6,20
**physically (3)**
23:10;40:13;69:13
**pick (1)**
55:19
**pickup (1)**
21:25
**picture (2)**
26:1,24
**pictures (5)**
26:24;30:5,14,15;34:4
**piece (2)**
42:3;53:11
**place (4)**
5:25;26:14;64:24;67:3
**placed (3)**
57:16,17;61:14
**Planning (1)**
14:16
**plant (1)**
13:8
**please (7)**
5:15,17;6:23;7:1,9;
8:5;40:13
**pm (1)**
23:24
**point (20)**
25:20;35:20,22;36:13,
19,25;38:12,14;39:10,
16,20;45:10;46:2,16;
47:6,22;54:17;70:15;
72:15,16
**pointing (1)**
43:25
**police (41)**
8:18,23;9:2,4,13,20;
13:13,14;14:7,18,22;
15:10,24;16:21,22;17:9;

Case 1:17-cv-00650-GJQ-RSK    ECF No. 47-3 filed 11/28/18    PageID.1017    Page 28 of 31

Elizabeth Lowing v.                          Dale Gibbs                                    Dale Gibbs - Vol. I
Justin Visser, Newaygo County, et. al.                                                    June 5, 2018

18:4,6,20;19:3,17,18;
21:3,21;23:16,19,20,23;
34:20;38:19,21,22;40:6;
49:25;51:23;59:4;62:8,
14;63:15;64:24;66:4
**port (1)**
61:22
**portion (1)**
32:20
**position (4)**
43:21;44:19;61:13,14
**positioning (1)**
49:23
**positions (2)**
12:25;13:1
**Possible (1)**
29:25
**possibly (1)**
28:2
**post (1)**
67:23
**potential (2)**
11:3,6
**prepared (1)**
8:22
**prescribed (1)**
68:11
**presence (1)**
69:22
**present (1)**
29:19
**presumably (1)**
37:15
**presume (2)**
7:20;15:14
**pretty (8)**
6:9;7:8;22:12;26:23;
28:7;49:21;53:25;58:5
**previous (1)**
67:5
**previously (1)**
42:14
**Prior (6)**
8:15;17:12;20:19;
55:24;69:6;72:4
**probably (4)**
16:21;20:1;21:14;
39:8;49:25;51:8
**problem (4)**
17:24;57:20;62:1,4
**problems (1)**
57:23
**procedures (1)**
20:9
**proceed (1)**
37:8
**proceeded (2)**
44:25;45:5
**proceeding (1)**
25:16
**process (3)**
20:7;51:21,25
**profane (1)**

22:12
**profanity (1)**
22:18
**professional (1)**
14:5
**prosecutor (2)**
63:10;65:8
**provide (1)**
6:17
**pull (2)**
50:12;55:11
**pulled (8)**
24:13;49:10;54:20,21;
57:2;59:2;61:22,24
**pulling (2)**
56:10;73:2
**punched (1)**
29:18
**punches (1)**
22:3
**punching (4)**
22:2,8;24:19;52:21
**purportedly (1)**
68:23
**purports (1)**
31:25
**purposes (1)**
5:20
**pursuant (1)**
5:19
**push (1)**
50:5
**put (23)**
13:24;14:22;25:25;
26:2;37:5;41:8,9,10,13;
43:20;46:8;47:17,22,24;
48:5;50:25;51:3;52:7;
53:25;54:4,5;60:17;61:8
**puts (1)**
54:14
**putting (2)**
50:15;73:1
**puzzle (1)**
42:3

## Q

**quick (1)**
51:6
**Quit (3)**
56:11;58:25;72:25
**Quite (1)**
6:11
**quote (1)**
15:4

## R

**raised (1)**
58:20
**ram (3)**
33:13,13,15
**rammed (1)**

33:11
**ramming (6)**
29:4,6,9,23;33:2,3
**reach (4)**
47:22;48:11;52:13;
71:2
**reached (11)**
36:24;47:16,17;48:6;
51:12;53:2;70:20;72:9,
14,21,22
**reaches (4)**
48:8;52:21;53:6,8
**reaching (2)**
22:1;72:4
**reaction (2)**
51:11;57:2
**read (5)**
7:12;14:17;32:13;
66:22,22
**reading (3)**
6:22;12:2;63:1
**ready (1)**
14:24
**reaffirmed (1)**
67:7
**real (2)**
42:1;51:7
**realize (1)**
13:5
**really (3)**
15:2;47:9;65:5
**reappoint (1)**
10:25
**reappointed (1)**
10:4
**rear (3)**
29:12;31:25;55:3
**reason (5)**
10:8;32:19;36:5;
55:11;61:15
**reasonable (1)**
61:19
**reasons (1)**
10:23
**recall (21)**
9:15,16;18:22;24:6,9,
20;25:19;27:5;34:25;
36:9;37:22;46:9;47:8;
50:6;59:15,19;61:1;
65:23;66:18;68:12;
71:20
**recalled (1)**
12:9
**recap (2)**
25:12,12
**recapping (1)**
15:9
**receive (1)**
46:13
**recently (3)**
9:19,21;12:3
**reciprocating (1)**
23:9

**recognize (8)**
19:9;30:17,24;31:9,
22,25;32:9;62:12
**recognized (1)**
19:7
**recollect (1)**
69:24
**recollection (3)**
31:18;63:6;72:25
**reconstruction (2)**
67:15,18
**record (14)**
5:17;7:5;8:10,21;
11:12,14,21,22;21:21;
26:5;27:24;44:7;52:5,12
**records (1)**
12:3
**red (1)**
21:25
**Reese (1)**
29:13
**reflect (2)**
5:18;26:5
**refresh (1)**
31:18
**refuse (1)**
28:5
**regarding (4)**
5:25;9:14;20:22;66:1
**related (1)**
14:6
**relation (2)**
19:11;38:19
**relationship (1)**
42:20
**relatively (1)**
19:15
**remember (32)**
6:23;21:12;22:16;
27:23;33:4,20;35:16;
36:6,24;37:4,6,20;39:12,
13;45:11;46:15;48:5,20;
50:7,8;51:5;58:9,20,21,
25;62:24;63:24;64:5;
65:6;66:23;67:3;69:1
**Repeat (1)**
9:3
**rephrase (2)**
7:16,18
**report (21)**
8:20,22;9:2,5;23:23;
24:1;32:20;33:23;34:20;
62:8,14,23;63:4,7,15;
64:24;65:18,20;66:4,11;
70:20
**reported (1)**
23:25
**REPORTER (5)**
5:5;6:15;8:5,10;22:22
**reports (1)**
8:19
**represent (1)**
11:5

**representing (1)**
5:24
**request (3)**
19:17;27:3;41:2
**requested (3)**
12:24;17:24;68:25
**requesting (2)**
41:1,5
**required (1)**
14:1
**requires (1)**
6:25
**resist (1)**
56:12
**resisting (3)**
56:11;58:25;73:1
**respect (5)**
11:6;17;22:20;32:10,
24
**responder (1)**
14:12
**response (2)**
6:18;73:20
**responses (1)**
6:24
**retain (1)**
14:3
**retained (1)**
11:4
**retirement (1)**
13:4
**Retract (1)**
14:7
**retreat (2)**
45:1,7
**retrieve (4)**
36:25;38:6;45:13,16
**returned (1)**
34:8
**reviewed (3)**
8:18;9:1,4
**ride (6)**
68:15;70:1,6,8,12;
73:4
**right (70)**
6:14;8:13,14;13:9,25;
16:23,25;19:22,23;20:1,
6;21:12,17,21,23,24;
25:20,25;26:5,14,22;
30:14;33:17;34:4,5;
35:2;36:6,10,16;37:16,
17;42:5,6,9;43:16;44:3,
3,15;45:8,9;47:8;49:24;
50:8;51:14;53:9,10,13,
17,18,20,24;54:3,7;
55:21;56:10;59:4,4;
62:2,3,7,17,18;63:5,20;
64:10;65:10;70:21;71:1,
9;72:1
**Rockford (1)**
68:5
**role (1)**
15:11

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs - Vol. I
June 5, 2018

room (12)
  6:16;27:24,25;28:6,
  14;35:7;37:18;39:18;
  40:1;42:24;43:2,4
rough (1)
  44:17
ruckus (1)
  35:13
Rules (4)
  5:21,21;6:12,13
run (2)
  18:4;37:11
Russian (1)
  7:15

**S**

sake (1)
  8:4
Sally (1)
  61:22
same (5)
  8:7;12:8;31:23;35:2,3
Sanborn (26)
  17:14;18:4,7;19:2,7,
  12,12;20:18,25;21:25;
  22:1,2;23:9;33:21;34:7,
  8;36:15,17;66:24,25;
  68:7,7,23;69:7,22;70:1
sat (6)
  25:22;26:2,24;55:7,
  17;63:7
saw (10)
  15:1;21:25;24:10;
  31:16,19,20;51:15;61:3;
  62:1;73:15
saying (8)
  6:4,21;22:11,15;
  25:19;27:14;45:18,24
scale (1)
  44:18
scenarios (1)
  33:19
scene (1)
  29:20
schedule (1)
  16:17
schedules (1)
  16:13
scheduling (1)
  16:19
scratch (1)
  48:21
screaming (7)
  23:4;27:9;36:12;46:3;
  70:15,17;71:21
seat (8)
  22:1;37:1,3;38:3;44:2;
  57:17;59:21;70:11
seatbelt (3)
  46:8;57:17;61:14
seated (2)
  39:10,20

seats (1)
  26:10
second (2)
  13:16;46:6
section (1)
  64:12
security-type (1)
  12:23
seek (2)
  18:1;49:2
seem (1)
  68:9
seems (1)
  49:20
self-performance (1)
  10:13
sense (1)
  33:12
sentences (1)
  15:12
separate (1)
  25:20
separation (3)
  10:3;11:19,24
sequence (1)
  52:11
sequentially (1)
  24:23
set (5)
  47:7;55:3;56:19;60:5;
  74:1
setup (1)
  26:8
seven (2)
  10:22;39:9
Shawn (3)
  5:23;42:12,15
Sheridan (1)
  12:14
sheriffs (1)
  12:14
sheriff's (5)
  12:12;13:23;16:17;
  67:24;68:2
short (1)
  25:12
shoulder (1)
  44:3
shoulders (1)
  6:20
show (4)
  30:14;44:9;62:8;68:22
showed (1)
  29:12
showing (1)
  69:16
shrug (1)
  6:20
side (11)
  19:21,23;20:3;26:3;
  28:1;38:22;39:2;54:2;
  55:18,18;70:21
sidewalk (1)

19:8
sign (1)
  15:7
signature (1)
  62:19
signs (1)
  15:5
sit (3)
  26:11,13;61:12
sitting (5)
  6:22;37:1;42:13;44:8;
  46:21
situation (1)
  28:21
situations (1)
  9:15
six (3)
  15:25;16:4;40:24
size (1)
  19:16
sketch (1)
  44:17
slam (1)
  55:11
slow (2)
  42:1;51:7
small (1)
  19:16
Smith (1)
  10:20
smoke (2)
  37:8;44:25
smoked (1)
  45:2
sob (1)
  27:8
solemnly (1)
  5:5
somebody (8)
  6:22;15:7;33:13;40:3,
  12,13;41:3;45:16
somehow (1)
  70:8
someplace (1)
  71:9
sometime (1)
  47:24
sometimes (1)
  6:19
somewhat (2)
  25:21,24
somewhere (2)
  47:22;71:10
somewheres (3)
  13:20;47:16;51:15
soon (1)
  17:24
sound (1)
  54:9
sounds (5)
  6:9;8:25;16:19,22;
  20:1
speak (1)

73:7
specialist (1)
  67:19
speed (1)
  33:14
spiral-bound (1)
  66:3
spoken (1)
  6:16
squad (2)
  61:8,9
squeeze (1)
  49:20
squirming (1)
  56:15
stand (1)
  57:18
standby (6)
  39:22,25;40:3,12,25;
  41:2
standing (3)
  46:22;47:2,23
start (5)
  15:19;33:2;37:10;
  41:17,18
Started (3)
  37:9;56:10,10
starting (1)
  50:12
state (5)
  5:15;15:5,20;18:23;
  73:13
stated (2)
  47:6;68:12
statement (12)
  28:20,23,24;29:3;
  33:22,25;34:13,16;
  68:22,24;69:2,4
stay (2)
  26:2;45:8
Stayed (1)
  45:9
steering (4)
  41:8,9,11,13
step (1)
  45:7
stick (1)
  62:6
still (14)
  15:7,13;25:23;35:7;
  37:19,21;38:14;39:23;
  42:5,23;49:7,22;54:2,24
stop (6)
  24:12,15,19,19;53:14;
  54:5
stopped (2)
  24:20,20
Store (1)
  67:2
story (1)
  28:1
street (8)
  17:8;19:21,21,24;

20:3;35:12;68:9,10
Streets (6)
  14:15;15:1,4,6,7;
  40:21
strike (2)
  48:17;52:25
strikes (1)
  54:4
striking (5)
  51:13
struck (5)
  52:8;71:8,12,19;73:19
stuck (1)
  62:1
stuff (1)
  66:7
subject (1)
  12:19
sued (1)
  9:9
summarize (1)
  15:11
supposed (2)
  61:5;63:13
sure (9)
  6:2;14:9,25;18:23;
  20:23;44:10;45:22;
  60:21;68:16
surprised (1)
  10:10
surveillance (2)
  59:7,9
swat (1)
  25:2
swear (2)
  5:5;22:13
swearing (1)
  38:15
swinging (1)
  38:17
sworn (1)
  5:11
Synonymous (1)
  29:17

**T**

table (2)
  39:7,8
talk (3)
  26:3;28:1;69:22
talked (2)
  59:3;69:14
talking (5)
  7:14;34:7;46:18,19;
  47:2
telling (4)
  25:14;28:11;66:24;
  70:13
ten (1)
  46:18
tended (1)
  18:18

**tendency (1)**
8:3
**terminated (1)**
12:17
**terminology (1)**
49:25
**testified (3)**
5:12;72:11,18
**testify (1)**
73:10
**testimony (5)**
5:6;7:5;26:15;52:12;
67:5
**thinking (2)**
36:8;53:18
**though (5)**
6:18;23:13;35:2;
43:11;60:17
**thought (2)**
20:5;45:14
**three (5)**
20:20;29:14;30:7;
46:16;61:23
**three-page (2)**
8:22;62:14
**thumb (1)**
51:1
**Thursday (1)**
64:14
**thus (1)**
64:6
**tickets (1)**
34:2
**tight (5)**
49:20;60:14,17,20,21
**tightness (1)**
61:3,6
**till (2)**
9:24,25
**times (3)**
22:8;71:23;72:24
**today (5)**
6:5,16;26:21;45:25;
73:14
**together (1)**
58:5
**told (7)**
6:2;26:2;34:12;44:9;
56:3;57:17;68:7
**took (9)**
5:25;25:21;43:5,11;
49:12;50:21;57:16;
64:24;67:3
**top (3)**
23:4;63:17;64:16
**topic (1)**
11:7
**toss (1)**
61:15
**touching (1)**
33:10
**towards (1)**
49:15

**town (1)**
40:18
**trailer (1)**
67:11
**training (6)**
9:14,18;14:14;67:15,
17,23
**transcript (1)**
6:23
**translation (1)**
7:7
**transpired (1)**
69:23
**treasurer (1)**
25:25
**treatment (1)**
49:2
**tricky (1)**
7:17
**tried (7)**
23:13;26:13;28:20,23;
41:22;46:17;70:12
**tries (2)**
53:14;54:5
**truck (5)**
24:14;29:5,12;30:24;
67:11
**true (3)**
29:24;40:7;42:16
**truth (3)**
5:7,7,8
**try (11)**
6:23;7:1,16;25:2,5;
27:21;28:11;39:14;
41:16;52:25;72:5
**trying (12)**
7:11;9:16;22:19;33:3,
7,8;35:16;39:12;41:12;
42:12;45:11;47:4
**Tuesday (1)**
5:2
**turn (8)**
14:23;41:12,16,20;
46:17;47:17,19;48:8
**turned (2)**
55:4,19
**Twelve (1)**
58:18
**twice (2)**
13:21;22:10
**two (17)**
10:22;12:14;16:5;
20:20;25:20;30:7;32:20;
41:10;43:2,18;46:19;
51:23;54:19;57:10;
59:20;63:14;66:15
**type (7)**
12:19,22;21:5;33:22;
49:2,4;73:20

**U**

**UD-10 (4)**

32:3,10;34:21;67:8
**Uh-hum (8)**
7:3,6;30:18;46:24;
58:2;64:15,18,21
**Um-hum (7)**
6:6;7:1;16:20;39:19;
51:2;56:23;64:13
**under (7)**
25:25;26:24;46:20;
51:3,23;54:14;60:19
**underneath (2)**
50:23;56:24
**understood (1)**
7:20
**un-huh (1)**
7:2
**uniform (1)**
23:16
**unless (1)**
32:14
**unlike (1)**
16:21
**unreasonable (1)**
55:14
**unsafe (2)**
45:14;70:2
**up (34)**
14:21,22,24;15:22;
18:22;21:12,19;24:12;
33:9,14;35:22,24;39:11,
16,20;42:8,13;45:23;
49:13;50:13;51:3,20;
55:19;56:5;57:14,20;
61:22,22;63:16;67:12;
69:16;70:16,17;71:9
**upright (2)**
61:13,14
**upset (3)**
7:9;38:12;46:4
**use (3)**
9:14,16;22:21
**used (5)**
5:20;17:13;53:24;
55:25;56:7
**using (3)**
22:13,17;67:6
**usually (1)**
20:21

**V**

**Valley (1)**
13:13
**vehicle (24)**
29:5;30:17,21;31:4,
16,22;32:25;33:15,16;
36:23;37:5;38:24;39:11;
41:7,17;45:1,7;57:16;
59:11,12,12,13;60:1;
72:6
**vehicles (2)**
29:11;30:5
**verbal (9)**

6:17,24;21:15;24:12;
28:23,25;34:18,19;72:8
**verbally (5)**
23:9;45:20,24;47:11,
12
**version (3)**
32:21,22;70:24
**versus (3)**
7:1;32:21;67:11
**Village (16)**
11:6;15:21;21:7,9,22,
24;23:18,20;25:22;26:9,
19;27:21;28:5;38:20,21;
43:4
**Visser (49)**
16:15;41:22;42:5,8,
17;43:6,17,22;44:3,20;
45:10;46:22;47:7;49:12;
51:17;52:17;54:23;55:4,
23,25;56:8;57:14,18,25;
59:13,16;60:8,22;61:2,
11,23;68:17;69:7,11,13,
25,25;70:4,5,7,19;71:2,
12,19;72:4,8,19;73:13,
20
**Visser's (1)**
69:6
**voice (2)**
23:4;58:20

**W**

**waist (2)**
24:13;25:2
**wait (1)**
8:6
**walked (5)**
36:1,4,12,17;43:10
**walking (4)**
19:8;36:5,6;56:18
**wall (1)**
26:23
**wants (2)**
17:5;42:7
**warned (1)**
56:7
**warning (2)**
55:24;56:1
**watching (1)**
47:3
**water (1)**
28:17
**watery-eye (1)**
27:8
**way (11)**
6:4;8:9;17:16;27:18;
29:4,6,10;43:8;51:5;
54:8;70:17
**ways (1)**
61:15
**wears (1)**
14:18
**Wednesday (1)**

63:3
**weren't (1)**
29:19
**What's (5)**
17:18;40:14;43:21;
46:25;50:18
**wheel (4)**
41:9,9,11,14
**white (4)**
22:25;29:4,6,10
**whole (2)**
5:7;53:23
**whose (1)**
30:21
**wife (1)**
20:22
**wind (1)**
56:5
**window (1)**
22:2
**within (3)**
39:6;46:22;58:6
**without (3)**
28:11;33:12;67:4
**WITNESS (26)**
5:9,11;15:18;17:3,6;
18:15;20:14,16;22:24;
27:18;31:6,9;32:15;
40:5;42:9,18;44:1,5,10;
52:7;57:4;58:14;63:20,
23;65:5;72:12
**witnesses (1)**
24:7
**woman (1)**
21:9
**wooden (1)**
26:23
**word (6)**
6:15;22:15,17;40:5,
13;71:22
**words (6)**
22:13,21;29:6;45:21;
59:1;72:25
**work (4)**
16:11,12,16,16
**worked (1)**
12:12
**working (5)**
12:22;13:2,3;40:21;
68:4
**workmans' (1)**
49:4
**works (2)**
20:5;50:2
**worse (1)**
47:13
**write (6)**
33:21,24;43:25;65:25;
68:25;70:19
**written (4)**
28:24;34:16;65:20,23
**wrong (1)**
25:12

Elizabeth Lowing v.
Justin Visser, Newaygo County, et. al.

Dale Gibbs

Dale Gibbs -  Vol. I
June 5, 2018

**wrote (1)**
  34:20
**Wyoming (4)**
  6:8;12:11;13:18;67:24

## Y

**year (3)**
  12:7,9;64:4
**years (4)**
  7:8;13:6,8;63:1
**yell (2)**
  58:22,23
**Yelling (5)**
  27:9,10,17;46:3;58:25
**Yup (8)**
  26:17;34:22;36:11;
  49:17,17;50:3;53:15;
  54:16

## Z

**Zoning (2)**
  14:15;15:21