# EXHIBIT C

# In The Matter Of:

*Elizabeth Lowing v.*
*Justin Visser, Newaygo County, Dale Gibbs, et. al.*

---

*Justin Visser*
*Vol. I*
*April 9, 2018*
*Justin Visser*

---

*Court Reporting Services*
*Oakland County, Clarkston, Michigan*
*www.courtreportingservices.org*

Original File Visser_Justin.txt

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

Page 1

1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MICHIGAN
2

3  ELIZABETH LOWING,

4            Plaintiff,

5                          Case No. 1:17-cv-650

6  -vs-                    Hon. Gordon J. Quist

7  JUSTIN VISSER, NEWAYGO COUNTY,
   DALE GIBBS, and VILLAGE OF HESPERIA,
8  in their individual and official capacities,

9            Defendants.

10 _____

11

12           DEPOSITION OF JUSTIN VISSER,

13  Taken by the Plaintiff, before Jayne M. Jones, Court

14  Reporter (CSR-2457, RPR) and Notary Public for the

15  County of Ingham, Acting in the County of Newaygo,

16  on Monday, April 9, 2018 at 1035 E. James Street,

17  White Cloud, Michigan, at 10:00 a.m.

18

19

20

21

22

23

24

25

Page 2

1  APPEARANCES:

2  SHAWN C. CABOT (P42449)

3  CHRISTOPHER TRAINOR & ASSOCIATES

4  9750 Highland Road

5  White Lake, Michigan  48386

6  (248) 886-8650

7  shawn.cabot@cjtrainor.com

8      Appearing on behalf of the Plaintiff.

9

10 MATTHEW W. CROSS (P77526)

11 CUMMINGS, MCCLOREY, DAVIS & ACHO

12 400 W. Front Street, Ste. 200

13 Traverse City, Michigan  49684

14 (231) 922-1888

15 mcross@cmda-law.com

16     Appearing on behalf of Defendants Visser and

17         Newaygo.

18

19

20

21

22

23

24

25

Page 3

1  APPEARANCES CONTINUED:

2  KATHARINE MCCARTHY (P77595)

3  ZAUSMER, AUGUST & CALDWELL, PC

4  31700 Middlebelt Road, Ste. 150

5  Farmington Hills, Michigan  48334-2301

6  (248) 851-4111

7  kmccarthy@zacfirm.com

8     Appearing on behalf of Defendants of Village of

9         Hesperia & Dale Gibbs.

10

11 ALSO PRESENT: Dale Gibbs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        INDEX

2  WITNESS                              Page

3  JUSTIN VISSER:

4      EXAMINATION BY MR. CABOT         5, 85

5      EXAMINATION BY MS. MCCARTHY      82

6      EXAMINATION BY MR. CROSS         82

7  EXHIBITS                             Page

8  Exhibit 1    Interrogatories        73

9  Exhibit 2    Newaygo Disclosures    78

10 Exhibit 3    Booking Documents      83

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1   White Cloud, Michigan
2   Monday, April 9, 2018
3
4               R E C O R D
5        COURT REPORTER: Do you solemnly swear
6   the testimony you're about to give in the cause now
7   pending will be the truth, the whole truth, and nothing
8   but the truth?
9        THE WITNESS: Yes.
10            JUSTIN VISSER,
11       (at 10:00 a.m., sworn as a witness,
12  testified as follows:
13           EXAMINATION
14  BY MR. CABOT:
15  Q.  Will you please state your full name for the record?
16  A.  Justin. Middle name Lee, L-E-E. Last name is Visser.
17      V-I-S-S-E-R.
18            MR. CABOT: Please let the record
19      reflect that this is the deposition of Justin Visser
20      taken pursuant to notice and agreement of counsel, to
21      be used for any and all purposes consistent with the
22      Federal Court Rules and the Federal Rules of Evidence.
23  BY MR. CABOT:
24  Q.  Good morning. My name is Shawn Cabot. I'm one of the
25      attorneys representing Elizabeth Lowing regarding an

Page 6

1   incident that occurred on/or about December 15, 2015.
2            This is what we typically call a
3   discovery deposition, which is really just a fancy way
4   of saying I get to ask you a bunch of questions today.
5            Have you ever had your deposition taken
6   before?
7   A.  Yes.
8   Q.  All right. So you're probably pretty familiar with the
9       ground rules, but I don't think you and I have ever had
10      occasion to have a deposition together so I'm going to
11      give you my version of the rules. They will probably
12      serve as just a reminder to you then.
13           The first rule is the important rule and
14      that is always make sure your responses are verbal.
15      The court reporter cannot take down nods of the head,
16      shrugs of the shoulders; thing like that. Also, if I
17      ask you a yes or no question, try to remember to say
18      yes or no. Versus saying things like um-hum or un-huh,
19      because believe it or not, the lawyers do read these
20      transcripts later and we'll get confused and not know
21      if one of those things was a yes or a no and we don't
22      want that to happen.
23           Our goal here today is to get whatever
24      your version of the events is in an understandable and
25      clear format in the transcript.

Page 7

1        If I ask you a question that you don't
2   understand or doesn't make sense to you, you can tell
3   me that. You won't hurt my feelings. And I'll
4   rephrase the question. But if you presume you
5   understood the question and I will
6   hold you to whatever answer that you give me.
7        There may be periodically times that
8   your attorney may object to some of my questions on
9   some legal ground that he just doesn't like the
10  question for whatever reason, but absent an instruction
11  from him not to answer the question, when he's done
12  with his objection, the rule of thumb is to go ahead
13  and answer the question. If for some reason your
14  attorney has some basis that he does not want you to
15  answer the question, I'm sure that instruction will be
16  very clear to us all. But I don't anticipate that
17  happening.
18       The other thing is, you know, obviously
19  this is a rather informal setting. There's no judge,
20  there's no jury and there's nothing like that. So it's
21  rather conversational. But with that, we have to be
22  careful that we don't talk over one another because the
23  court reporter, as you can see, she's busy typing away,
24  and she can only take down one person speaking at a
25  time. So it's really important that you listen to my

Page 8

1   question first in its entirety and then wait until I'm
2   done before you answer the question. And, likewise,
3   I'll grant you that same courtesy. I'll not ask a
4   question until I think your answer is done. And that
5   way we just, again, get a clear record which is our
6   ultimate goal.
7        Also, if at any time you need to take a
8   break, that's fine. I just ask that you answer any
9   question that may be pending before you take that
10  break. All right?
11  A.  Yup.
12  Q.  All right. Prior to your deposition today, have you
13      reviewed anything?
14  A.  I have.
15  Q.  What have you reviewed?
16  A.  The report. We reviewed our policy. Yeah.
17  Q.  Okay. Now, there are a couple of reports here. One
18      from yourself. One from Gibbs. Did you read both of
19      those or just yours?
20  A.  Just mine.
21  Q.  Okay. Any other reports other than the police report
22      that you reviewed in preparation for today?
23  A.  Any other reports?
24  Q.  Yeah.
25  A.  No.

Elizabeth Lowing v.                          Justin Visser                          Justin Visser – Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                              April 9, 2018

---

Page 9

1  Q.  Okay.  And the policy, I'm assuming that's the use of
2      force policy?
3  A.  Yes.
4  Q.  Other than your attorneys, have you discussed this
5      matter with anyone else?
6  A.  My sheriff and undersheriff.
7  Q.  And what are their names?
8  A.  Sheriff Mendham.
9  Q.  Can you spell that?
10 A.  Yup.  M-E-N-D-H-A-M.
11 Q.  And does he or she have a first name?
12 A.  Robert is his official name.
13 Q.  And who is the undersheriff?
14 A.  Chad Palmeter.  P-A-L-M-E-T-E-R.
15 Q.  Okay.  And regarding this incident, what documents did
16     you draft or author other than your police report, if
17     any?
18 A.  It would be just the use of force form that we have to
19     fill out.
20 Q.  Okay.  And did you fill one out in this case?
21 A.  I would say yes, but I don't remember.
22 Q.  You didn't review that, though, in preparation for
23     today, correct?  At least that wasn't one of the things
24     that you listed for me.
25 A.  No, I did not.

---

Page 10

1  Q.  As you sit here today, are you a hundred percent
2      certain you drafted a use of force?
3  A.  I'm not one hundred percent sure.
4          MR. CROSS:  Just for the record, Shawn,
5      I haven't seen it either.  So I don't think it exists.
6  BY MR. CABOT:
7  Q.  That's why I'm looking through my papers because I
8      don't remember seeing one either.  But why don't you
9      tell me when a use of force of form is supposed to be
10     completed.
11 A.  When is it?
12 Q.  Yes.  In general.
13 A.  In general, when, I guess, any type of force is used or
14     any type of, like basically if we go hands-on or if
15     there's like OC spray used or a Taser, or something to
16     that effect.
17 Q.  Okay.  And when you say "hands-on", generally does that
18     mean if you have hand-to-hand contact with an
19     individual that results in some type of arrest or
20     force?
21 A.  On top of just the regular handcuffing of somebody,
22     yeah.
23 Q.  And you used some level of force with Ms. Lowing on
24     this occasion, correct?
25 A.  Um-hum.  Oh.  Yes.  I'm sorry.  Yes.

---

Page 11

1  Q.  And so under the policy, you should have done a use of
2      force form, correct?
3  A.  There should be, yeah.
4  Q.  Okay.  I'm going to ask that you look for that at some
5      point with your counsel and if you find it, send it to
6      him because I know I haven't seen it and he said that
7      he hasn't seen it.  So we just want to make sure if
8      there is one, we get it and if there's not, we know
9      there's not.
10 A.  Okay.
11 Q.  Have you ever been sued before?
12 A.  No.
13 Q.  Have you ever been the subject of a citizens complaint
14     which alleged any type of force or demeanor issues?
15 A.  No.
16 Q.  Have you ever been the subject of an internal
17     investigation to your knowledge?
18 A.  No.
19 Q.  Do you get performance evaluations?
20 A.  I guess --
21 Q.  Sure.  I'll explain it.  Some departments have some
22     type of annual or semiannual review process.  In a vast
23     majority of departments it's a paper evaluation where
24     they rank you one to five or one to ten, or A to E.
25     Other places have some type of oral performance

---

Page 12

1      evaluation, which is then brought down to paper format.
2          Do you have anything like that?
3  A.  No.
4  Q.  Okay.  Do you get use of force training?
5  A.  Yes.
6  Q.  How often does that occur?  Or is it sporadic?
7  A.  I would say sporadic.
8  Q.  How long have you been with the Newaygo County
9      Sheriff's Department?
10 A.  Including my part-time?
11 Q.  Sure.
12 A.  April of 2004.
13 Q.  How many trainings have you had regarding use of force
14     since you've been with the department in 2004?
15 A.  I -- I don't know an exact number.  I will guess ten.
16 Q.  Okay.  So somewhere in the vicinity of ten?
17 A.  I would guess.
18 Q.  Okay.  Is that hands-on or classroom training, or is it
19     computer modules?
20 A.  Hands-on.  Classroom.
21 Q.  Do you recall when the last such training you had was?
22 A.  I don't remember the exact date.
23 Q.  And I notice you keep looking to your attorney.  And
24     I'm just going to let you know it's a common thing, but
25     even if he knows the answer, he can't tell you.

---

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

Page 13

1  A.  Okay. I'm sorry.
2  Q.  No, that's okay. Usually it always happens with
3      plaintiffs. They always look at me during the
4      deposition. But just know that he can't --
5  A.  Okay.
6  Q.  And if you don't know -- and that's one of the things
7      that I'm sure he told you and I will tell you today --
8      if you don't know an answer to my question, you can
9      tell me you don't know. I may try to pick your brain a
10     little bit further to see if I can open up some well of
11     knowledge in there but if you don't know, you don't
12     know. That's an acceptable answer.
13  A.  I don't remember the last date we had one.
14  Q.  Do you remember who your trainer was?
15  A.  They're -- we have several -- I remember there are
16     several different ones. We have -- Craig Goodspeed has
17     done it before. He was a deputy. Kevin Kulk from
18     Fremont Police Department has done it before. And then
19     Gabe Sanchez from our jail, he did it with his --
20     another jail -- Glenna. And I don't know her last
21     name.
22  Q.  All right.
23  A.  And then we have done trainings with Sensei Bomay from
24     Bassai Karate.
25  Q.  I'm going to ask you if you can spell Sensei Bomay.

Page 14

1  A.  I think it's Sensi, S-E-N-S-E-I.
2  Q.  Yeah, I'm good with that one.
3  A.  Bomay is B-O-M-A-Y.
4  Q.  And he's from where?
5  A.  Newaygo. His first name is Jerry. I just call him
6     Sensei. Sorry.
7  Q.  That's okay. And what facility was he from?
8  A.  Bassai. B-A-S-S-A-I.
9  Q.  All right.
10  A.  And he's done several trainings for us.
11  Q.  Okay. Do you know if they have any type of credentials
12     from like the American Corrections Academy or anything
13     like that?
14  A.  I don't know what they have.
15  Q.  All right. Fair enough.
16          And when you go to these things, do you
17     know if they're mandatory?
18  A.  Yes, they are mandatory.
19  Q.  Do you sign some type of sign-in sheet, I suppose?
20  A.  Correct.
21  Q.  All right. Any background in the military at all?
22  A.  Nope.
23  Q.  Okay. Let's go back through your background a little
24     bit, starting with your education.
25          Are you a high school graduate?

Page 15

1  A.  Yes.
2  Q.  From where?
3  A.  Fremont High School.
4  Q.  The home of Gerber Baby Food?
5  A.  Home of the baby food.
6  Q.  And when did you graduate from there?
7  A.  2000.
8  Q.  Any education post high school?
9  A.  Graduated -- I went to Muskegon Community College and
10     then transferred to West Shore Community College.
11         MR. CABOT: Off the record.
12         (Conversation held off the record.)
13    BY MR. CABOT:
14  Q.  Back on the record. And when did you attend Muskegon
15     Community College?
16  A.  2000 to 2001.
17  Q.  And you attended West Shore Community College during
18     what time period?
19  A.  2001 to December of '03.
20  Q.  Did you obtain a degree from Muskegon?
21  A.  Nope. No.
22  Q.  Nope is okay.
23  A.  Okay. I'm sorry.
24  Q.  Did you obtain a degree from West Shore Community
25     College?

Page 16

1  A.  I did.
2  Q.  And what was the nature of that degree?
3  A.  An associate's in criminal justice and then it's,
4     slash, criminal justice, because it was kind of a dual
5     degree.
6  Q.  Okay. And who was your instructor? If you recall?
7  A.  I can see his face. Dan is his first name. I can't
8     remember his last name right off the top of my head.
9  Q.  Any other education other than Muskegon Community
10     College and West Shore Community College?
11  A.  No.
12  Q.  Any certificates or professional affiliations that you
13     currently hold? Such as paramedic, EMS, MCOLES? All
14     that sort of thing.
15  A.  I have my MCOLES.
16  Q.  Any breaks in service in that? Any lapses in that
17     certification?
18  A.  No.
19  Q.  And how long have you been MCOLES certified?
20  A.  Since January of '04.
21  Q.  Okay. Any other professional certifications or
22     affiliations you have other than the union, if you're
23     in one?
24  A.  We are, yeah. I guess I do -- I just got put on the
25     Fremont Fire Department, but I have not any

Elizabeth Lowing v.                          Justin Visser                          Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                            April 9, 2018

Page 17

1   certifications yet because I'm a proby, I guess, is
2   what they call you.
3   Q.  Okay.  And is that a full-time position?  Volunteer?
4   A.  Volunteer.
5   Q.  And when did you start there?
6   A.  November of last year.  Of '17.
7   Q.  Okay.
8   A.  September or November.  One of the two.
9   Q.  Okay.  Sure.
10          All right.  Any other professional
11  affiliations or certifications you currently possess?
12  A.  No.
13  Q.  Let's look at your employment.  Prior to your
14  employment with the Newaygo County Sheriff's
15  Department, did you hold any employment that dealt with
16  security or police-type work or corrections?
17  A.  Yup.  I worked at Fremont Police Department.  That was
18  my first job right out of the academy.
19  Q.  And when was that, approximately?
20  A.  I was hired January of 2004.
21  Q.  Okay.  And how long did you work there, approximately?
22  A.  A year.
23  Q.  Was that a full-time position?
24  A.  Part-time.
25  Q.  And were you road patrol?

Page 18

1   A.  Yes.
2   Q.  And your reason for leaving there?
3   A.  Full-time at the sheriff's office.
4   Q.  Did you work part-time at the sheriff's office while
5   you worked at Fremont, too?
6   A.  I worked part-time at three different spots, actually.
7   Q.  Okay.  What were those?
8   A.  So right after I got hired at Fremont, that summer --
9   and I don't remember the date, I don't know if it was
10  April, May -- I got hired at Newaygo PD.
11  Q.  Okay.  So the summer of 2004, though?
12  A.  Yup.
13  Q.  Okay.
14  A.  And then April of '04 I got hired part-time at the
15  sheriff's department.  So I held all three of them at
16  the same time.
17  Q.  A busy guy?
18  A.  I was very busy.  And then I stopped working when I got
19  hired full-time here.
20  Q.  And when was that?
21  A.  April of '05.  2005.
22  Q.  And you're still presently employed with them?
23  A.  The sheriff's office?
24  Q.  Yes.
25  A.  Yes.

Page 19

1   Q.  And in what capacity?
2   A.  Road patrol.
3   Q.  Okay.  And was that your position back in December of
4   2015?
5   A.  Yes.
6   Q.  And back in 2015 did you have a rank?  Such as
7   sergeant, lieutenant, captain?
8   A.  Deputy.
9   Q.  Okay.  Did you have any supervision responsibilities?
10  A.  No.
11  Q.  Who was your supervisor back in December of 2015?  Or
12  if it could have been a couple of people, if that's
13  easier, you could list those.
14  A.  2015?  I don't remember who my sergeant was.
15  Q.  Okay.  Male or female?
16  A.  Male.
17  Q.  Okay.
18  A.  2015?
19  Q.  And they never tell you that this is going to be a
20  memory test, do they?
21  A.  I'm just trying to think because we had -- we only had
22  two sergeants at the time.  It probably was Sergeant
23  Lentz, L-E-N-T-Z, would be my guess as to who it was.
24  Q.  And the record will reflect that's your best guess,
25  so --

Page 20

1   A.  Yup.
2   Q.  Does he have a first name?
3   A.  Jeff.
4   Q.  All right.  Prior to -- well, first of all, Newaygo
5   County, any estimate back in 2015 what the general
6   population of the county was?
7   A.  It runs between 50 and 60,000.
8   Q.  And back in 2015, as a road patrol deputy, did you have
9   a particular sector of the county that you were
10  particularly responsible for, or did that change
11  everyday, or as a road patrol deputy you were
12  responsible for the whole county?
13  A.  We were responsible for the whole county.
14  Q.  Did you typically work with a partner at that time?
15  A.  No.
16  Q.  Having grown up in Northern Michigan, I know that the
17  communities tend to be smaller.  A little tightknit.
18  Generally people know each other.  Were there people in
19  your mind back in 2015 that seemed to be frequent
20  fliers with the sheriff's department, so to speak?
21  A.  Yes.
22  Q.  Okay.  Was Ms. Lowing one of those?
23  A.  Yes.
24  Q.  And in what way?
25  A.  We had -- several of our deputies had taken several

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

Page 21

1 civils, civil complaints. Suicidals. Mostly civil
2 complaints between her and her husband.
3 Q. I'm going to start general and then we're going to be
4 like a funnel and get more specific.
5 A. Okay.
6 Q. The complaints, the civil complaints between Ms. Lowing
7 and her husband, were these physical domestics? Were
8 these argument domestics? Or don't you know?
9 A. Just from reading the other deputy's reports, there
10 were kind of a wide range of complaints. Some of it
11 was property. Some of it was physical. There were
12 suicidal complaints with overtaking of medications.
13 There was a CSC report. And I don't remember the rest
14 of the reports.
15 Q. Okay. The physical aspect, was it the husband
16 claiming -- and I'm just going to make it real
17 simple -- was it the husband claiming that the wife was
18 beating him up? Or was it generally the wife
19 complaining that the husband was beating her up?
20 A. If I remember, it was both ways.
21 Q. Okay. The CSC?
22 A. Yup.
23 Q. What was -- what do you recall that was about?
24 A. She had reported that her husband tried to have anal
25 sex with her.

Page 22

1 Q. Okay. And then property. Was that like involving real
2 property or personal property disputes?
3 A. Personal -- when you say real?
4 Q. Real means like an acre of land.
5 A. Oh, no. Property -- or -- or not real.
6 Q. So personal things?
7 A. Oh, yes. Yes. Yes.
8 Q. And was it alleged she stole from him? He stole from
9 her? Or was it a mixture?
10 A. Both.
11 Q. Okay. Again, we're talking generalities now until we
12 go down that funnel.
13     How many complaints are you aware of
14 that came from the Lowings, generally, from the time
15 you've been with the Newaygo County Sheriff's
16 Department?
17 A. Came from the Lowings?
18 Q. Well, when -- or the Sanborns. When she was a Sanborn?
19 A. Well, in total? Or did you say before?
20 Q. Before -- from the time you started to today, I guess.
21 I mean are we talking in excess of 20?
22 A. Yes.
23 Q. Are we talking hundreds, thousands?
24 A. Yes, over 20. I don't know other county reports. Just
25 from us, I would say over 20.

Page 23

1 Q. Okay. Do you think it was over 50, as far as Newaygo
2 County was concerned?
3 A. I'm going to -- I would guess around 50.
4 Q. Okay.
5 A. That's my best guess. Give or take.
6 Q. Now we're going to go down that funnel a little bit.
7 A. Yes.
8 Q. How many do you personally recall being called to deal
9 with?
10 A. Two.
11 Q. Okay. Were these pre -- and I'm going to say date of
12 incident. The date of incident is going to be, the day
13 we're going to be talking more in a bit, is December
14 15, 2015.
15     Were these pre date of incident or post,
16 or a combination?
17 A. Combination.
18 Q. So one pre and one post?
19 A. No, one the day of and one just two or three days
20 after.
21 Q. Is that the one where you went to the house with
22 Goodspeed?
23 A. Yes.
24 Q. And somebody was wearing a body cam?
25 A. Yes.

Page 24

1 Q. Were you wearing the body cam?
2 A. We reviewed that. I don't know -- I think -- I don't
3 remember. I believe it was me upon looking at it.
4 Q. Because I could never see the person filming.
5 A. Right.
6 Q. But Goodspeed went with somebody and was talking to
7 somebody.
8 A. Yeah, I would dare say that was my body cam. I don't
9 remember wearing one, but --
10 Q. Okay. Did you have body cams issued to you in December
11 of 2015?
12 A. We had them issued, but my -- my system -- there were
13 several cars, but my system, as well as other cars,
14 would make our cars go dead so we had unhooked our --
15 several cars camera systems.
16 Q. Okay.
17 A. So I did not have cameras.
18 Q. Well, you did a couple of days afterward the incident?
19 A. That was because we were with Goodspeed's car.
20 Q. Okay. But on the day of the incident -- we'll get into
21 this again I'm sure, because I will forget I asked
22 you -- on the day of the incident you didn't have a
23 body cam on. Is that accurate?
24 A. That is accurate.
25 Q. And if you didn't have a body cam on because, as your

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

Page 25

```
1    testimony was, there was some technology issue, was
2    your car equipped with audio or video otherwise?
3  A. No.
4  Q. And you knew that?
5  A. I knew that, correct.
6  Q. Okay. So you dealt with Ms. Lowing twice. One the day
7    of the incident, and one a couple of days after when
8    you went with Goodspeed?
9  A. Correct.
10 Q. And what was the general call of that one, two or three
11   days later? What took you out there?
12 A. Ms. Sanborn was reporting that she had some property
13   that was taken.
14 Q. She didn't get violent with you or Goodspeed on that
15   day, did she?
16 A. No.
17 Q. Did you ever hear of Ms. Lowing or Sanborn -- and if I
18   say one or the other, it's the same person.
19 A. Correct.
20 Q. Since we obviously know they're divorced. On any of
21   these other occasions were you aware of Ms. Sanborn
22   getting violent with any deputy?
23 A. Not to my knowledge, no.
24 Q. Okay. Do you know if she had ever been jailed before
25   in Newaygo County Jail?
```

Page 26

```
1  A. I have no idea.
2  Q. Okay. You didn't jail her on your encounter with her
3    on the second one?
4  A. No.
5  Q. Correct?
6  A. No. Correct.
7  Q. So prior to December 15, 2015, you knew who Ms. Lowing
8    was generally through, I guess, watercooler talk,
9    correct?
10 A. I knew per reports, yeah. I didn't know her
11   personally.
12 Q. Had you ever had any deputies or other law enforcement
13   have a conversation directly about her with you prior
14   to the incident?
15 A. No.
16 Q. Okay. So tell me how did you initially get involved
17   with Ms. Lowing on December 15, 2015. What prompted
18   your initial involvement?
19 A. I was asked by Chief Gibbs to do a civil standby.
20 Q. And how were you asked by Chief Gibbs? Did he call
21   you? Did he -- like on a cell phone? Did he call
22   dispatch and they called you? How did that work?
23 A. Through the radio. I can't remember if he called
24   dispatch or if he just called for somebody.
25 Q. You called it a civil, what?
```

Page 27

```
1  A. Standby.
2  Q. And somebody who is reading this record who may not
3    know what that means, just tell us what that means.
4  A. In general terms, we stand there to make sure there's
5    no issue when people are either getting property or
6    something as far as civil. We just stand there to make
7    sure -- I shouldn't say that. We make sure that two
8    parties aren't getting into it.
9  Q. Don't duke it out?
10 A. Correct.
11 Q. So Gibbs did not request you specifically, is that
12   correct? Like did he request you by name?
13 A. No.
14 Q. Do you know, as you sit here today, what prompted him
15   to ask for a civil standby?
16 A. At that time, I did not.
17 Q. Okay. Do you know if there had been any interaction
18   with Gibbs and Mr. or Mrs. Sanborn at all prior to the
19   time you requested the civil standby?
20 A. I did not.
21 Q. And you believe you heard it over the radio?
22 A. I did hear it over the radio.
23 Q. And how was it determined that you would answer that
24   call?
25 A. We are the closest unit complaint. So I was probably
```

Page 28

```
1    the closest one there.
2  Q. Okay. Was there anyone else working road patrol in
3    Newaygo County that day other than yourself?
4         MR. CROSS: Object to foundation. If
5    you know, go ahead.
6         THE WITNESS: I don't know exactly who
7    but there were other people.
8  BY MR. CABOT:
9  Q. Okay. You're not a -- you're not a sole-person deputy
10   in Newaygo County, are you?
11 A. Correct. You're right.
12 Q. All right. Did you make any further contact with
13   Chief Gibbs or anyone else prior to your arrival at the
14   scene?
15 A. No.
16 Q. Was there any other information given in this initial
17   radio traffic about what was going on or why a civil
18   standby was even needed?
19 A. Not on the radio, no.
20 Q. Okay. I'm going to make some assumptions and you tell
21   me if I am wrong. You were probably in a fully-marked
22   police vehicle?
23 A. Correct.
24 Q. You were on duty as a sheriff's deputy at the time,
25   correct?
```

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

Page 29

1  A.  Correct.
2  Q.  And you were probably in full-brown sheriff deputy
3      uniform?
4  A.  Correct.
5  Q.  And you probably had a gun on you?
6  A.  Correct.
7  Q.  You probably had at least one set of handcuffs on you?
8  A.  Correct.
9  Q.  Did you have any other weapons on you?  Or did you have
10     multiple sets of handcuffs?
11 A.  I have two sets of handcuffs.
12 Q.  Okay.
13 A.  Do you want me to tell you everything on my belt?
14 Q.  That you had that day, yeah, that I haven't already
15     guessed.
16 A.  Taser.
17 Q.  Okay.
18 A.  Radio.  Rubber gloves.  Two sets of handcuffs.  Gun.
19     Keys.  Mace.  Pepper spray.
20 Q.  Were you advised at any time prior to your arrival that
21     there had been some type of encounter with Mr. and
22     Mrs. Sanborn at all prior to your arrival?
23         MR. CROSS: Object.  I just object to
24     form.  You can answer.
25         THE WITNESS: I don't remember.  I don't

Page 30

1      believe so.  I think I talked to Chief when we got
2      there about what was going on.
3  BY MR. CABOT:
4  Q.  Okay.  And where did you -- when you arrived, did you
5      arrive there with lights and sirens or normal speed?
6  A.  Normal speed.
7  Q.  Okay.  There's nothing in the nature of the run that
8      made it appear to you that there was an emergency, is
9      that correct?
10 A.  Correct.
11 Q.  There was no request for multiple units, was there?
12 A.  Correct.
13 Q.  And what type of vehicle were you driving that day?
14 A.  Impala.
15 Q.  So it was a sedan versus a truck?
16 A.  Correct.
17 Q.  You were not a canine handler, were you?
18 A.  No.
19 Q.  All right.  When you arrived at the scene, tell me what
20     the scene was.  Where were we?
21 A.  In the Village of Hesperia.
22 Q.  Okay.
23 A.  At the police department.
24 Q.  And where did you park in relation to Ms. Lowing?
25 A.  So the police department is on the north side of the

Page 31

1      road and there's kind of a parking way that is
2      north/south so the cars can park in front of the police
3      department.  There's a road and then on the opposite
4      side of the road there's the same idea, principle of
5      parking, that can park north and south.  I parked on
6      that.  So across the road in that parking spot parking
7      east and west.
8  Q.  Were you parked behind Ms. Lowing?
9  A.  When you say "behind", like across the street?
10 Q.  Right.
11 A.  Yeah.
12 Q.  So what was the approximate distance that you were
13     parked behind her?
14 A.  Two lanes of travel.  I don't know how big the lanes
15     are there.
16 Q.  Two lanes.  One going east, one going west?
17 A.  Yeah.  Like the east and west, I was like across the
18     street.
19 Q.  Okay.  The parking lot where Ms. Lowing was parked, was
20     it paved?
21 A.  Yes.
22 Q.  So eventually when Ms. -- did you ever move your
23     vehicle?
24 A.  Nope.
25 Q.  So to get Ms. Lowing from her vehicle to your vehicle,

Page 32

1      you would have to go across the street?
2  A.  Yes.
3  Q.  A road?
4  A.  Yup.
5  Q.  Two lanes of traffic?
6  A.  Yes.
7  Q.  Was there gravel before you get to the parking spots on
8      the lanes?
9  A.  It's all paved.
10 Q.  Okay.  Besides Ms. Lowing's vehicle, was there any
11     other vehicles there parked near her that you're aware
12     of?
13 A.  Chief Gibbs' car was out front.  And I don't remember
14     if there was any other cars there.
15 Q.  And Chief Gibbs' car, do you know how it was parked in
16     relation to Ms. Lowing's vehicle?
17 A.  Near.  I don't know how many spaces away from it it
18     was, but it was somewhere over there.
19 Q.  Was his vehicle on the same side of the road as
20     Ms. Lowing?
21 A.  Yes.
22 Q.  Okay.  Do you know if Ms. Lowing's ex-husband's vehicle
23     was there?
24 A.  It was not.
25 Q.  Do you know if Ms. Lowing's ex-husband was present when

Elizabeth Lowing v.                          **Justin Visser**                    Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                            April 9, 2018

Page 33

1  you arrived?
2  A.  He was not.
3  Q.  When you initially arrived, who did you physically see
4       before you even get out of your car?
5  A.  Chief Gibbs.
6  Q.  Okay.  And where was he?
7  A.  Standing outside somewhere.  I don't remember where.
8  Q.  Was he in close proximity to Ms. Lowing's vehicle or
9       was he closer to, like, the entrance of the police
10      department?
11 A.  I don't remember.
12 Q.  Okay.  So tell me what happens next.  You park your
13      car.  Is that correct?
14 A.  Correct.
15 Q.  And what do you do next?
16 A.  I went and talked to Chief Gibbs.
17 Q.  Where did the two of you talk?
18 A.  Parking lot.
19 Q.  Out in the parking lot or did you go inside somewhere?
20 A.  No, outside in the parking lot somewhere.  I don't
21      remember exactly where.
22 Q.  Do you remember which vehicle was Ms. Lowing's at the
23      time?
24 A.  At the time, no.
25 Q.  Okay.  You know today?

Page 34

1  A.  I don't even remember what kind of car it was.
2  Q.  I'll tell you.  It was an Equinox.
3  A.  Okay.
4  Q.  When you were talking with Gibbs, were you in close
5       proximity to the Equinox that you would eventually
6       encounter Ms. Lowing in?
7  A.  Yes.
8  Q.  How far away do you think you were?
9  A.  I have no idea.  Ten feet.  Fifteen feet.  That's a
10      guess, though.
11 Q.  Okay.  At any time from your initial arrival, to
12      crossing the road, to talking with Gibbs, did you hear
13      Ms. Lowing screaming or hollering or saying anything?
14 A.  Yeah, I could hear her screaming the whole time.
15 Q.  What was she saying?
16 A.  I couldn't understand what she was saying.
17 Q.  When you were talking to Gibbs, did you have to tell
18      her to quiet down?
19 A.  At that time, no.
20 Q.  Okay.  Were her doors open?
21 A.  Her driver's door was open.
22 Q.  Were her windows up or down?
23 A.  Don't remember.
24 Q.  Open or closed I guess?
25 A.  I don't remember.

Page 35

1  Q.  You couldn't understand any words she was saying?
2  A.  Correct.
3  Q.  Okay.  And when you say screaming, does that mean at
4       the top of her lungs or was she at an elevated voice?
5       I'm just trying to get a sense of what was going on.
6  A.  Loudly.  I don't know what the top of her lungs sound
7       like.  So I mean very loudly.
8  Q.  Okay.  Did her voice ever crack from yelling so loud?
9  A.  I don't remember.
10 Q.  Okay.  So what did you talk to Gibbs about when you
11      initially arrived?
12 A.  Just kind of asked him what was going on and what was
13      the civil standby.
14 Q.  And what was the response?
15 A.  Chief had advised me that they had pulled in there
16      because she had rammed his -- Robert's car several
17      times in the Village.
18 Q.  And he told you the words that "she rammed his car
19      several times"?
20 A.  I don't remember exactly how it was, but had hit his
21      car several times.
22 Q.  Okay.
23 A.  And that they had came in to make a complaint -- or he
24      had came in to make a complaint and Ms. Sanborn
25      followed in there.  I don't know what transpired with

Page 36

1       that, but he had told Mr. Sanborn to head home and he
2       told me that there was a -- they had just gotten a
3       divorce and that there was an order or something that
4       the judge had did where there was going to be custody
5       of the dogs and Ms. Sanborn wanted to have somebody
6       accompany her over to get the dogs.  And in the midst
7       of that in the Village, their incident happened.
8  Q.  Did Gibbs ever tell you if he had taken Ms. Lowing into
9       the police station at all or --
10 A.  At that time, no.
11 Q.  Okay.  Did you ever request backup?
12 A.  No.
13 Q.  Did you ever draw your weapon?
14 A.  No.
15 Q.  Ever threaten to draw your weapon on Ms. Sanborn?
16 A.  No.
17 Q.  Ever threaten or warn to Mace her?
18 A.  Nope.
19 Q.  Ever threaten or warn her that she would be arrested
20      for disorderly or anything?
21 A.  Nope.
22 Q.  Okay.  Disturbing the peace?
23 A.  Nope.
24 Q.  During your conversation with Mr. Gibbs, which was
25      approximately, a guess, 10 to 15 feet away from

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

Page 37

1  Ms. Lowing, were the two of you -- you could hear what
2  Gibbs was telling you?
3  A.  Could I hear?
4  Q.  Yes.
5  A.  Oh, yeah.
6  Q.  Okay.
7  A.  Yeah.
8  Q.  So she wasn't yelling so loudly where the two of you
9  couldn't hear each other talk?
10 A.  Correct.
11 Q.  Were you talking at a normal tone with each other?
12 A.  Yes.
13 Q.  Okay.  Was there anyone else present at that point?
14 A.  No.
15 Q.  Other than the three of you?
16 A.  No.
17 Q.  Did you ever look at any damage with respect to
18 Ms. Lowing's vehicle?
19 A.  No.
20 Q.  So you don't know if there was any damage to the
21 vehicle or not.  Is that accurate?
22 A.  That's correct.
23 Q.  So after this initial conversation with Gibbs, what
24 happens next?
25 A.  I walked over to Elizabeth to try to talk to her to

Page 38

1  figure out what was going on.
2  Q.  Does Gibbs follow or does he go in the police station?
3  A.  I don't think he went into the police station.  I don't
4  know where he was at.  My back was to him.
5  Q.  So he could have been two steps behind you or 20 feet.
6  You don't know?
7  A.  I don't remember.
8  Q.  Okay.  And which side of the vehicle do you approach?
9  A.  Driver's side.
10 Q.  Okay.  And Ms. Lowing was in the driver's side seat,
11 correct?
12 A.  Correct.
13 Q.  And you said her door was open?
14 A.  Correct.
15 Q.  Where were her hands?  Were they on the wheel?  On the
16 dash?  You couldn't see them or you don't remember?
17 A.  I don't remember where they were at.
18 Q.  Okay.  Was she sitting erect in the seat?  Was she
19 slumped over?  Was she sideways?
20 A.  Sitting straight.  Or, normal.
21 Q.  Okay.  Did she have a seatbelt on?
22 A.  No.
23 Q.  Did she have a lap belt on?
24 A.  No.
25 Q.  Do you know whether her seat was extended all the way

Page 39

1  forward or back?  Do you know what I mean?  Cars have a
2  lever where you can either make your seat go real close
3  if you've got short legs or go far back if you have
4  long legs, or didn't you pay attention to that?
5  A.  I mean it wasn't so close that she was right up against
6  the steering wheel.  It was a normal distance for her.
7  Q.  Okay.  At the time that you initially encountered her,
8  did you notice if she had anything on her feet or legs?
9  A.  I noticed that she had a cast.
10 Q.  Which leg?
11 A.  Originally I, through memory, I thought it was the
12 right leg.  But through all the talk, it was her left
13 leg.  But I couldn't remember.
14 Q.  And do you remember what kind of cast it was?  Was it
15 the kind we used to get when we were kids like the --
16 A.  It was -- sorry.
17 Q.  -- like rough ones or was it like a walking cast, if
18 you recall?
19 A.  Like a walking cast.
20 Q.  And what's the first thing you -- was said when you
21 approached the vehicle?
22 A.  I don't know exactly, but I walked over there to -- and
23 I asked her, you know:  Hey.  And I always introduce
24 myself.  My name is Justin.  I said what's going on.
25 Like basically what's going on.

Page 40

1  Q.  And again you didn't have a weapon drawn at this point,
2  correct?
3  A.  No.
4  Q.  And you never drew one?
5  A.  No.
6  Q.  Did she have a response to your question?
7  A.  Continued screaming.
8  Q.  But do you know what she was saying?
9  A.  No.
10 Q.  I mean was she screaming swear words?  Was she saying:
11 I can't believe this is happening to me?  Was she
12 screaming:  I don't want to live anymore?
13 A.  There was a lot of words.  I mean I couldn't -- I
14 couldn't put them all together.
15 Q.  So you couldn't connect a theme?
16 A.  Correct.
17 Q.  Although, you know she wasn't screaming any verbal
18 threats at you or the officers?  You knew that?
19 A.  Right.  Right.
20 Q.  I'm going to shoot the police?
21 A.  Correct.  Correct.
22 Q.  Or I'm going to kick your ass or --
23 A.  Correct.  Correct.
24 Q.  She wasn't doing anything like that?
25 A.  Correct.

Elizabeth Lowing v.  Justin Visser  Justin Visser – Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.  April 9, 2018

Page 41

1 Q. And I'm assuming because if she had done that, you
2    probably would have had your hand on your weapon,
3    right?  At a minimum?
4         MR. CROSS: Object to form.
5         THE WITNESS: No.
6 BY MR. CABOT:
7 Q. No?
8 A. No.
9 Q. Why not?  Because you knew who she was?
10 A. No, she just didn't pose a threat to me.
11 Q. Okay.  So -- and again I'm not trying to be difficult,
12    but you were there.  And other than Mr. Gibbs, none of
13    us in the room were there.
14 A. Correct.
15 Q. So when you say "screaming", again is it like the top
16    of her voice or is she just talking at an elevated
17    tone?
18 A. Like I said, I don't know what the top of her voice
19    sounds like but it was very loud.
20 Q. Okay.
21 A. I mean it was -- yeah.
22 Q. Okay.  Was it loud enough that if you think she was in
23    her car by herself with all the windows rolled up and
24    the doors shut, you could hear her outside?
25 A. Yes.

Page 42

1 Q. Prior to you arriving at the car, you believe your
2    initial communication was: Hey, my name is Justin.
3    What's going on?
4 A. Yup.
5 Q. Do you recall if prior to that you had ever told her to
6    quiet down?
7 A. Nope.
8 Q. Okay.  And her response to your inquiry was saying more
9    things that you don't know what she said?
10 A. Correct.
11 Q. Then what happens?
12 A. I kneeled down and I talked real, real soft.  Almost in
13    a whisper.
14 Q. Okay.
15 A. Trying to get her to kind of calm down.  So I was
16    almost, like I said, I was whispering almost to the
17    point -- just to try to get her to calm down.
18 Q. Where is Gibbs at that point?
19 A. Somewhere behind me.
20 Q. Could have been two steps behind you?  Twenty feet
21    behind you?  You don't know?
22 A. I don't know.  I was kneeling in the doorway.
23 Q. Okay.  So you're actually -- the door -- was the door
24    fully extended?
25 A. Yes.

Page 43

1 Q. Okay.  So you're in the V. part of the door to the
2    frame?
3 A. Kind of parallel with the door.  With the opening.  Not
4    like my back against the V. part, but like my back
5    towards the open part of the door.
6 Q. Okay.  I'm trying to understand your positioning, so --
7    and I know this didn't happen, but if she would have
8    went to shut the door, would she have shut you in it?
9 A. Yes.
10 Q. Okay.
11 A. Yes.
12 Q. So you were in the open part?
13 A. Yup.  In the open part, yup.
14 Q. And just for the record.  She didn't try to shut the
15    down on you, did she?
16 A. She did not, no.
17 Q. So now you're talking to her.  What are you saying?
18 A. Basically, I'm just like -- I don't know verbatim what
19    I said -- but I was trying to say: Hey, I'm here to
20    try to figure out what's going on.  Trying to say: Hey,
21    Chief wants a civil standby.  What's happening?  Just
22    the initial time I was there, I was trying to figure
23    out what was going on in her aspect -- in her point of
24    view.
25 Q. And did she tell you?

Page 44

1 A. I could not understand what she was --
2 Q. Was she crying at the same time?
3 A. Yup.
4 Q. Was it a cry or a sob?
5         MR. CROSS: Object to form.  You can
6    answer.
7 BY MR. CABOT:
8 Q. Do you know the difference?
9 A. It was not a sob.  Because a sob would be like, you
10    know -- are you saying like a sob, like a kid is in the
11    corner just pouting-type thing?
12 Q. Did you see tears flowing from her eyes?  Let's start
13    with that.
14 A. I don't remember if I saw tears.
15 Q. Was she crying at a point that she was like kind of
16    trying to catch her breath type thing?
17 A. No.
18 Q. Because I think your report indicated that she was --
19 A. While we are looking for that, can we take a pause to
20    use the bathroom?
21 Q. Sure.
22 A. Is that okay?
23         MR. CABOT: Off the record.
24         (Recess taken at 11:00 a.m. and resumed
25    the deposition at 11:05 a.m.)

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

**Page 45**

BY MR. CABOT:

1 Q. So do you know if she was crying or sobbing or
    displaying any type of emotion other than this
    screaming that you've described so far?
5 A. I mean you could tell that she was emotional.
6 Q. Okay.
7 A. I mean crying. I mean her eyes were red and -- I mean
    like she had been crying.
9 Q. Okay. And is that when you mentioned something about
    the loss of your family member?
11 A. No.
12 Q. Okay. So you're kneeling in the crook of the door.
13 A. Yup.
14 Q. Trying to figure out what's going on. What happens
    next?
16 A. I couldn't get her to calm down so then I backed away
    from the car and I met with Chief again.
18 Q. Now when you backed up, how far did you have to go to
    start talking with the Chief? Like a couple of steps
    or feet?
21 A. We backed up, I don't know, ten feet away from the car.
22 Q. Okay.
23 A. About. I don't know the exact distance.
24 Q. Okay. And what did the two of you talk about at that
    point?

**Page 46**

1 A. My main thing was to maybe give her some time to calm
    down. So I told Chief, you know, give it a second and
    then I'll go back up there and try to talk to her
    again.
5 Q. And was he in agreement with that general plan?
6 A. Yeah. I mean we're kind of both stumped as to what to
    do as far as getting her to calm down. So gave it a
    minute or two. I went back there. This time I was
    standing.
10 Q. Now when you say a minute or two, do you literally mean
    like a minute or two or is that just slang for maybe
    five, ten minutes?
13 A. It wasn't ten minutes. I mean it wasn't that long.
14 Q. Okay.
15 A. No, no more than five. I mean it wasn't -- I wouldn't
    even say it was that long. When I say a minute or two,
    probably a minute or two.
18 Q. And during that time she doesn't try to leave?
19 A. Correct.
20 Q. She doesn't try to leave her car?
21 A. Correct.
22 Q. She doesn't display any assaultive behavior?
23 A. Correct.
24 Q. She's still doing, what?
25 A. Yelling, screaming.

**Page 47**

1 Q. Okay. And you decide to go back to the car?
2 A. Yup.
3 Q. Does Gibbs follow you?
4 A. I don't know. Like I said, I don't know where he was
    at.
6 Q. Okay. This time you stand?
7 A. Yup.
8 Q. Are you in the crook of the door at this time standing
    or are you on the outside of the door?
10 A. Same spot I was when I was kneeling.
11 Q. So you're in the crook of the door there?
12 A. Yup.
13 Q. Now what happens?
14 A. I was going to -- I was telling her that I didn't feel
    comfortable with her driving. She was too emotional to
    drive. I offered her at that time that I was going to
    give her a ride home. That her car would be fine. And
    I'm just talking. She's still screaming but I'm just
    talking. I said: I don't feel comfortable with you
    driving home. You're too emotional. I told her I was
    going to give her a ride home. I told her I would give
    her my business card with my personal cell phone number
    on it so she could call me and I would come get her and
    bring her back when she calmed down. I told her --
    again, I'm just talking. I said: Going to get her

**Page 48**

1    dogs today was not going to be an option.
2 Q. Did she ever have a response to that?
3 A. She -- yeah. She -- I remember her saying that she
    wanted her dogs. But I -- and I just told her, I just
    said: It's not an option. You're too emotional. I
    tried to explain to her, you know, with the events of
    what happened today, it's just not going to be an
    option. You guys needed to calm down. And, again, I'm
    just talking.
10 Q. Okay.
11 A. She's continuing to scream. I did raise my voice and
    say, I said: Elizabeth. You know, loudly. At that
    time she was telling me that I just didn't understand.
    And that's when I said: I'm trying to understand. And
    then she mentioned something about losing a child. And
    then that's when I knelt down again and I said:
    Elizabeth, I completely understand. I lost my mom two,
    three months prior to that and I thought that was my in
    to get her to calm down. So I knelt down again and I
    was trying to tell her I knew -- I understood what she
    was going through. I didn't lose a child but I lost a
    mom. But she continued to, again, screaming and
    yelling telling me I didn't understand.
24    So this went on for some time. I don't
25    know. Five, ten minutes.

Elizabeth Lowing v.                           Justin Visser                    Justin Visser – Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                  April 9, 2018

---

Page 49

1  Q.  Okay.  And during this time, we'll call it this
2      communication, do you know where Gibbs is?
3  A.  I don't know where he is at this time.
4  Q.  Could be two steps behind you?  Ten feet?  You don't
5      know?
6  A.  Correct.
7  Q.  And again during this, you're within, if she wanted to,
8      she could have hit you, knocked you off balance,
9      anything, correct?
10 A.  Yes.  Yes.
11 Q.  She didn't do that, correct, at that point?
12 A.  Correct.
13 Q.  You never felt you needed to draw your weapon when
14     dealing with her at that point.  Is that correct?
15 A.  Correct.
16 Q.  You never felt you had to call for backup?
17 A.  Correct.
18 Q.  Okay.  So there's some discussion going on.  Then you
19     stand up.  And then what happens when you stand up?
20 A.  I backed away from the car again.
21 Q.  And where did you go?
22 A.  I talked to Chief again.
23 Q.  Again?
24 A.  Again.
25 Q.  Okay.  So this is basically conversation number two?

---

Page 50

1  A.  Number two, correct.
2  Q.  With Chief Gibbs?
3  A.  Yup.
4  Q.  And what's discussed at this time?
5  A.  I told Chief Gibbs I don't want her to drive.  She's
6      too emotional.  I was concerned with the safety of
7      other people and herself.  I said:  Maybe if both of us
8      walk up there together we can ask her to get out of the
9      car.  Hopefully, she will come out of the car.
10 Q.  And is that what happened?
11 A.  We walked back up there together, yes.
12 Q.  Okay.  Did you both approach the driver's door or did
13     one go to the passenger side and one stay in the
14     driver's?
15 A.  No, we both went on the driver's side.
16 Q.  Was Gibbs within arm's reach of you?
17 A.  He was right on my left side.
18 Q.  And did you go back into the crook of the car again?
19 A.  Nope.  I was at the, like the B. pillar.  I know --
20     okay.  Where the door shuts -- are you familiar with
21     the B. pillar?
22 Q.  Uh-hum.
23 A.  Okay.  I was right at the B. pillar.  And Chief was
24     right to the left of me right with his back up against,
25     like the door.

---

Page 51

1  Q.  Basically, B. pillar, for those that don't know, is
2      where the door would shut and latch?
3  A.  True.
4  Q.  Essentially, there's a piece of metal that usually runs
5      down.  That's the pillar we're talking about?
6  A.  Correct.
7  Q.  And so what happens at this point?
8  A.  I had put both of my hands out and I said:  You know,
9      Elizabeth, I'm going to help you get out of the car.  I
10     don't feel comfortable with you driving.  And Chief was
11     right there.  She had looked at us both.  And that's
12     when she took her left arm and struck Chief in the
13     chest.
14 Q.  Now, where was -- if you're at the B. pillar, where is
15     the Chief?
16 A.  Right to my left.
17 Q.  So he's --
18 A.  In the door.
19 Q.  -- closer to the V. of the door?
20 A.  Correct.
21 Q.  Okay.  And you say she takes her left arm and does
22     what?
23 A.  She strikes Chief in the chest.
24 Q.  With the arm?  With the palm of her hand or with a
25     fist?

---

Page 52

1  A.  With her -- with her fist.
2  Q.  So she had -- you're telling me her hand was balled in
3      a fist?
4  A.  Yes.
5  Q.  It wasn't a slap?
6  A.  No.  And then she proceeded from there to backhand me
7      in my chest, chest/arm area.
8  Q.  Were they separate actions or one sweeping motion that
9      happened to make contact with both of you?  Do you
10     understand my question?
11 A.  It would be two -- it would be two actions because it
12     wasn't -- it wasn't one action like this.  It was
13     straight here and then back here.  So it was two
14     different actions.
15 Q.  And where did she hit you?
16 A.  It was like my chest, but I had my arm up already.  So
17     it was like kind of --
18 Q.  So she hit your forearm?
19 A.  Yeah, arm and chest.  Yeah, like that.
20 Q.  Cause any bruising?
21 A.  Nope.  I had my vest on.
22 Q.  Did it knock you off balance?
23 A.  Nope.
24 Q.  Do you know if it knocked Gibbs off balance?
25 A.  No.

---

Elizabeth Lowing v.           Justin Visser                Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                    April 9, 2018

### Page 53

1  Q.  You don't know or it didn't?
2  A.  It didn't.
3  Q.  Okay. So it was kind of like a fly-swatting motion?
4      Is that what we're talking about?
5          MR. CROSS: Object to form.
6    BY MR. CABOT:
7  Q.  Go ahead.
8  A.  I guess explain a fly-swatting motion.
9  Q.  Well, if she's sitting in the car, she extends it -- do
10     you know if it was the front part of her wrist? What
11     part of her fist actually hit you?
12 A.  It was the back part of her arm or hand.
13 Q.  So the top part of her hand?
14 A.  Um-hum.
15 Q.  Is that correct?
16 A.  That's correct.
17 Q.  And do you know what part of her hand made contact
18     with, you said Gibbs' chest?
19 A.  What part of her hand?
20 Q.  Yeah.
21 A.  It would be -- I'm not going to say exactly, but I
22     would -- her hand was balled and it had to be her
23     knuckles.
24 Q.  Okay. And it was a backhanded motion, correct, or was
25     it a front-on, like a boxer motion?

### Page 54

1  A.  No, it was a straight off to the side motion.
2  Q.  Okay. Do you know if it left any marks on Chief Gibbs?
3  A.  I don't know that.
4  Q.  What happened when you -- when you put both hands out,
5      did you tell her what you were doing or did you just
6      put your hands in the car?
7  A.  No, I wasn't even in the car. My hands were outside
8      and I said: Elizabeth, I'm going to help you out of
9      the car. Because I noticed that she had a cast on. I
10     said: Elizabeth, I'm going to give you a ride home.
11     I'm going to help you out of the car. And it was a,
12     like a -- like: I'm going to help you gesture.
13 Q.  Did she ever indicate to you that she had a cast on her
14     foot?
15 A.  No.
16 Q.  So she never mentioned it?
17 A.  No.
18 Q.  What happens next?
19 A.  At that time I grabbed her hand.
20 Q.  Which hand did you grab?
21 A.  Her left hand.
22 Q.  Okay. Did you tell her you were going to grab her
23     hand?
24 A.  No, I didn't. It was at -- when she had hit me, it was
25     a fluid motion where I grabbed onto her.

### Page 55

1  Q.  Okay.
2  A.  And I said: You're under arrest now.
3  Q.  Okay. Did you grab her hand, or her wrist, or arm?
4  A.  At that point I grabbed her -- her wrist. And then I
5      had my right hand -- I moved my right hand down to
6      her --
7  Q.  Between her --
8  A.  Biceps.
9  Q.  Between her shoulder?
10 A.  Yeah, her biceps. So underneath -- underneath her --
11     like tricep region, up.
12 Q.  So between her elbow and her shoulder?
13 A.  Correct.
14 Q.  Did you do that forcefully or just enough to get her
15     out of the car?
16 A.  No, at that point I just grabbed onto her. I said:
17     Elizabeth, you're under arrest. You need to get out of
18     the car. She was pulling away so I was pulling -- it
19     was kind of a tug-of-war thing back and forth. I said:
20     Elizabeth, you're under arrest. You need to get out of
21     the car.
22         At that time when we were pulling back
23     and forth, I did try to forcefully bring her out.
24 Q.  And when you did that, what was the nature of your
25     contact with her? What did you have grabbing her?

### Page 56

1  A.  My hand -- my hands.
2  Q.  Okay. Did you have both hands on one arm, or one
3      arm still on -- one hand on one of her wrists and the
4      other hand on the other tricep, or where?
5  A.  Same arm. I had my left hand on her -- on her wrist
6      area, and I had my right hand on her tricep/bicep area.
7  Q.  Okay. And did you get her out of the car?
8  A.  Nope.
9  Q.  What happens?
10 A.  As I was -- I pulled harder. She took her left foot
11     and put her left foot up in -- I'm sorry -- she put her
12     left foot in to, on the door, between the door, and
13     braced her -- braced herself with her foot.
14 Q.  Are you saying she did that in an attempt to preclude
15     you from getting out of her car --
16 A.  Yes.
17 Q.  -- or was she trying to deal with the walking cast she
18     had on?
19 A.  No. No, she put her foot up to prevent herself from
20     getting out of the car.
21 Q.  And while this is all going on with you and Elizabeth,
22     what is Gibbs doing? Is he standing there within an
23     arm's reach of you?
24 A.  As a matter of fact, I moved over some. So I don't
25     know if I kicked him out of the way or moved into the

Elizabeth Lowing v.                                  Justin Visser                          Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                         April 9, 2018

---

Page 57

1    thing.  I don't remember exactly where he was at.
2 Q. But you believe you felt him physically?
3 A. I couldn't tell you.
4 Q. Okay.  Did he ever intervene on your behalf?
5 A. Nope.  Intervene on my behalf?  What do you mean?
6 Q. Like get in there to assist you and grab her or pull
7    her, or anything like that?
8 A. No.  No.
9 Q. Your understanding was he was in the near vicinity,
10   though.  He could have if he wanted to?  I mean it
11   wasn't like he was a hundred yards away?
12 A. Oh.  Correct.  Correct.
13 Q. He was within an arm's reach of you, wasn't he?
14 A. Um-hum.
15 Q. Is that a yes?
16 A. Yes. I'm sorry.  My fault.
17 Q. Okay.  So you claim she uses -- are you claiming that
18   she used the foot that was in the brace to brace
19   herself?
20 A. She used her left foot.
21 Q. Let's do it the easy way.  Which foot was she using to
22   brace herself?  Was it the one with the cast or the one
23   without the cast?
24 A. The one with the cast.
25 Q. Okay.  A little bit ago we talked a little bit about

---

Page 58

1    the position of the vehicles.
2 A. Uh-hum.
3 Q. And did your car ever -- prior to the body cam -- did
4    your car ever have cameras in the front?
5 A. Did it ever?
6 Q. Yeah.
7 A. I mean they were installed but they never worked
8    because it would drain my battery.
9 Q. I'm talking before the body cam.
10 A. Right.  The camera itself destroyed the batteries in
11   our car.
12 Q. Okay.
13 A. So anytime they hooked it up and we put a new battery
14   in it, it exploded the battery.  So we -- so it never
15   worked in my car.
16 Q. Oh, okay.  And you knew that?
17 A. I knew that.
18 Q. Okay.  Do you know when management knew of that issue?
19   It was before this incident, wasn't it?
20 A. It was right when we got it.
21 Q. And when was that, approximately?
22 A. I don't remember.
23 Q. When do you recall you got your body cam?
24 A. Same time-ish.  I don't know.
25 Q. Do you know if you got it in 2014, 2015?

---

Page 59

1 A. I don't know when we got them.
2 Q. All right.  But they -- was the problem ever resolved?
3 A. No.
4 Q. With the battery and the body cam?
5 A. No.  My camera is still not hooked up.  We have the
6    same camera systems.
7 Q. Okay.  So you would have to use somebody else's car --
8 A. Correct.
9 Q. For it to work?
10 A. Correct.
11 Q. And that's why we got the Goodspeed --
12 A. Correct.
13 Q. -- encounter?
14 A. Correct.
15 Q. What was your car?
16 A. What was my car?
17 Q. Did it have a number or --
18 A. Our badge number is our car.  It's 208.
19 Q. Do you know if there was ever a work order or
20   maintenance request done to fix that?
21 A. There's been so many of them.  So, yes.  We had the
22   camera system people actually come over to our cars and
23   work on them, and couldn't figure out what it was
24   doing.
25 Q. But if your body cam would have been operational, this

---

Page 60

1    encounter would have been captured, correct?
2 A. Right.
3 Q. So we're at the point now where you're telling me she's
4    using her casted foot to brace herself?
5 A. Yup.
6 Q. In what you believe to be an attempt to not allow her
7    to be removed from the vehicle?
8 A. Yup.
9 Q. You have both hands on her.  One on her wrist, and one
10   on her -- between her elbow and her shoulder.  What
11   happens next?
12 A. We did this back and forth tug of war.  And at that
13   time I took my -- I took her arm and I pulled it.  I
14   reached in with my right arm.  I secured her arm and I
15   used the infraorbital, which is a pressure point
16   underneath the nose.
17 Q. So basically describe what that is.  Is it like you use
18   your --
19 A. Yup.
20 Q. -- like your --
21 A. Pointer finger.
22 Q. Yup.
23 A. And then you put it underneath where your nostrils
24   meet, there's a little notch.
25 Q. The bridge?

---

Page 61

1 A.  The bridge.  And basically you do a push and then up on
2     the nose.
3 Q.  Okay.  Did you warn her that:  Look, if you don't get
4     out of this car, I'm going to have to use some force on
5     you?
6 A.  Nope.
7 Q.  Okay.  I have to admit in 14 years of doing this, I've
8     never heard of that technique.  Is that a technique you
9     learned through your training at Newaygo?  Is it
10    something you learned at the academy?
11 A.  Both.
12 Q.  Okay.  Which academy did you go to?  I didn't ask that.
13 A.  West Shore Community College.
14 Q.  All right.  So since I'm not familiar with the
15    technique, I'm just going to call it the finger under
16    the nose.  Okay?
17 A.  Um-hum.
18 Q.  So you put your finger under the nose.  And is that
19    meant to kind of make her follow you to --
20 A.  Correct.  It's a pain compliance, yes.
21 Q.  And what's your other hand doing at that time?  So
22    you've got one under the nose?
23 A.  Yes.
24 Q.  Do you still have her arm or something?
25 A.  No.  I secured her chin with my -- with my other arm.

Page 62

1     So I secured the chin and underneath the nose.
2 Q.  Okay.  And you probably do a pulling motion towards you
3     so she gets out of the car, or what happens?
4 A.  I didn't have to.  She came right out of the car.
5 Q.  And when you say "came right out of the car," what does
6     that mean?  She fell onto the ground or stand up?
7 A.  No, she didn't stand up.  She put her foot down and
8     then, like she was pushing out of the car, she was
9     using -- I didn't have to pull her.  She just came
10    right out of the car.
11 Q.  So she kind of swiveled her buttocks to get her feet
12    out and puts them on the ground and --
13 A.  Yeah, we didn't -- she didn't stand up.  We went
14    straight down to the ground.
15 Q.  How does she end up on the ground?  Does she end up on
16    her side, or buttocks?  Face, back?
17 A.  How did she --
18 Q.  If you know.
19 A.  I don't -- I don't know if she came down on her side
20    and then over, or -- I don't know.
21 Q.  So she didn't get up on her feet?
22 A.  She did not stand up, correct.
23 Q.  Okay.  And then what happens when she's on the ground?
24 A.  I take my hands off of her and take her arms and put
25    her in handcuffs.

Page 63

1 Q.  Where is Gibbs during this part?
2 A.  Standing right next to me.
3 Q.  So you know where he's at at that moment?
4 A.  Um-hum.
5 Q.  Is that a yes?
6 A.  Yes.  I'm sorry.  Yes.
7 Q.  You're fine.
8            Is she handcuffed while she's on the
9     ground?
10 A.  Yes.
11 Q.  Okay.  So she couldn't have been laying on her back,
12    right?
13 A.  Correct.  Correct.
14 Q.  So she's either sitting, laying on her side, or laying
15    on her stomach?
16 A.  She's on her stomach when I handcuffed her.
17 Q.  Did she give you any problems getting her hands behind
18    her back?
19 A.  No.
20 Q.  Did you ask her or did she voluntarily do it?
21 A.  I mean I was telling her:  Put your hands behind your
22    back.
23 Q.  And she did that?
24 A.  Yeah.
25 Q.  She didn't say:  F. you or --

Page 64

1 A.  She was calling me all kinds of names but -- but, yeah.
2 Q.  But she didn't resist your efforts giving you her
3     hands?
4 A.  Correct.
5 Q.  You didn't have to ask Chief Gibbs for assistance?
6 A.  That's correct.
7 Q.  You didn't have to force her arms?
8 A.  Correct.
9 Q.  She voluntarily brought them back when you told her to,
10    correct?
11 A.  Yes.
12 Q.  Did you use one set of cuffs or two?
13 A.  One.
14 Q.  Did you handcuff her alone or did you have assistance?
15 A.  Alone.
16 Q.  And describe to me the handcuffing process that you
17    used.
18 A.  I have hinge cuffs.  So when they are behind her, I put
19    the handcuffs on.  I always put my finger in between
20    the handcuffs.  When it gets tight on my finger, I go
21    on to the next hand.  With her, her hands are there so
22    then I put it on there.  I always have my finger.  Cuff
23    it until it is on my finger, and go.
24 Q.  Okay.  Did you do anything else?
25 A.  After handcuffing?

Page 65

1  Q.  With regard to the handcuffs?
2  A.  Yup.  I have a -- there's a button, if you want to call
3       it, on the handcuffs.  I take, either my pen or a
4       handcuff key -- in my case, I always use my pen -- and
5       you push the locks on it so they can't -- they're
6       locked.  They can't tighten or loosen.
7  Q.  So the phrase is:  You double locked and checked for
8       tightness?
9  A.  Correct.
10 Q.  And you claim you did that in this case?
11 A.  Yup.
12 Q.  You're certain of that?
13 A.  Positive.
14 Q.  And the purpose of that is, A, the finger is so that
15      it's not too tight around the skin?
16 A.  Correct.
17 Q.  And double lock is so it doesn't get tighter as the day
18      progresses, right?
19 A.  Correct.
20 Q.  And you said they're hinged?
21 A.  Yup.
22 Q.  What does that mean?
23 A.  So in laymen's terms you have the two handcuffs.  There
24      are two chains rather than one so you can't twist your
25      hands around.

Page 66

1  Q.  So there's a chain.  It's just a short chain?
2  A.  There are two chains so you can't twist.  It's --
3       they're locked.
4  Q.  Got you.
5  A.  If you can understand -- if you know what I'm saying?
6  Q.  I don't.
7  A.  So you have your two handcuffs.  And you know normal
8       handcuffs have one chain?
9  Q.  Right.
10 A.  And you can twist it.
11 Q.  Yeah.
12 A.  Basically, this has two chains so you can't twist the
13      handcuffs.
14 Q.  Okay.  Okay.  I always learn something new.
15          MR. CROSS: I think Chief Gibbs might
16      have a pair.
17          THE WITNESS: Those are the normal ones.
18          MR. CABOT: Let's go off the record.
19          (Conversation held off the record.)
20 BY MR. CABOT:
21 Q.  All right.  So once you get Ms. Lowing handcuffed,
22      she's on the ground on her stomach, what happens next?
23 A.  I handcuff her.
24 Q.  Yeah, after you handcuff her.
25 A.  Okay.

Page 67

1  Q.  What happens next?
2  A.  I roll her up on her side.  And I said:  I need you
3       to -- I always tell them I need you to put your feet
4       under there.  We're going to help you up.  Rolled her
5       to her side.  And then I say:  We're going to help you
6       up.  And then I went:  One, two, three.  And up to her
7       feet we went.
8  Q.  Did you have any assistance from Gibbs doing that?
9  A.  I don't remember.
10 Q.  Okay.
11 A.  I don't remember.
12 Q.  But he was still --
13 A.  He was right there.
14 Q.  He was right there?
15 A.  Yup.
16 Q.  She never tried to kick you, did she?
17 A.  No.
18 Q.  So now she's on her feet.  What happens next?
19 A.  We walk across the street to my cruiser.
20 Q.  Did you ever drag her at all on the cement?
21 A.  No.
22 Q.  Did you ever move her while she was on the cement?
23 A.  Other than to her side, no.
24 Q.  No reason to drag her, right?
25 A.  No.

Page 68

1  Q.  That would be unreasonable or excessive, wouldn't it?
2  A.  Yup.
3  Q.  And you said you also checked her cuffs for tightness
4       by sticking your index finger in there and you double
5       locked it, right?
6  A.  Yes.
7  Q.  And to not do that would be unreasonable, wouldn't it?
8  A.  If I did not do it?
9  Q.  Yeah, if you don't do it?
10 A.  Correct.
11 Q.  Did she ever complain that the handcuffs were too
12      tight?
13 A.  Nope.
14 Q.  Have you ever had an arrestee complain that the
15      handcuffs were too tight?
16 A.  Yup.
17 Q.  And what do you do when that complaint is made?
18 A.  You check them again.
19 Q.  Okay.  And to not do that would be unreasonable,
20      wouldn't it?
21 A.  Correct.
22 Q.  Now, is there a policy on that or is that just by your
23      training, or both?
24 A.  I don't think there's a policy on it.  I think it's
25      just through training.

Elizabeth Lowing v.                        Justin Visser                   Justin Visser – Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                April 9, 2018

Page 69

1  Q.  Okay.  So once you have Ms. Lowing to her feet, you
2      walk her to your police car, which is across the
3      highway or the road?
4  A.  Street.  Not a highway.  A street.
5  Q.  A street?
6  A.  Yup.
7  Q.  Does Gibbs go with you?
8  A.  I think so but I don't remember.
9  Q.  Okay.  And how is Ms. Lowing put in the car?
10 A.  She sat down.
11 Q.  So she sat down on her buttocks?
12 A.  Um-hum.
13 Q.  Is that a yes?
14 A.  Yes.  I'm sorry.  Yes.
15 Q.  She didn't go in on her side?
16 A.  Correct.
17 Q.  Okay.  Was she seatbelted?
18 A.  No.
19 Q.  And was there a reason why?
20 A.  She was still screaming.  Still hollering.  The way our
21     seatbelts are, you have to reach around the person to
22     seatbelt them and I wasn't going to put my whole body
23     in front of her.
24 Q.  Didn't you reach around her while she was in her car?
25 A.  No.

Page 70

1  Q.  You didn't reach an arm around her to get her out?
2  A.  No.
3  Q.  What happens when she's in the car?
4  A.  She continues to scream.
5  Q.  Again, you don't know what she's saying?
6  A.  I have no idea what she's saying.
7  Q.  And then what happens?
8  A.  I told Chief that I'm out of there and off to the jail
9      we went.
10 Q.  Okay.  Take her to the Newaygo County Jail?
11 A.  Yup.
12 Q.  And what happens there?  How far of a distance was
13     that, approximately, driving distance?  Like five
14     minutes, ten minutes, an hour?
15 A.  Oh, no.  Ten minutes.
16 Q.  And what was she doing on the way there?
17 A.  On the way to the jail?
18 Q.  Yeah.
19 A.  Just screaming.
20 Q.  And you said she never complained the handcuffs were
21     too tight?
22 A.  No.
23 Q.  What happens at the jail?  Are you met with anybody or
24     did you get her out on your own?
25 A.  I don't think I was met by anybody.  I think I got her

Page 71

1      out on my own.
2  Q.  No problems doing that?
3  A.  No.
4  Q.  Didn't have to ask for backup?
5  A.  No.
6  Q.  And then what do you do with her?
7  A.  When you pull into the jail, it's like a garage.
8  Q.  Like a sally port?
9  A.  A sally port, yup.  And then you've got to walk through
10     two separate doors.  They have to buzz you in through
11     two separate doors.  And then when you walk into that
12     separate door, that's kind of where they do their
13     pat-down and the corrections officer takes the cuffs
14     off.  Does a pat-down.  Takes all their property.  Like
15     jewelry and all that at that table right there.
16 Q.  Do you stay there while they're doing that?
17 A.  No, I walk on.  And there's another table, like the
18     booking table where they ask all the questions.  And
19     that's where we fill out the booking form.
20 Q.  Were you present when she was asked the booking
21     questions?
22 A.  I don't think so.  No.
23 Q.  Were you present when they inventoried her property?
24 A.  I'm in the vicinity.  I don't watch them inventory the
25     property.

Page 72

1  Q.  But if there was a problem with her, like she started
2      attacking people, you would have heard that?
3  A.  Correct.  Yup.
4  Q.  None of that happened?
5  A.  Correct.
6  Q.  Was she screaming in the facility?
7  A.  She -- I don't remember.
8  Q.  Okay.
9  A.  I don't remember.
10 Q.  How long were you there, do you think?
11 A.  Five minutes.
12 Q.  Okay.  Any more dealings with her after you brought her
13     and turned her over to the other jailers?
14 A.  Two days later.
15 Q.  When you went to her house?
16 A.  Yeah.
17 Q.  Other than that, for that day?
18 A.  Oh.  For that day, no.
19 Q.  Okay.
20 A.  No.
21 Q.  Did she complain of any injuries or any pain or
22     anything like that?
23 A.  No.
24 Q.  In your Interrogatory answers you said:  Plaintiff's
25     demeanor was quote "highly agitated, distressed."

Page 73

1  A.  What is interrogatories -- whatever you said.
2          MR. CROSS: Those are those written
3  questions.
4          THE WITNESS: Oh, okay.
5          MR. CABOT: Well, since there's a
6  question, I'll go ahead and -- I don't have another
7  copy.  Sorry.
8          MR. CROSS: I don't either.
9          MR. CABOT: So I will make it an
10  exhibit, but they are the Interrogatories.
11          (Exhibit 1 was marked.)
12  BY MR. CABOT:
13  Q.  I am going to show you what's been labeled as Exhibit
14  1, which are your signed Interrogatories.  And I want
15  you to first go to page five and tell me if that is
16  your signature.
17  A.  It is.
18  Q.  Okay.  Do these questions look familiar to you?
19  They're titled Defendant Justin Visser and Newaygo
20  County's Answers to Plaintiff's First Set of
21  Interrogatories to Defendants Visser & Newaygo.
22  A.  What am I looking at?
23          MR. CROSS: That's the title.
24          THE WITNESS: Okay.  Yeah.  Yeah.  Okay.
25  BY MR. CABOT:

Page 74

1  Q.  Have you seen these before?
2  A.  I seen the questions.  I don't remember seeing this.
3  Q.  Okay.  Well, let's look at the answers.  But that is
4  your -- but that is your signature at the end?
5  A.  Yup.  Yup.
6  Q.  Okay.  All right.  So looking at --
7  A.  Yes, I've seen this before.  Yes, I'm sorry.
8  Q.  Okay.
9  A.  Yes, I'm sorry.  My fault.
10  Q.  Looking at Interrogatory 3 of Exhibit 1.  You said,
11  "Plaintiff's demeanor was highly agitated, distressed,
12  angry and verbally assaultive."
13  A.  Uh-hum.  Yes.
14  Q.  What does angry and verbally assaultive mean?
15  A.  She was calling Chief and I names.  Assholes.  Jerks.
16  She was just calling us all kinds of names.
17  Q.  That didn't hurt your feelings, did it?
18  A.  No, I've been called worse.
19  Q.  I was going to say, you've probably been called that
20  and worse, right?
21  A.  Yes.
22  Q.  And then you said it was comparable to a small child
23  having a temper tantrum?
24  A.  Yup.
25  Q.  What does that mean?

Page 75

1  A.  Where a small child that's having such an uncontrolled
2  fit that you kind of can't control that child.  And you
3  kind of just let them be until they calm down and then
4  you talk about it afterwards.
5  Q.  Okay.  But again there was nothing so assaultive you
6  had to un-holster your weapon?
7  A.  Correct.
8  Q.  Or request assistance?
9  A.  Correct.  Correct.  Correct.  Yes.
10  Q.  Now, it says in your response to question six:  That
11  you reached into the car in a motion to help her.
12          So I guess my question is:  What did you
13  do to reach in the car?  You felt okay to do that then
14  but you said you didn't want to reach over her in the
15  squad car to put a seatbelt on?
16  A.  I reached my hands up to ask her to help her out of the
17  car.  I didn't reach into the car around her.  I
18  reached my hands over to say:  Hey, I'll help you out
19  of the car.  With the cars, the seatbelt is on your
20  left side so you have to reach across the person to put
21  the handcuffs on.
22  Q.  Okay.  And did you use a Gooseneck hold on her wrist?
23  A.  Correct.
24  Q.  What's that?
25  A.  That is where you -- there's a pressure point in your

Page 76

1  hand here.  So when she -- after she struck me, I
2  grabbed onto her hand, wrist and it's kind of moving
3  the wrist.  It's another pain compliance.
4  Q.  Basically, you moved the hand in a downward motion
5  while applying pressure to the top of their wrist?
6  A.  Correct.  Good answer.
7  Q.  Thanks.  Glad I could help.
8          And then you said you used the straight
9  arm bar.  Now, usually with the straight arm bar you
10  use your foot as another maneuver.  Did you use your
11  foot?  You couldn't use your foot at this point?
12  A.  I guess I don't know about using your foot for a
13  straight arm bar.
14  Q.  Well, usually they position it with their legs.  But
15  what did you do?
16  A.  I guess -- I guess I don't know if --
17  Q.  Let's talk about what you do.
18  A.  The straight arm bar is basically you use the arm.  You
19  bring it down to your hip and you use your arm to
20  straight arm bar the person to the floor.
21  Q.  Okay.  That's how you got her to the ground?
22  A.  No, that's not how I got her to the ground.
23  Q.  What did you use the straight arm bar for then?
24  A.  That was to try to get her out of the car.  She was
25  putting her foot up to prevent me from getting her out

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

Page 77

1    of that.
2 Q. Okay. So that's the maneuver you used when you claim
3    she was using her casted leg to brace herself to not be
4    removed from the vehicle?
5 A. Correct.
6 Q. When did you draft your police report regarding this
7    incident? Was it that day? The next day?
8 A. We dictate our reports.
9 Q. Okay.
10 A. So it would have been that day I would have dictated
11    it.
12 Q. And when you say dictate, that's the old fashion you
13    talk into a microphone and then --
14 A. Telephone.
15 Q. And then somebody else types it up?
16 A. Correct.
17 Q. And then you review it or --
18 A. Correct.
19 Q. Do you recall when you reviewed this?
20 A. I don't know the exact date.
21 Q. Do you sign it when you're done?
22 A. No.
23 Q. Huh?
24 A. No.
25 Q. Then how do you know it's accurate? Or how do you let

Page 78

1    someone else know that you reviewed this and what's in
2    it is true and accurate?
3 A. Because you press the "submit" button and it submits
4    it.
5 Q. Okay. So I'm going to give you a packet -- I have
6    enough of these for everybody. This will be Exhibit 2.
7         (Exhibit 2 was marked.)
8 BY MR. CABOT:
9 Q. And you're going to notice at the bottom right corner
10    there's some numbers called Bates stamps. Not that you
11    care to know that. But I want you to look at Bates
12    stamp pages three, four and five of that packet.
13         And I've got one for both of you guys.
14 A. Three back?
15         MR. CROSS: You're going this way.
16    Yeah, there you go. Right down here.
17         THE WITNESS: Okay.
18 BY MR. CABOT:
19 Q. So pages three, four and five. Does that document look
20    familiar to you?
21 A. Yes.
22 Q. And what is it?
23 A. A police report.
24 Q. Okay. This is what I got from your counsel.
25 A. Um-hum.

Page 79

1 Q. So I want to know how do I know that this is the
2    version that you reviewed and you put your seal of
3    approval on as being truthful and accurate?
4 A. How do you know?
5 Q. How do I know that this is your final version; that's
6    the correct and accurate one?
7 A. I guess I don't know how you would know.
8 Q. Okay. When you entered the report, did you
9    automatically put the status as closed in it, or does
10    somebody else do that?
11 A. At this time -- it's since changed -- but everything
12    was closed at that time. Closed with us. Turned over
13    to the prosecutor.
14 Q. Okay.
15 A. Now they do it so everything is open and turned over to
16    the prosecutor because with the computer system they
17    can close it out now.
18 Q. I want you to look at page two of your report. It says
19    after -- first full paragraph on that page -- starts
20    off: After I told Ms. Sanborn that she was going to be
21    transported home, "I reached into the car"?
22 A. Um-hum.
23 Q. So what was -- what was it -- how far did you reach
24    into the car?
25 A. An inch or two. I reached into the car to help her

Page 80

1    out.
2 Q. You didn't reach across her body?
3 A. Nope.
4 Q. Are you sure?
5 A. Positive.
6 Q. Okay. And then you say: Ms. Sanborn was then assisted
7    out of the car. Is that just you that assisted her?
8 A. Yup.
9 Q. And is this report complete and accurate to the best of
10    your knowledge?
11 A. Yes.
12 Q. Were you ever requested to testify at any preliminary
13    exam or any court hearing?
14 A. No.
15 Q. Did Ms. Lowing ever tell you of any surgeries she had
16    on that foot?
17 A. No.
18 Q. Did she have any difficulty walking?
19 A. No.
20 Q. Do you know Chief Gibbs outside of your working
21    relationship? Like do you go to his house for a
22    barbecue on the Fourth of July or --
23 A. No.
24 Q. Okay. Do you know of anybody who was in the general
25    area who might have seen anything occur that day?

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

**Justin Visser**

Justin Visser - Vol. I
April 9, 2018

---

**Page 81**

1  A.  No.
2  Q.  You indicated that before you used the finger and the
3      nose technique, you didn't warn her.  Did you ever warn
4      her before you used the arm bar technique?
5  A.  No.
6  Q.  Any reason why not?
7  A.  Well, she struck me.  There was -- I don't need to.  It
8      was -- it was one fluid motion.
9  Q.  The arm bar and the finger under the nose was one
10     motion?
11 A.  No.  When she struck the Chief and myself, it was one
12     fluid motion is me -- after she struck me to, grab
13     onto.
14 Q.  Okay.  What about -- okay.  So grabbing onto her,
15     that's a fluid motion?
16 A.  Yup.
17 Q.  What about the finger under the nose?  That wasn't
18     fluid, was it?  That was a separate act, right?
19 A.  It was fluid from the arm bar to the nose.
20 Q.  Was it just you alone that lifted her to her feet or
21     did she have assistance by Gibbs?
22 A.  I don't remember if Chief helped her up or not, or
23     assisted in helping her up.
24         MR. CABOT:  I don't have anything
25     further at this time.  Counsel might.

**Page 82**

1          MR. CROSS:  Kate, do you have any
2      questions?
3          MS. MCCARTHY:  Just one quick question.
4          EXAMINATION
5  BY MS. MCCARTHY:
6  Q.  So based on what you're saying that this was a fluid
7      motion, this all happened within seconds, correct?
8  A.  It was -- it was quick.  The striking of the Chief and
9      myself to the arm bar, did.  There was -- it was kind
10     of like a tug-of-war match for, I'm going to say 10, 15
11     seconds back and forth.  And from there I knew it
12     wouldn't work.  So once she put her foot up, I reached
13     around and out.  Maybe total 30 seconds from all that.
14     Forty-five seconds.
15         MS. MCCARTHY:  Okay.  That's all I have.
16         MR. CROSS:  Okay.
17         EXAMINATION
18 BY MR. CROSS:
19 Q.  I think we cleared this up already, but we talked about
20     the -- how you reached into the car to pull her out.
21     Counsel was asking if you reached in to pull her out of
22     the car, why didn't you reach around to buckle her
23     seatbelt.
24         I just want to clear up that when you
25     reached in to pull her out of her car, was that in

**Page 83**

1      front of her chest or behind her neck?
2  A.  Behind her.
3  Q.  Okay.  So you would have been at different -- you would
4      have been exposed differently if you had reached to
5      buckle her seatbelt in your patrol car, correct?
6  A.  Correct.
7  Q.  So in the, what we've been calling the finger under the
8      nose maneuver, did you have other options available to
9      you?
10 A.  Yeah.  Obviously, when she struck the Chief and I, I
11     mean as I'm doing the arm bar, or the arm bar to take
12     out, I could have used a strike on her arm.  It's a
13     pressure point.  A strike.  I could have used the, what
14     they call a brachial, which is to the side of the neck.
15     There are a lot of different options.  I could have --
16     I could have went straight for my Taser.  I could have
17     used my -- I could have used my Mace, but I didn't feel
18     that that was necessary.
19 Q.  And why didn't you feel it was necessary?
20 A.  I didn't think she felt -- or was a threat to myself.
21 Q.  Okay.  Before we mark this, do you recognize this
22     document?
23 A.  Yes.
24 Q.  Okay.
25         MR. CROSS:  We will mark this as Exhibit

**Page 84**

1      3.
2          (Exhibit 3 was marked.)
3  BY MR. CROSS:
4  Q.  Could you just tell me what that document is?  Exhibit
5      3 is?
6  A.  So this is the booking document that we fill out.  When
7      I said that I do this after -- when they're patting her
8      down, this is the booking document that we fill out.
9  Q.  So did you fill this out?
10 A.  I do.
11 Q.  Looking at -- I guess it's about two-thirds of the way
12     down -- it says:  Arresting Officer's Pre-Lodging
13     Questionnaire.  Do you see that section?
14 A.  Yes.
15 Q.  Okay.  So you would have asked Ms. Lowing a series of
16     questions, correct?
17 A.  Correct.
18 Q.  I want you to -- first of all, do you have any
19     independent recollection of what her responses were to
20     these questions?
21 A.  I don't remember -- no, I don't remember verbatim, no.
22 Q.  Okay.  But what she said you would have written down on
23     this form, correct?
24 A.  Correct.  Yup.
25 Q.  So according to this form, what was her response when

Elizabeth Lowing v.                                Justin Visser                    Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                             April 9, 2018

Page 85

1    you asked her whether she was taking any prescription
2       medications?
3  A.  I was told to:  Fuck off.
4  Q.  Okay.  And according to this form, what was her
5       response when you asked if she ever attempted suicide
6       or thought of committing suicide?
7  A.  To fuck off again.
8  Q.  So she was still verbally assaultive?
9  A.  Correct.
10 Q.  When you arrived at the jail, correct?
11 A.  Yes.
12          MR. CROSS: Okay.  I don't have any
13     other questions.
14          RE-EXAMINATION
15   BY MR. CABOT:
16 Q.  So that's your handwriting about -- on three-quarters
17     of it.  Do you know who it is at the bottom where it
18     says:  Correction officer's signature?
19 A.  No.  Whoever is badge No. 134.
20 Q.  Now, in number six you said she wouldn't talk but she
21     at least told you to fuck off, right?
22 A.  Correct.
23 Q.  Was she screaming at the jail?
24 A.  I don't remember.
25          MR. CABOT: All right.  I have nothing

Page 86

1    further.
2          MS. MCCARTHY: We're all done.
3          MR. CROSS: All right.  You're all set.
4       (Deposition concluded at 12:00 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

**0**

**03 (1)**
15:19
**04 (2)**
16:20;18:14
**05 (1)**
18:21

**1**

**1 (3)**
73:11,14;74:10
**10 (2)**
36:25;82:10
**10:00 (1)**
5:11
**11:00 (1)**
44:24
**11:05 (1)**
44:25
**12:00 (1)**
86:4
**134 (1)**
85:19
**14 (1)**
61:7
**15 (6)**
6:1;23:14;26:7,17;
36:25;82:10
**150 (1)**
3:4
**17 (1)**
17:6

**2**

**2 (2)**
78:6,7
**20 (4)**
22:21,24,25;38:5
**2000 (2)**
15:7,16
**2001 (2)**
15:16,19
**2004 (4)**
12:12,14;17:20;18:11
**2005 (1)**
18:21
**2014 (1)**
58:25
**2015 (14)**
6:1;19:4,6,11,14,18;
20:5,8,19;23:14;24:11;
26:7,17;58:25
**2018 (1)**
5:2
**208 (1)**
59:18
**248 (1)**
3:6

**3**

**3 (4)**
74:10;84:1,2,5
**30 (1)**
82:13
**31700 (1)**
3:4

**4**

**48334-2301 (1)**
3:5

**5**

**50 (3)**
20:7;23:1,3

**6**

**60,000 (1)**
20:7

**8**

**851-4111 (1)**
3:6

**9**

**9 (1)**
5:2

**A**

**absent (1)**
7:10
**Academy (4)**
14:12;17:18;61:10,12
**acceptable (1)**
13:12
**accompany (1)**
36:6
**according (2)**
84:25;85:4
**accurate (8)**
24:23,24;37:21;77:25;
78:2;79:3,6;80:9
**acre (1)**
22:4
**across (8)**
31:6,9,17;32:1;67:19;
69:2;75:20;80:2
**act (1)**
81:18
**action (1)**
52:12
**actions (3)**
52:8,11,14
**actually (4)**
18:6;42:23;53:11;

59:22
**admit (1)**
61:7
**advised (2)**
29:20;35:15
**affiliations (3)**
16:12,22;17:11
**afterward (1)**
24:18
**afterwards (1)**
75:4
**again (23)**
8:5;22:11;24:21;40:1;
41:11,15;45:17;46:4;
47:25;48:8,16,19,22;
49:7,20,22,23,24;50:18;
68:18;70:5;75:5;85:7
**against (3)**
39:5;43:4;50:24
**agitated (2)**
72:25;74:11
**ago (1)**
57:25
**agreement (2)**
5:20;46:5
**ahead (4)**
7:12;28:5;53:7;73:6
**alleged (2)**
11:14;22:8
**allow (1)**
60:6
**Almost (3)**
42:12,16,16
**alone (3)**
64:14,15;81:20
**Although (1)**
40:17
**always (9)**
6:14;13:2,3;39:23;
64:19,22;65:4;66:14;
67:3
**American (1)**
14:12
**anal (1)**
21:24
**angry (2)**
74:12,14
**annual (1)**
11:22
**anticipate (1)**
7:16
**anymore (1)**
40:12
**appear (1)**
30:8
**APPEARANCES (1)**
3:1
**Appearing (1)**
3:8
**applying (1)**
76:5
**approach (2)**
38:8;50:12

**approached (1)**
39:21
**approval (1)**
79:3
**approximate (1)**
31:12
**approximately (5)**
17:19,21;36:25;58:21;
70:13
**April (5)**
5:2;12:12;18:10,14,21
**area (4)**
52:7;56:6,6;80:25
**argument (1)**
21:8
**arm (30)**
51:12,21,24;52:16,19;
53:12;55:3;56:2,3,5;
60:13,14;61:24,25;70:1;
76:9,9,13,18,18,19,20,
23;81:4,9,19;82:9;83:11,
11,12
**arms (2)**
62:24;64:7
**arm's (3)**
50:16;56:23;57:13
**around (9)**
23:3;65:15,25;69:21,
24;70:1;75:17;82:13,22
**arrest (4)**
10:19;55:2,17,20
**arrested (1)**
36:19
**arrestee (1)**
68:14
**Arresting (1)**
84:12
**arrival (4)**
28:13;29:20,22;34:11
**arrive (1)**
30:5
**arrived (5)**
30:4,19;33:1,3;35:11;
85:10
**arriving (1)**
42:1
**aspect (2)**
21:15;43:23
**ass (1)**
40:22
**assaultive (5)**
46:22;74:12,14;75:5;
85:8
**Assholes (1)**
74:15
**assist (1)**
57:6
**assistance (5)**
64:5,14;67:8;75:8;
81:21
**assisted (1)**
80:6,7;81:23
**associate's (1)**

16:3
**assuming (2)**
9:1;41:1
**assumptions (1)**
28:20
**attacking (1)**
72:2
**attempt (2)**
56:14;60:6
**attempted (1)**
85:5
**attend (1)**
15:14
**attended (1)**
15:17
**attention (1)**
39:4
**attorney (3)**
7:8,14;12:23
**attorneys (2)**
5:25;9:4
**audio (1)**
25:2
**AUGUST (1)**
3:3
**author (1)**
9:16
**automatically (1)**
79:9
**available (1)**
83:8
**aware (3)**
22:13;25:21;32:11
**away (9)**
7:23;32:17;34:8;
36:25;45:16,21;49:20;
55:18;57:11

**B**

**Baby (2)**
15:4,5
**back (32)**
14:23;15:14;19:3,6,
11;20:5,8,19;38:4;39:1,
3;43:4,4;46:3,8;47:1,24;
50:11,18,24;52:13;
53:12;55:19,22;60:12;
62:16;63:11,18,22;64:9;
78:14;82:11
**backed (4)**
45:16,18,21;49:20
**background (2)**
14:21,23
**backhand (1)**
52:6
**backhanded (1)**
53:24
**backup (3)**
36:11;49:16;71:4
**badge (2)**
59:18;85:19
**balance (3)**

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

**Justin Visser**

Justin Visser – Vol. I
April 9, 2018

49:8;52:22,24
**balled (2)**
    52:2;53:22
**bar (1)**
    76:9,9,13,18,20,23;
    81:4,9,19;82:9;83:11,11
**barbecue (1)**
    80:22
**based (1)**
    82:6
**basically (10)**
    10:14;39:25;43:18;
    49:25;51:1;60:17;61:1;
    66:12;76:4,18
**basis (1)**
    7:14
**Bassai (2)**
    13:24;14:8
**B-A-S-S-A-I (1)**
    14:8
**Bates (2)**
    78:10,11
**bathroom (1)**
    44:20
**batteries (1)**
    58:10
**battery (4)**
    58:8,13,14;59:4
**beating (2)**
    21:18,19
**behalf (3)**
    3:8;57:4,5
**behavior (1)**
    46:22
**behind (13)**
    31:8,9,13;38:5;42:19,
    20,21;49:4;63:17,21;
    64:18;83:1,2
**belt (2)**
    29:13;38:23
**Besides (1)**
    32:10
**best (3)**
    19:24;23:5;80:9
**Biceps (2)**
    55:8,10
**big (1)**
    31:14
**bit (6)**
    13:10;14:24;23:6,13;
    57:25,25
**body (13)**
    23:24;24:1,8,10,23,25;
    58:3,9,23;59:4,25;69:22;
    80:2
**Bomay (3)**
    13:23,25;14:3
**B-O-M-A-Y (1)**
    14:3
**booking (5)**
    71:18,19,20;84:6,8
**both (16)**
    8:18;21:20;22:10;

46:6;50:7,12,15;51:8,11;
52:9;54:4;56:2;60:9;
61:11;68:23;78:13
**bottom (2)**
    78:9;85:17
**boxer (1)**
    53:25
**brace (5)**
    57:18,18,22;60:4;77:3
**braced (2)**
    56:13,13
**brachial (1)**
    83:14
**brain (1)**
    13:9
**break (2)**
    8:8,10
**breaks (1)**
    16:16
**breath (1)**
    44:16
**bridge (2)**
    60:25;61:1
**bring (3)**
    47:24;55:23;76:19
**brought (3)**
    12:1;64:9;72:12
**bruising (1)**
    52:20
**buckle (2)**
    82:22;83:5
**bunch (1)**
    6:4
**business (1)**
    47:22
**busy (3)**
    7:23;18:17,18
**buttocks (3)**
    62:11,16;69:11
**button (2)**
    65:2;78:3
**buzz (1)**
    71:10

**C**

**CABOT (25)**
    5:14,18,23,24;10:6;
    15:11,13;28:8;30:3;
    41:6;44:7,23;45:1;53:6;
    66:18,20;73:5,9,12,25;
    78:8,18;81:24;85:15,25
**CALDWELL (1)**
    3:3
**call (13)**
    6:2;14:5;17:2;25:10;
    26:20,21;27:24;47:23;
    49:1,16;61:15;65:2;
    83:14
**called (8)**
    23:8;26:22,23,24,25;
    74:18,19;78:10
**calling (4)**

64:1;74:15,16;83:7
**calm (8)**
    42:15,17;45:16;46:1,
    7;48:8,19;75:3
**calmed (1)**
    47:24
**cam (10)**
    23:24;24:1,8,23,25;
    58:3,9,23;59:4,25
**came (8)**
    22:14,17;35:23,24;
    62:4,5,9,19
**camera (1)**
    24:15;58:10;59:5,6,22
**cameras (2)**
    24:17;58:4
**cams (1)**
    24:10
**can (18)**
    7:2,23,24;9:9;13:8,10,
    25;16:7;29:24;31:2,5;
    39:2;44:5,19;50:8;66:5,
    10;79:17
**canine (1)**
    30:17
**capacity (1)**
    19:1
**captain (1)**
    19:7
**captured (1)**
    60:1
**car (66)**
    24:19;25:2;32:13,15;
    33:4,13;34:1;35:16,18,
    21;41:23;42:1;45:17,21;
    46:20;47:1,17;49:20;
    50:9,9,18;51:9;53:9;
    54:6,7,9,11;55:15,18,21;
    56:7,15,20;58:3,4,11,15;
    59:7,15,16,18;61:4;62:3,
    4,5,8,10;69:2,9,24;70:3;
    75:11,13,15,17,17,19;
    76:24;79:21,24,25;80:7;
    82:20,22,25;83:5
**card (1)**
    47:22
**care (1)**
    78:11
**careful (1)**
    7:22
**cars (9)**
    24:13,13,14,15;31:2;
    32:14;39:1;59:22;75:19
**case (3)**
    9:20;65:4,10
**cast (10)**
    39:9,14,17,19;54:9,13;
    56:17;57:22,23,24
**casted (2)**
    60:4;77:3
**catch (1)**
    44:16
**cause (2)**

5:6;52:20
**cell (2)**
    26:21;47:22
**cement (2)**
    67:20,22
**certain (2)**
    10:2;65:12
**certificates (1)**
    16:12
**certification (1)**
    16:17
**certifications (3)**
    16:21;17:1,11
**certified (1)**
    16:19
**Chad (1)**
    9:14
**chain (3)**
    66:1,1,8
**chains (2)**
    65:24;66:2,12
**change (1)**
    20:10
**changed (1)**
    79:11
**check (1)**
    68:18
**checked (2)**
    65:7;68:3
**chest (7)**
    51:13,23;52:7,16,19;
    53:18;83:1
**chest/arm (1)**
    52:7
**Chief (31)**
    26:19,20;28:13;30:1;
    32:13,15;33:5,16;35:15;
    43:21;45:17,19;46:2;
    49:22;50:2,5,23;51:10,
    12,15,23;54:2;64:5;
    66:15;70:8;74:15;80:20;
    81:11,22;82:8;83:10
**child (5)**
    48:15,21;74:22;75:1,2
**chin (3)**
    60:14;61:25;62:1
**citizens (1)**
    11:13
**civil (11)**
    21:1,1,6;26:19,25;
    27:6,15,19;28:17;35:13;
    43:21
**civils (1)**
    21:1
**claim (3)**
    57:17;65:10;77:2
**claiming (3)**
    21:16,17;57:17
**classroom (2)**
    12:18,20
**clear (4)**
    6:25;7:16;8:5;82:24
**cleared (1)**

82:19
**close (5)**
    33:8;34:4;39:2,5;
    79:17
**closed (4)**
    34:24;79:9,12,12
**closer (2)**
    33:9;51:19
**closest (2)**
    27:25;28:1
**Cloud (1)**
    5:1
**College (8)**
    15:9,10,15,17,25;
    16:10,10;61:13
**combination (2)**
    23:16,17
**comfortable (3)**
    47:15,19;51:10
**committing (1)**
    85:6
**common (1)**
    12:24
**communication (2)**
    42:2;49:2
**communities (1)**
    20:17
**Community (8)**
    15:9,10,15,17,24;16:9,
    10;61:13
**comparable (1)**
    74:22
**complain (3)**
    68:11,14;72:21
**complained (1)**
    70:20
**complaining (1)**
    21:19
**complaint (5)**
    11:13;27:25;35:23,24;
    68:17
**complaints (7)**
    21:1,2,6,6,10,12;22:13
**complete (1)**
    80:9
**completed (1)**
    10:10
**completely (1)**
    48:17
**compliance (2)**
    61:20;76:3
**computer (2)**
    12:19;79:16
**concerned (2)**
    23:2;50:6
**concluded (1)**
    86:4
**confused (1)**
    6:20
**connect (1)**
    40:15
**consistent (1)**
    5:21

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

contact (5)
  10:18;28:12;52:9;
  53:17;55:25
CONTINUED (3)
  3:1;40:7;48:22
continues (1)
  70:4
continuing (1)
  48:11
control (1)
  75:2
Conversation (6)
  15:12;26:13;36:24;
  37:23;49:25;66:19
conversational (1)
  7:21
copy (1)
  73:7
corner (2)
  44:11;78:9
Correction (1)
  85:18
Corrections (3)
  14:12;17:16;71:13
counsel (5)
  5:20;11:5;78:24;
  81:25;82:21
County (14)
  12:8;17:14;20:5,6,9,
  12,13;22:15,24;23:2;
  25:25;28:3,10;70:10
County's (1)
  73:20
couple (5)
  8:17;19:12;24:18;
  25:7;45:19
COURT (5)
  5:5,22;6:15;7:23;
  80:13
courtesy (1)
  8:3
crack (1)
  35:8
Craig (1)
  13:16
credentials (1)
  14:11
criminal (2)
  16:3,4
crook (4)
  45:12;47:8,11;50:18
CROSS (18)
  10:4;28:4;29:23;41:4;
  44:5;53:5;66:15;73:2,8,
  23;78:15;82:1,16,18;
  83:25;84:3;85:12;86:3
crossing (1)
  34:12
cruiser (1)
  67:19
cry (1)
  44:4
crying (5)

44:2,15;45:2,7,8
CSC (2)
  21:13,21
Cuff (1)
  64:22
cuffs (3)
  64:12,18;68:3;71:13
currently (2)
  16:13;17:11
custody (1)
  36:4

D

Dale (2)
  3:9,11
damage (2)
  37:17,20
Dan (1)
  16:7
dare (1)
  24:8
dash (1)
  38:16
date (7)
  12:22;13:13;18:9;
  23:11,12,15;77:20
day (16)
  23:12,19;24:20,22;
  25:6,15;28:3;29:14;
  30:13;65:17;72:17,18;
  77:7,7,10;80:25
days (5)
  23:19;24:18;25:7,11;
  72:14
dead (1)
  24:14
deal (2)
  23:8;56:17
dealing (1)
  49:14
dealings (1)
  72:12
dealt (2)
  17:15;25:6
December (8)
  6:1;15:19;19:3,11;
  23:13;24:10;26:7,17
decide (1)
  47:1
Defendant (1)
  73:19
Defendants (2)
  3:8;73:21
degree (4)
  15:20,24;16:2,5
demeanor (3)
  11:14;72:25;74:11
Department (13)
  12:9,14;13:18;16:25;
  17:15,17;18:15;20:20;
  22:16;30:23,25;31:3;
  33:10

departments (2)
  11:21,23
deposition (8)
  5:19;6:3,5,10;8:12;
  13:4;44:25;86:4
deputies (2)
  20:25;26:12
deputy (8)
  13:17;19:8;20:8,11;
  25:22;28:9,24;29:2
deputy's (1)
  21:9
describe (2)
  60:17;64:16
described (1)
  45:4
destroyed (1)
  58:10
determined (1)
  27:23
dictate (2)
  77:8,12
dictated (1)
  77:10
difference (1)
  44:8
different (5)
  13:16;18:6;52:14;
  83:3,15
differently (1)
  83:4
difficult (1)
  41:11
difficulty (1)
  80:18
directly (1)
  26:13
discovery (1)
  6:3
discussed (2)
  9:4;50:4
discussion (1)
  49:18
disorderly (1)
  36:20
dispatch (2)
  26:22,24
display (1)
  46:22
displaying (1)
  45:3
disputes (1)
  22:2
distance (5)
  31:12;39:6;45:23;
  70:12,13
distressed (2)
  72:25;74:11
Disturbing (1)
  36:22
divorce (1)
  36:3
divorced (1)

25:20
document (5)
  78:19;83:22;84:4,6,8
documents (1)
  9:15
dogs (4)
  36:5,6;48:1,4
domestics (2)
  21:7,8
done (12)
  7:11;8:2,4;11:1;13:17,
  18,23;14:10;41:1;59:20;
  77:21;86:2
door (21)
  34:21;38:13;42:23,23;
  43:1,3,5,8;45:12;47:8,9,
  11;50:12,20,25;51:2,18,
  19;56:12,12;71:12
doors (4)
  34:20;41:24;71:10,11
doorway (1)
  42:22
double (3)
  65:7,17;68:4
down (33)
  6:15;7:24;12:1;22:12;
  23:6;34:18,22;42:6,12,
  15,17;43:15;45:16;46:2,
  7;47:24;48:8,16,19,19;
  51:5;55:5;62:7,14,19;
  69:10,11;75:3;76:19;
  78:16;84:8,12,22
downward (1)
  76:4
draft (2)
  9:16;77:6
drafted (1)
  10:2
drag (2)
  67:20,24
drain (1)
  58:8
draw (3)
  36:13,15;49:13
drawn (1)
  40:1
drew (1)
  40:4
drive (2)
  47:16;50:5
driver's (6)
  34:21;38:9,10;50:12,
  14,15
driving (5)
  30:13;47:15,20;51:10;
  70:13
dual (1)
  16:4
duke (1)
  27:9
during (7)
  13:3;15:17;36:24;
  46:18;49:1,7;63:1

duty (1)
  28:24

E

easier (1)
  19:13
east (3)
  31:7,16,17
easy (1)
  57:21
education (3)
  14:24;15:8;16:9
effect (1)
  10:16
efforts (1)
  64:2
either (7)
  10:5,8;27:5;39:2;
  63:14;65:3;73:8
elbow (2)
  55:12;60:10
elevated (2)
  35:4;41:16
Elizabeth (10)
  5:25;37:25;48:12,17;
  51:9;54:8,10;55:17,20;
  56:21
else (8)
  9:5;28:2,13;37:13;
  64:24;77:15;78:1;79:10
else's (1)
  59:7
emergency (1)
  30:8
emotion (1)
  45:3
emotional (5)
  45:5;47:15,20;48:5;
  50:6
employed (1)
  18:22
employment (3)
  17:13,14,15
EMS (1)
  16:13
encounter (5)
  26:2;29:21;34:6;
  59:13;60:1
encountered (1)
  39:7
end (3)
  62:15,15;74:4
enforcement (1)
  26:12
enough (4)
  14:15;41:22;55:14;
  78:6
entered (1)
  79:8
entirety (1)
  8:1
entrance (1)

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

33:9
Equinox (2)
34:2,5
equipped (1)
25:2
erect (1)
38:18
Essentially (1)
51:4
estimate (1)
20:5
evaluation (2)
11:23;12:1
evaluations (1)
11:19
even (6)
12:25;28:18;33:4;
34:1;46:16;54:7
events (2)
6:24;48:6
eventually (2)
31:22;34:5
everybody (1)
78:6
everyday (1)
20:11
Evidence (1)
5:22
exact (4)
12:15,22;45:23;77:20
exactly (6)
28:6;33:21;35:20;
39:22;53:21;57:1
exam (1)
80:13
EXAMINATION (3)
5:13;82:4,17
excess (1)
22:21
excessive (1)
68:1
exhibit (9)
73:10,11,13;74:10;
78:6,7;83:25;84:2,4
ex-husband (1)
32:25
ex-husband's (1)
32:22
exists (1)
10:5
explain (3)
11:21;48:6;53:8
exploded (1)
58:14
exposed (1)
83:4
extended (2)
38:25;42:24
extends (1)
53:9
eyes (2)
44:12;45:7

# F

face (2)
16:7;62:16
facility (2)
14:7;72:6
fact (1)
56:24
Fair (1)
14:15
familiar (5)
6:8;50:20;61:14;
73:18;78:20
family (1)
45:10
fancy (1)
6:3
far (9)
23:1;27:6;34:8;39:3;
45:4,18;46:7;70:12;
79:23
Farmington (1)
3:5
fashion (1)
77:12
fault (2)
57:16;74:9
Federal (2)
5:22,22
feel (5)
47:14,19;51:10;83:17,
19
feelings (2)
7:3;74:17
feet (16)
34:9,9;36:25;38:5;
39:8;42:20;45:20,21;
49:4;62:11,21;67:3,7,18;
69:1;81:20
fell (1)
62:6
felt (5)
49:13,16;57:2;75:13;
83:20
female (1)
19:15
Fifteen (1)
34:9
figure (5)
38:1;43:20,22;45:14;
59:23
fill (6)
9:19,20;71:19;84:6,8,
9
filming (1)
24:4
final (1)
79:5
find (1)
11:5
fine (3)
8:8;47:17;63:7

finger (13)
60:21;61:15,18;64:19,
20,22,23;65:14;68:4;
81:2,9,17;83:7
Fire (1)
16:25
first (13)
6:13;8:1;9:11;14:5;
16:7;17:18;20:2,4;
39:20;73:15,20;79:19;
84:18
fist (4)
51:25;52:1,3;53:11
fit (1)
75:2
five (9)
11:24;46:12,15;48:25;
70:13;72:11;73:15;
78:12,19
fix (1)
59:20
fliers (1)
20:20
floor (1)
76:20
flowing (1)
44:12
fluid (7)
54:25;81:8,12,15,18,
19;82:6
fly-swatting (2)
53:3,8
follow (3)
38:2;47:3;61:19
followed (1)
35:25
follows (1)
5:12
Food (2)
15:4,5
foot (18)
54:14;56:10,11,12,13,
19;57:18,20,21;60:4;
62:7;76:10,11,11,12,25;
80:16;82:12
force (13)
9:2,18;10:2,9,13,20,
23;11:2,14;12:4,13;
61:4;64:7
forcefully (2)
55:14,23
forearm (1)
52:18
forget (1)
24:21
form (11)
9:18;10:9;11:2;29:24;
41:4;44:5;53:5;71:19;
84:23,25;85:4
format (2)
6:25;12:1
forth (4)
55:19,23;60:12;82:11

Forty-five (1)
82:14
forward (1)
39:1
foundation (1)
28:4
four (2)
78:12,19
Fourth (1)
80:22
frame (1)
43:2
Fremont (6)
13:18;15:3;16:25;
17:17;18:5,8
frequent (1)
20:19
front (6)
31:2;32:13;53:10;
58:4;69:23;83:1
front-on (1)
53:25
Fuck (3)
85:3,7,21
full (2)
5:15;79:19
full-brown (1)
29:2
full-time (4)
17:3,23;18:3,19
fully (1)
42:24
fully-marked (1)
28:21
funnel (3)
21:4;22:12;23:6
further (3)
13:10;28:12;81:25;
86:1

# G

Gabe (1)
13:19
garage (1)
71:7
gave (1)
46:7
general (8)
10:12,13;20:5;21:3;
25:10;27:4;46:5;80:24
generalities (1)
22:11
generally (5)
10:17;20:18;21:18;
22:14;26:8
Gerber (1)
15:4
gesture (1)
54:12
gets (2)
62:3;64:20
Gibbs (36)

3:9,11;8:18;26:19,20;
27:11,18;28:13;33:5,16;
34:4,12,17;35:10;36:8,
24;37:2,23;38:2;41:12;
42:18;47:3;49:2;50:2,5,
16;52:24;54:2;56:22;
63:1;64:5;66:15;67:8;
69:7;80:20;81:21
Gibbs' (3)
32:13,15;53:18
given (1)
28:16
giving (1)
64:2
Glad (1)
76:7
Glenna (1)
13:20
gloves (1)
29:18
goal (2)
6:23;8:6
Good (3)
5:24;14:2;76:6
Goodspeed (6)
13:16;23:22;24:6;
25:8,14;59:11
Goodspeed's (1)
24:19
Gooseneck (1)
75:22
grab (5)
54:20,22;55:3;57:6;
81:12
grabbed (5)
54:19,25;55:4,16;76:2
grabbing (2)
55:25;81:14
graduate (2)
14:25;15:6
Graduated (1)
15:9
grant (1)
8:3
gravel (1)
32:7
ground (11)
6:9;7:9;62:6,12,14,15,
23;63:9;66:22;76:21,22
grown (1)
20:16
guess (22)
10:13;11:20;12:15,17;
16:24;17:1;19:23,24;
22:20;23:3,5;26:8;
34:10,24;36:25;53:8;
75:12;76:12,16,16;79:7;
84:11
guessed (1)
29:15
gun (2)
29:5,18
guy (1)

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

18:17
**guys (2)**
48:8;78:13

## H

**hand (25)**
41:2;51:24;52:2;
53:12,13,17,19,22;
54:19,20,21,23;55:3,5,5;
56:1,3,4,5,6;61:21;
64:21;76:1,2,4
**handcuff (4)**
64:14;65:4;66:23,24
**handcuffed (3)**
63:8,16;66:21
**handcuffing (3)**
10:21;64:16,25
**handcuffs (17)**
29:7,10,11,18;62:25;
64:19,20;65:1,3,23;66:7,
8,13;68:11,15;70:20;
75:21
**handler (1)**
30:17
**hands (16)**
38:15;51:8;54:4,6,7;
56:1,2;60:9;62:24;
63:17,21;64:3,21;65:25;
75:16,18
**hands-on (4)**
10:14,17;12:18,20
**hand-to-hand (1)**
10:18
**handwriting (1)**
85:16
**happen (2)**
6:22;43:7
**happened (7)**
36:7;48:7;50:10;52:9;
54:4;72:4;82:7
**happening (3)**
7:17;40:11;43:21
**happens (20)**
13:2;33:12;37:24;
42:11;45:14;47:13;
49:19;51:7;54:18;56:9;
60:11;62:3,23;66:22;
67:1,18;70:3,7,12,23
**harder (1)**
56:10
**head (3)**
6:15;16:8;36:1
**hear (8)**
25:17;27:22;34:12,14;
37:1,3,9;41:24
**heard (3)**
27:21;61:8;72:2
**hearing (1)**
80:13
**held (3)**
15:12;18:15;66:19
**help (11)**

51:9;54:8,11,12;67:4,
5;75:11,16,18;76:7;
79:25
**helped (1)**
81:22
**helping (1)**
81:23
**herself (8)**
41:23;50:7;56:13,19;
57:19,22;60:4;77:3
**Hesperia (2)**
3:9;30:21
**Hey (5)**
39:23;42:2;43:19,20;
75:18
**high (3)**
14:25;15:3,8
**highly (2)**
72:25;74:11
**highway (2)**
69:3,4
**Hills (1)**
3:5
**hinge (1)**
64:18
**hinged (1)**
65:20
**hip (1)**
76:19
**hired (5)**
17:20;18:8,10,14,19
**hit (6)**
35:20;49:8;52:15,18;
53:11;54:24
**hold (4)**
7:6;16:13;17:15;75:22
**hollering (2)**
34:13;69:20
**home (8)**
15:4,5;36:1;47:17,20,
21;54:10;79:21
**hooked (2)**
58:13;59:5
**Hopefully (1)**
50:9
**hour (1)**
70:14
**house (3)**
23:21;72:15;80:21
**Huh (1)**
77:23
**hundred (3)**
10:1,3;57:11
**hundreds (1)**
22:23
**hurt (2)**
7:3;74:17
**husband (6)**
21:2,7,15,17,19,24

## I

**idea (4)**

26:1;31:4;34:9;70:6
**Impala (1)**
30:14
**important (2)**
6:13;7:25
**inch (1)**
79:25
**incident (13)**
6:1;9:15;23:12,12,15;
24:18,20,22;25:7;26:14;
36:7;58:19;77:7
**Including (1)**
12:10
**independent (1)**
84:19
**index (1)**
68:4
**indicate (1)**
54:13
**indicated (2)**
44:18;81:2
**individual (1)**
10:19
**informal (1)**
7:19
**information (2)**
28:16
**infraorbital (1)**
60:15
**initial (6)**
26:18;28:16;34:11;
37:23;42:2;43:22
**initially (4)**
26:16;33:3;35:11;39:7
**injuries (1)**
72:21
**inquiry (1)**
42:8
**inside (1)**
33:19
**installed (1)**
58:7
**instruction (2)**
7:10,15
**instructor (1)**
16:6
**interaction (1)**
27:17
**internal (1)**
11:16
**interrogatories (4)**
73:1,10,14,21
**Interrogatory (2)**
72:24;74:10
**intervene (2)**
57:4,5
**into (15)**
24:20;27:8;36:8;38:3;
50:18;56:25;71:7,11;
75:11,17;77:13;79:21,
24,25;82:20
**introduce (1)**
39:23

**inventoried (1)**
71:23
**inventory (1)**
71:24
**investigation (1)**
11:17
**involved (1)**
26:16
**involvement (1)**
26:18
**involving (1)**
22:1
**issue (3)**
25:1;27:5;58:18
**issued (2)**
24:10,12
**issues (1)**
11:14

## J

**jail (11)**
13:19,20;25:25;26:2;
70:8,10,17,23;71:7;
85:10,23
**jailed (1)**
25:24
**jailers (1)**
72:13
**January (2)**
16:20;17:20
**Jeff (1)**
20:3
**Jerks (1)**
74:15
**Jerry (1)**
14:5
**jewelry (1)**
71:15
**job (1)**
17:18
**judge (2)**
7:19;36:4
**July (1)**
80:22
**jury (1)**
7:20
**justice (2)**
16:3,4
**JUSTIN (6)**
5:10,16,19;39:24;
42:2;73:19

## K

**Karate (1)**
13:24
**Kate (1)**
82:1
**KATHARINE (1)**
3:2
**keep (1)**
12:23

**Kevin (1)**
13:17
**key (1)**
65:4
**Keys (1)**
29:19
**kick (2)**
40:22;67:16
**kicked (1)**
56:25
**kid (1)**
44:10
**kids (1)**
39:15
**kind (21)**
16:4;21:10;31:1;34:1;
35:12;39:14,15;42:15;
43:3;44:15;46:6;52:17;
53:3;55:19;61:19;62:11;
71:12;75:2,3;76:2;82:9
**kinds (2)**
64:1;74:16
**kmccarthy@zacfirmcom (1)**
3:7
**kneeled (1)**
42:12
**kneeling (3)**
42:22;45:12;47:10
**knelt (2)**
48:16,19
**knew (11)**
25:4,5;26:7,10;40:18;
41:9;48:20;58:16,17,18;
82:11
**knock (1)**
52:22
**knocked (2)**
49:8;52:24
**knowledge (4)**
11:17;13:11;25:23;
80:10
**knows (1)**
12:25
**knuckles (1)**
53:23
**Kulk (1)**
13:17

## L

**labeled (1)**
73:13
**land (1)**
22:4
**lanes (5)**
31:14,14,16;32:5,8
**lap (1)**
38:23
**lapses (1)**
16:16
**Last (6)**
5:16;12:21;13:13,20;
16:8;17:6

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser -  Vol. I
April 9, 2018

latch (1)
 51:2
later (3)
 6:20;25:11;72:14
law (1)
 26:12
lawyers (1)
 6:19
laying (3)
 63:11,14,14
laymen's (1)
 65:23
learn (1)
 66:14
learned (2)
 61:9,10
least (3)
 9:23;29:7;85:21
leave (2)
 46:18,20
leaving (1)
 18:2
Lee (1)
 5:16
L-E-E (1)
 5:16
left (14)
 39:12;50:17,24;51:12,
 16,21;54:2,21;56:5,10,
 11,12;57:20;75:20
leg (4)
 39:10,12,13;77:3
legal (1)
 7:9
legs (4)
 39:3,4,8;76:14
Lentz (1)
 19:23
L-E-N-T-Z (1)
 19:23
level (1)
 10:23
lever (1)
 39:2
lieutenant (1)
 19:7
lifted (1)
 81:20
lights (1)
 30:5
likewise (1)
 8:2
list (1)
 19:13
listed (1)
 9:24
listen (1)
 7:25
literally (1)
 46:10
little (7)
 13:10;14:23;20:17;
 23:6;57:25,25;60:24

live (1)
 40:12
lock (1)
 65:17
locked (4)
 65:6,7;66:3;68:5
locks (1)
 65:5
long (7)
 12:8;16:19;17:21;
 39:4;46:13,16;72:10
look (10)
 11:4;13:3;17:13;
 37:17;61:3;73:18;74:3;
 78:11,19;79:18
looked (1)
 51:11
looking (8)
 10:7;12:23;24:3;
 44:19;73:22;74:6,10;
 84:11
loosen (1)
 65:6
lose (1)
 48:21
losing (1)
 48:15
loss (1)
 45:10
lost (2)
 48:17,21
lot (6)
 31:19;33:18,19,20;
 40:13;83:15
loud (3)
 35:8;41:19,22
Loudly (4)
 35:6,7;37:8;48:12
Lowing (23)
 5:25;10:23;20:22;
 21:6;25:6,17;26:7,17;
 30:24;31:8,19,25;32:20;
 34:6,13;36:8;37:1;
 38:10;66:21;69:1,9;
 80:15;84:15
Lowings (2)
 22:14,17
Lowing's (7)
 32:10,16,22,25;33:8,
 22;37:18
lungs (2)
 35:4,6

## M

Mace (3)
 29:19;36:17;83:17
main (1)
 46:1
maintenance (1)
 59:20
majority (1)
 11:23

Male (2)
 19:15,16
management (1)
 58:18
mandatory (2)
 14:17,18
maneuver (3)
 76:10;77:2;83:8
many (5)
 12:13;22:13;23:8;
 32:17;59:21
mark (2)
 83:21,25
marked (3)
 73:11;78:7;84:2
marks (1)
 54:2
match (1)
 82:10
matter (2)
 9:5;56:24
may (6)
 7:7,8;8:9;13:9;18:10;
 27:2
maybe (4)
 46:1,11;50:7;82:13
MCCARTHY (5)
 3:2;82:3,5,15;86:2
MCOLES (3)
 16:13,15,19
mean (26)
 10:18;22:21;35:3,7;
 39:1,5;40:10,13;41:21;
 45:5,7,7,7;46:6,10,13,
 15;57:5,10;58:7;62:6;
 63:21;65:22;74:14,25;
 83:11
means (3)
 22:4;27:3,3
meant (1)
 61:19
medications (2)
 21:12;85:2
meet (1)
 60:24
member (1)
 45:10
memory (1)
 19:20;39:11
Mendham (1)
 9:8
M-E-N-D-H-A-M (1)
 9:10
mentioned (3)
 45:9;48:15;54:16
met (3)
 45:17;70:23,25
metal (1)
 51:4
Michigan (3)
 3:5;5:1;20:16
microphone (1)
 77:13

Middle (1)
 5:16
Middlebelt (1)
 3:4
midst (1)
 36:6
might (3)
 66:15;80:25;81:25
military (1)
 14:21
mind (1)
 20:19
mine (1)
 8:20
minimum (1)
 41:3
minute (5)
 46:8,10,11,16,17
minutes (7)
 46:12,13;48:25;70:14,
 14,15;72:11
mixture (1)
 22:9
modules (1)
 12:19
mom (2)
 48:17,22
moment (1)
 63:3
Monday (1)
 5:2
months (1)
 48:18
more (5)
 21:4;23:13;42:8;
 46:15;72:12
morning (1)
 5:24
Mostly (1)
 21:1
motion (15)
 52:8;53:3,8,24,25;
 54:1,25;62:2;75:11;
 76:4;81:8,10,12,15;82:7
move (2)
 31:22;67:22
moved (4)
 55:5;56:24,25;76:4
moving (1)
 76:2
Mrs (2)
 27:18;29:22
multiple (2)
 29:10;30:11
Muskegon (4)
 15:9,14,20;16:9
myself (4)
 39:24;81:11;82:9;
 83:20

## N

name (14)

5:15,16,16,24;9:11,12;
 13:21;14:5;16:7,8;20:2;
 27:12;39:24;42:2
names (1)
 9:7;64:1;74:15,16
nature (1)
 16:2;30:7;55:24
near (3)
 32:11,17;57:9
necessary (2)
 83:18,19
neck (2)
 83:1,14
need (6)
 8:7;55:17,20;67:2,3;
 81:7
needed (3)
 28:18;48:8;49:13
new (2)
 58:13;66:14
Newaygo (14)
 12:8;14:5;17:14;
 18:10;20:4;22:15;23:1;
 25:25;28:3,10;61:9;
 70:10;73:19,21
next (12)
 33:12,15;37:24;45:15;
 54:18;60:11;63:2;64:21;
 66:22;67:1,18;77:7
nods (1)
 6:15
none (2)
 41:12;72:4
Nope (16)
 14:22;15:21,22;31:24;
 36:18,21,23;42:7;50:19;
 52:21,23;56:8;57:5;
 61:6;68:13;80:3
normal (7)
 30:5,6;37:11;38:20;
 39:6;66:7,17
north (2)
 30:25;31:5
north/south (1)
 31:2
Northern (1)
 20:16
nose (11)
 60:16;61:2,16,18,22;
 62:1;81:3,9,17,19;83:8
nostrils (1)
 60:23
notch (1)
 60:24
notice (4)
 5:20;12:23;39:8;78:9
noticed (2)
 39:9;54:9
November (2)
 17:6,8
number (7)
 12:15;47:22;49:25;
 50:1;59:17,18;85:20

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser - Vol. I
April 9, 2018

numbers (1)
78:10

## O

object (7)
7:8;28:4;29:23,23;
41:4;44:5;53:5
objection (1)
7:12
obtain (2)
15:20,24
obviously (3)
7:18;25:20;83:10
OC (1)
10:15
occasion (2)
6:10;10:24
occasions (1)
25:21
occur (2)
12:6;80:25
occurred (1)
6:1
Off (17)
15:11,12;16:8;44:23;
49:8;52:22,24;54:1;
62:24;66:18,19;70:8;
71:14;79:20;85:3,7,21
offered (1)
47:16
office (3)
18:3,4,23
officer (1)
71:13
officers (1)
40:18
Officer's (2)
84:12;85:18
official (1)
9:12
often (1)
12:6
old (1)
77:12
on/or (1)
6:1
once (3)
66:21;69:1;82:12
one (60)
5:24;6:21;7:22,24;
8:17,18;9:20,23;10:3,8;
11:8,24,24;13:6,13;14:2;
16:23;17:8;20:22;23:18,
18,19,19,21;24:9;25:6,7,
10,18;26:3;28:1;29:7;
31:16,16;40:4;50:13,13;
52:8,12;56:2,2,3,3;
57:22,22,24;60:9,9;
61:22;64:12,13;65:24;
66:8;67:6;78:13;79:6;
81:8,9,11;82:3
ones (3)

13:16;39:17;66:17
only (2)
7:24;19:21
onto (6)
54:25;55:16;62:6;
76:2;81:13,14
open (9)
13:10;34:20,21,24;
38:13;43:5,12,13;79:15
opening (1)
43:3
operational (1)
59:25
opposite (1)
31:3
option (3)
48:1,5,8
options (2)
83:8,15
oral (1)
11:25
order (2)
36:3;59:19
Originally (1)
39:11
otherwise (1)
25:2
out (55)
9:19,20;17:18;25:11;
27:9;32:13;33:4,19;
38:1;43:20,23;45:14;
50:8,9;51:8,9;54:4,8,11;
55:15,17,20,23;56:7,15,
20,25;59:23;61:4;62:3,4,
5,8,10,12;70:1,8,24;
71:1,19;75:16,18;76:24,
25;79:17;80:1,7;82:13,
20,21,25;83:12;84:6,8,9
outside (6)
33:7,20;41:24;47:9;
54:7;80:20
over (19)
7:22;22:24,25;23:1;
27:21,22;32:18;36:6;
37:25;38:19;39:22;
56:24;59:22;62:20;
72:13;75:14,18;79:12,15
overtaking (1)
21:12
own (2)
70:24;71:1

## P

P77595 (1)
3:2
packet (2)
78:5,12
page (3)
73:15;79:18,19
pages (2)
78:12,19
pain (3)

61:20;72:21;76:3
pair (1)
66:16
palm (1)
51:24
Palmeter (1)
9:14
P-A-L-M-E-T-E-R (1)
9:14
paper (2)
11:23;12:1
papers (1)
10:7
paragraph (1)
79:19
parallel (1)
43:3
paramedic (1)
16:13
park (4)
30:24;31:2,5;33:12
parked (6)
31:5,8,13,19;32:11,15
parking (9)
31:1,5,6,6,19;32:7;
33:18,19,20
part (12)
43:1,4,5,12,13;53:10,
11,12,13,17,19;63:1
particular (1)
20:9
particularly (1)
20:10
parties (1)
27:8
partner (1)
20:14
part-time (5)
12:10;17:24;18:4,6,14
passenger (1)
50:13
pat-down (2)
71:13,14
patrol (6)
17:25;19:2;20:8,11;
28:2;83:5
patting (1)
84:7
pause (1)
44:19
paved (2)
31:20;32:9
pay (1)
39:4
PC (1)
3:3
PD (1)
18:10
peace (1)
36:22
pen (2)
65:3,4
pending (2)

5:7;8:9
people (8)
19:12;20:18,18;27:5;
28:7;50:7;59:22;72:2
Pepper (1)
29:19
per (1)
26:10
percent (2)
10:1,3
performance (2)
11:19,25
period (1)
15:18
periodically (1)
7:7
person (6)
7:24;24:4;25:18;
69:21;75:20;76:20
personal (4)
22:2,3,6;47:22
personally (2)
23:8;26:11
phone (2)
26:21;47:22
phrase (1)
65:7
physical (3)
21:7,11,15
physically (2)
33:3;57:2
pick (1)
13:9
piece (1)
51:4
pillar (6)
50:19,21,23;51:1,5,14
places (1)
11:25
plaintiffs (1)
13:3
Plaintiff's (3)
72:24;73:20;74:11
plan (1)
46:5
please (2)
5:15,18
pm (1)
86:4
point (18)
11:5;37:13;40:1;
42:17,18;43:23;44:15;
45:25;49:11,14;51:7;
55:4,16;60:3,15;75:25;
76:11;83:13
Pointer (1)
60:21
police (16)
8:21;9:16;13:18;
17:17;28:22;30:23,25;
31:2;33:9;36:9;38:2,3;
40:20;69:2;77:6;78:23
police-type (1)

17:16
policy (6)
8:16;9:1,2;11:1;68:22,
24
population (1)
20:6
port (2)
71:8,9
pose (1)
41:10
position (5)
17:3,23;19:3;58:1;
76:14
positioning (1)
43:6
Positive (2)
65:13;80:5
possess (1)
17:11
post (3)
15:8;23:15,18
pouting-type (1)
44:11
pre (3)
23:11,15,18
preclude (1)
56:14
preliminary (1)
80:12
Pre-Lodging (1)
84:12
preparation (2)
8:22;9:22
prescription (1)
85:1
PRESENT (5)
3:11;32:25;37:13;
71:20,23
presently (1)
18:22
press (1)
78:3
pressure (4)
60:15;75:25;76:5;
83:13
presume (1)
7:5
pretty (1)
6:8
prevent (2)
56:19;76:25
principle (1)
31:4
Prior (13)
8:12;17:13;20:4;26:7,
13;27:18;28:13;29:20,
22;42:1,5;48:18;58:3
probably (12)
6:8,11;19:22;27:25;
28:21;29:2,5,7;41:2;
46:17;62:2;74:19
problem (2)
59:2;72:1

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser -  Vol. I
April 9, 2018

problems (2)
63:17;71:2
proby (1)
17:1
proceeded (1)
52:6
process (2)
11:22;64:16
professional (3)
16:12,21;17:10
progresses (1)
65:18
prompted (2)
26:17,27:14
property (10)
21:11;22:1,2,2,5;
25:12;27:5;71:14,23,25
prosecutor (2)
79:13,16
proximity (2)
33:8;34:5
pull (6)
57:6;62:9;71:7;82:20,
21,25
pulled (1)
35:15;56:10;60:13
pulling (4)
55:18,18,22;62:2
purpose (1)
65:14
purposes (1)
5:21
pursuant (1)
5:20
push (2)
61:1;65:5
pushing (1)
62:8
put (25)
16:24;40:14;51:8;
54:4,6;56:11,11,19;
58:13;60:23;61:18;62:7,
24;63:21;64:18,19,22;
67:3;69:9,22;75:15,20;
79:2,9;82:12
puts (1)
62:12
putting (1)
76:25

**Q**

Questionnaire (1)
84:13
quick (2)
82:3,8
quiet (2)
34:18;42:6
quote (1)
72:25

**R**

radio (6)
26:23;27:21,22;28:17,
19;29:18
raise (1)
48:11
rammed (2)
35:16,18
range (1)
21:10
rank (2)
11:24;19:6
rather (3)
7:19,21;65:24
reach (13)
50:16;56:23;57:13;
69:21,24;70:1;75:13,14,
17,20;79:23;80:2;82:22
reached (11)
60:14;75:11,16,18;
79:21,25;82:12,20,21,
25;83:4
read (2)
6:19;8:18
reading (2)
21:9;27:2
real (8)
21:16;22:1,3,4,5;39:2;
42:12,12
really (2)
6:3;7:25
reason (6)
7:10,13;18:2;67:24;
69:19;81:6
recall (8)
12:21;16:6;21:23;
23:8;39:18;42:5;58:23;
77:19
Recess (1)
44:24
recognize (1)
83:21
recollection (1)
84:19
record (13)
5:15,18;8:5;10:4;
15:11,12,14;19:24;27:2;
43:14;44:23;66:18,19
red (1)
45:7
RE-EXAMINATION (1)
85:14
reflect (2)
5:19;19:24
regard (1)
65:1
regarding (4)
5:25;9:15;12:13;77:6
region (1)
55:11
regular (1)
10:21
relation (2)
30:24;32:16

relationship (1)
80:21
remember (45)
6:17;9:21;10:8;12:22;
13:13,14,15;16:8;18:9;
19:14;21:13,20,24;9;
26:23;29:25;32:13;33:7,
11,21,22;34:1,23,25;
35:9,20;38:7,16,17;
39:13,14;44:14;48:3;
57:1;58:22;67:9,11;
69:8;72:7,9;74:2;81:22;
84:21,21;85:24
reminder (1)
6:12
removed (2)
60:7;77:4
rephrase (1)
7:4
report (10)
8:16,21;9:16;21:13;
44:18;77:6;78:23;79:8,
18;80:9
reported (1)
21:24
REPORTER (3)
5:5;6:15;7:23
reporting (1)
25:12
reports (8)
8:17,21,23;21:9,14;
22:24;26:10;77:8
representing (1)
5:25
request (6)
27:11,12;30:11;36:11;
59:20;75:8
requested (2)
27:19;80:12
resist (1)
64:2
resolved (1)
59:2
respect (1)
37:17
response (7)
35:14;40:6;42:8;48:2;
75:10;84:25;85:5
responses (2)
6:14;84:19
responsibilities (1)
19:9
responsible (3)
20:10,12,13
rest (1)
21:13
results (1)
10:19
resumed (1)
44:24
review (3)
9:22;11:22;77:17
reviewed (8)

8:13,15,16,22;24:2;
77:19;78:1;79:2
ride (3)
47:17,21;54:10
right (58)
6:8;8:10,12;13:22;
14:9,15,21;16:8;17:10,
18;18:8;20:4;24:5;
28:11,12;30:19;31:10;
39:5,12;40:19,19;41:3;
50:17,23,24,24;51:11,
16;55:5,5;56:6;58:10,
20;59:2;60:2,14;61:14;
62:4,5,10;63:2,12;65:18;
66:9,21;67:13,14,24;
68:5;71:15;74:6,20;
78:9,16;81:18;85:21,25;
86:3
Road (14)
3:4;17:25;19:2;20:8,
11;28:2;31:1,3,4,6;32:3,
19;34:12;69:3
Robert (1)
9:12
Robert's (1)
35:16
roll (1)
67:2
rolled (2)
41:23;67:4
room (1)
41:13
rough (1)
39:17
Rubber (1)
29:18
rule (3)
6:13,13;7:12
Rules (4)
5:22,22;6:9,11
run (1)
30:7
runs (2)
20:7;51:4

**S**

safety (1)
50:6
sally (2)
71:8,9
same (10)
8:3;18:16;25:18;31:4;
32:19;44:2;47:10;56:5;
58:24;59:6
Sanborn (12)
22:18;25:12,17,21;
27:18;29:22;35:24;36:1,
5,15;79:20;80:6
Sanborns (1)
22:18
Sanchez (1)
13:19

sat (2)
69:10,11
saw (1)
44:14
saying (17)
6:4,18;34:13,15,16;
35:1;40:8,10;42:8;
43:17;44:10;48:3;56:14;
66:5;70:5,6;82:6
scene (3)
28:14;30:19,20
school (3)
14:25;15:3,8
scream (1)
48:11;70:4
screaming (16)
34:13,14;35:3;40:7,
10,12,17;41:15;45:4;
46:25;47:18;48:22;
69:20;70:19;72:6;85:23
seal (1)
79:2
seat (4)
38:10,18,25;39:2
seatbelt (6)
38:21;69:22;75:15,19;
82:23;83:5
seatbelted (1)
69:17
seatbelts (1)
69:21
second (2)
26:3;46:2
seconds (4)
82:7,11,13,14
section (1)
84:13
sector (1)
20:9
secured (1)
60:14;61:25;62:1
security (1)
17:16
sedan (1)
30:15
seeing (2)
10:8;74:2
seemed (1)
20:19
semiannual (1)
11:22
send (1)
11:5
sense (2)
7:2;35:5
Sensei (3)
13:23,25;14:6
S-E-N-S-E-I (1)
14:1
Sensi (1)
14:1
separate (5)
52:8;71:10,11,12;

Court Reporting Services
Phone (248) 535-8277 – courtreportingservices@ymail.com

(8) problems - separate

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

81:18
**September (1)**
17:8
**sergeant (3)**
19:7,14,22
**sergeants (1)**
19:22
**series (1)**
84:15
**serve (1)**
6:12
**service (1)**
16:16
**set (4)**
29:7;64:12;73:20;86:3
**sets (3)**
29:10,11,18
**setting (1)**
7:19
**several (10)**
13:15,16;14:10;20:25,
25;24:13,15;35:16,19,21
**sex (1)**
21:25
**Shawn (2)**
5:24;10:4
**sheet (1)**
14:19
**sheriff (3)**
9:6,8;29:2
**Sheriff's (9)**
12:9;17:14;18:3,4,15,
23;20:20;22:15;28:24
**shoot (1)**
40:20
**Shore (5)**
15:10,17,24;16:10;
61:13
**short (2)**
39:3;66:1
**shoulder (3)**
55:9,12;60:10
**shoulders (1)**
6:16
**show (1)**
73:13
**shrugs (1)**
6:16
**shut (5)**
41:24;43:8,8,14;51:2
**shuts (1)**
50:20
**side (19)**
30:25;31:4;32:19;
38:8,9,10;50:13,15,17;
54:1;62:16,19;63:14;
67:2,5,23;69:15;75:20;
83:14
**sideways (1)**
38:19
**sign (2)**
14:19;77:21
**signature (3)**

73:16;74:4;85:18
**signed (1)**
73:14
**sign-in (1)**
14:19
**simple (1)**
21:17
**sirens (1)**
30:5
**sit (2)**
10:1;27:14
**sitting (4)**
38:18,20;53:9;63:14
**six (2)**
75:10;85:20
**skin (1)**
65:15
**slang (1)**
46:11
**slap (1)**
52:5
**slash (1)**
16:4
**slumped (1)**
38:19
**small (2)**
74:22;75:1
**smaller (1)**
20:17
**sob (4)**
44:4,9,9,10
**sobbing (1)**
45:2
**soft (1)**
42:12
**solemnly (1)**
5:5
**sole-person (1)**
28:9
**somebody (10)**
10:21;23:24;24:6,7;
26:24;27:2;36:5;59:7;
77:15;79:10
**someone (1)**
78:1
**somewhere (6)**
12:16;32:18;33:7,19,
20;42:19
**sorry (12)**
10:25;13:1;14:6;
15:23;39:16;56:11;
57:16;63:6;69:14;73:7;
74:7,9
**sort (1)**
16:14
**sound (1)**
35:6
**sounds (1)**
41:19
**south (1)**
31:5
**spaces (1)**
32:17

**speak (1)**
20:20
**speaking (1)**
7:24
**specific (1)**
21:4
**specifically (1)**
27:11
**speed (2)**
30:5,6
**spell (2)**
9:9;13:25
**sporadic (1)**
12:6,7
**spot (2)**
31:6;47:10
**spots (2)**
18:6;32:7
**spray (2)**
10:15;29:19
**squad (1)**
75:15
**stamp (1)**
78:12
**stamps (1)**
78:10
**stand (9)**
27:4,6;47:6;49:19,19;
62:6,7,13,22
**standby (7)**
26:19;27:1,15,19;
28:18;35:13;43:21
**Standing (5)**
33:7;46:9;47:8;56:22;
63:2
**start (4)**
17:5;21:3;44:12;45:19
**started (2)**
22:20;72:1
**starting (1)**
14:24
**starts (1)**
79:19
**state (1)**
5:15
**station (3)**
36:9;38:2,3
**status (1)**
79:9
**stay (2)**
50:13;71:16
**Ste (1)**
3:4
**steering (1)**
39:6
**steps (4)**
38:5;42:20;45:19;49:4
**sticking (1)**
68:4
**still (10)**
18:22;46:24;47:18;
56:3;59:5;61:24;67:12;
69:20,20;85:8

**stole (2)**
22:8,8
**stomach (3)**
63:15,16;66:22
**stopped (1)**
18:18
**straight (11)**
38:20;52:13;54:1;
62:14;76:8,9,13,18,20,
23;83:16
**street (7)**
31:9,18;32:1;67:19;
69:4,4,5
**strike (1)**
83:12,13
**strikes (1)**
51:23
**striking (1)**
82:8
**struck (6)**
51:12;76:1;81:7,11,
12;83:10
**stumped (1)**
46:6
**subject (2)**
11:13,16
**submit (1)**
78:3
**submits (1)**
78:3
**sued (1)**
11:11
**suicidal (1)**
21:12
**Suicidals (1)**
21:1
**suicide (2)**
85:5,6
**summer (2)**
18:8,11
**supervision (1)**
19:9
**supervisor (1)**
19:11
**suppose (1)**
14:19
**supposed (1)**
10:9
**sure (14)**
6:14;7:15;10:3;11:7,
21;12:11;13:7;17:9;
24:21;27:4,7,7;44:21;
80:4
**surgeries (1)**
80:15
**swear (2)**
5:5;40:10
**sweeping (1)**
52:8
**swiveled (1)**
62:11
**sworn (1)**
5:11

**system (2)**
24:12,13;59:22;79:16
**systems (2)**
24:15;59:6

**T**

**table (3)**
71:15,17,18
**talk (13)**
7:22;26:8;33:17;
35:10;37:9,25;39:12;
45:24;46:3;75:4;76:17;
77:13;85:20
**talked (6)**
30:1;33:16;42:12;
49:22;57:25;82:19
**talking (19)**
22:11,21,23;23:13;
24:6;34:4,12,17;37:11;
41:16;43:17;45:19;
47:18,19,25;48:9;51:5;
53:4;58:9
**tantrum (1)**
74:23
**Taser (3)**
10:15;29:16;83:16
**tears (2)**
44:12,14
**technique (5)**
61:8,8,15;81:3,4
**technology (1)**
25:1
**Telephone (1)**
77:14
**telling (7)**
37:2;47:14;48:13,23;
52:2;60:3;63:21
**temper (1)**
74:23
**ten (11)**
11:24;12:15,16;34:9;
45:21;46:12,13;48:25;
49:4;70:14,15
**tend (1)**
20:17
**terms (2)**
27:4;65:23
**test (1)**
19:20
**testified (1)**
5:12
**testify (1)**
80:12
**testimony (2)**
5:6;25:1
**Thanks (1)**
76:7
**theme (1)**
40:15
**though (4)**
9:22;18:11;34:10;
57:10

Case 1:17-cv-00650-GJQ-RSK   ECF No. 47-4 filed 11/28/18   PageID.1054   Page 34 of 35

Elizabeth Lowing v.                                          Justin Visser                                    Justin Visser - Vol. I
Justin Visser, Newaygo County, Dale Gibbs, et. al.                                                                  April 9, 2018

thought (3)
39:11;48:18;85:6
thousands (1)
22:23
threat (2)
41:10;83:20
threaten (3)
36:15,17,19
threats (1)
40:18
three (10)
18:6,15;23:19;25:10;
37:15;48:18;67:6;78:12,
14,19
three-quarters (1)
85:16
thumb (1)
7:12
tight (5)
64:20;65:15;68:12,15;
70:21
tighten (1)
65:6
tighter (1)
65:17
tightknit (1)
20:17
tightness (2)
65:8;68:3
time-ish (1)
58:24
times (4)
7:7;35:17,19,21
title (1)
73:23
titled (1)
73:19
today (12)
6:4,23;8:12,22;9:23;
10:1;13:7;22:20;27:14;
33:25;48:1,7
together (4)
6:10;40:14;50:8,11
told (16)
13:7;35:18;36:1,2;
42:5;46:2;47:20,21,24;
48:4;50:5;64:9;70:8;
79:20;85:3,21
tone (2)
37:11;41:17
took (5)
25:11;51:12;56:10;
60:13,13
top (8)
10:21;16:8;35:4,6;
41:15,18;53:13;76:5
total (2)
22:19;82:13
towards (2)
43:5;62:2
traffic (2)
28:17;32:5
trainer (1)

13:14
training (6)
12:4,18,21;61:9;
68:23,25
trainings (3)
12:13;13:23;14:10
transcript (1)
6:25
transcripts (1)
6:20
transferred (1)
15:10
transpired (1)
35:25
transported (1)
79:21
travel (1)
31:14
tricep (2)
55:11;56:4
tricep/bicep (1)
56:6
tried (3)
21:24;48:6;67:16
truck (1)
30:15
True (2)
51:3;78:2
truth (3)
5:7,7,8
truthful (1)
79:3
try (11)
6:17;13:9;37:25;
42:17;43:14,20;46:3,18,
20;55:23;76:24
trying (13)
19:21;35:5;41:11;
42:15;43:6,19,20,22;
44:16;45:14;48:14,20;
56:17
tug (1)
60:12
tug-of-war (2)
55:19;82:10
turned (3)
72:13;79:12,15
Twenty (1)
42:20
twice (1)
25:6
twist (4)
65:24;66:2,10,12
two (41)
17:8;19:22;23:10,19;
25:10;27:7;29:11,18;
31:14,16;32:5;33:17;
37:1,8;38:5;42:20;
45:24;46:8,10,11,16,17;
48:17;49:4,25;50:1;
52:11,11,13;64:12;
65:23,24;66:2,7,12;67:6;
71:10,11;72:14;79:18,25

two-thirds (1)
84:11
type (12)
10:13,14,19;11:14,22,
25;14:11,19;29:21;
30:13;44:16;45:3
types (1)
77:15
typically (2)
6:2;20:14
typing (1)
7:23

U

Uh-hum (3)
50:22;58:2;74:13
ultimate (1)
8:6
um-hum (9)
6:18;10:25;53:14;
57:14;61:17;63:4;69:12;
78:25;79:22
uncontrolled (1)
75:1
under (11)
11:1;55:2,17,20;
61:15,18,22;67:4;81:9,
17;83:7
underneath (5)
55:10,10;60:16,23;
62:1
undersheriff (2)
9:6,13
understandable (1)
6:24
understood (2)
7:5;48:20
un-holster (1)
75:6
unhooked (1)
24:14
un-huh (1)
6:18
uniform (1)
29:3
union (1)
16:22
unit (1)
27:25
units (1)
30:11
unreasonable (3)
68:1,7,19
up (41)
13:10;20:16;21:18,19;
34:22;39:5;41:23;45:18,
21;46:3;49:19,19;50:8,
11,24;52:16;55:11;
56:11,19;58:13;59:5;
61:1;62:6,7,13,15,15,21,
22;67:2,4,6,6;75:16;
76:25;77:15;81:22,23;

82:12,19,24
upon (1)
24:3
use (20)
9:1,18;10:2,9;11:1;
12:4,13;44:20;59:7;
60:17;61:4;64:12;65:4;
75:22;76:10,10,11,18,
19,23
used (17)
5:21;10:13,15,23;
39:15;57:18,20;60:15;
64:17;76:8;77:2;81:2,4;
83:12,13,17,17
uses (1)
57:17
using (5)
57:21;60:4;62:9;
76:12;77:3
Usually (4)
13:2;51:4;76:9,14

V

vast (1)
11:22
vehicle (17)
28:22;30:13;31:23,25,
25;32:10,16,19,22;33:8,
22;37:18,21;38:8;39:21;
60:7;77:4
vehicles (2)
32:11;58:1
verbal (2)
6:14;40:17
verbally (3)
74:12,14;85:8
verbatim (2)
43:18;84:21
version (4)
6:11,24;79:2,5
Versus (2)
6:18;30:15
vest (1)
52:21
vicinity (3)
12:16;57:9;71:24
video (1)
25:2
view (1)
43:24
Village (4)
3:8;30:21;35:17;36:7
violent (1)
25:14,22
VISSER (5)
5:10,16,19;73:19,21
V-I-S-S-E-R (1)
5:17
voice (5)
35:4,8;41:16,18;48:11
voluntarily (2)
63:20;64:9

Volunteer (2)
17:3,4

W

wait (1)
8:1
walk (6)
50:8;67:19;69:2;71:9,
11,17
walked (3)
37:25;39:22;50:11
walking (3)
39:17,19;56:17;80:18
wants (1)
43:21
war (1)
60:12
warn (5)
36:17,19;61:3;81:3,3
watch (1)
71:24
watercooler (1)
26:8
way (12)
6:3;8:5;20:24;31:1;
38:25;56:25;57:21;
69:20;70:16,17;78:15;
84:11
ways (1)
21:20
weapon (4)
36:13,15;40:1;41:2;
49:13;75:6
weapons (1)
29:9
wearing (3)
23:24;24:1,9
West (8)
15:10,17,24;16:10;
31:7,16,17;61:13
what's (12)
39:20,24,25;42:3;
43:20,21;45:14;50:4;
61:21;73:13;75:24;78:1
wheel (2)
38:15;39:6
whisper (1)
42:13
whispering (1)
42:16
White (1)
5:1
whole (5)
5:7;20:12,13;34:14;
69:22
wide (1)
21:10
wife (2)
21:17,18
windows (2)
34:22;41:23
within (5)

Elizabeth Lowing v.
Justin Visser, Newaygo County, Dale Gibbs, et. al.

Justin Visser

Justin Visser – Vol. I
April 9, 2018

49:7;50:16;56:22;
57:13;82:7
**without (1)**
57:23
**WITNESS (9)**
5:9,11;28:6;29:25;
41:5;66:17;73:4,24;
78:17
**words (4)**
35:1,18;40:10,13
**work (9)**
17:16,21;18:4;20:14;
26:22;59:9,19,23;82:12
**worked (5)**
17:17;18:5,6;58:7,15
**working (3)**
18:18;28:2;80:20
**worse (2)**
74:18,20
**wrist (9)**
53:10;55:3,4;56:5;
60:9;75:22;76:2,3,5
**wrists (1)**
56:3
**written (2)**
73:2;84:22
**wrong (1)**
28:21

## Y

**yards (1)**
57:11
**year (2)**
17:6,22
**years (1)**
61:7
**yelling (4)**
35:8;37:8;46:25;48:23
**Yup (36)**
8:11;9:10;17:17;
18:12;20:1;21:22;32:4;
42:4;43:13,13;44:3;
45:13;47:2,7,12;50:3;
60:5,8,19,22;65:2,11,21;
67:15;68:2,16;69:6;
70:11;71:9;72:3;74:5,5,
24;80:8;81:16;84:24

## Z

**ZAUSMER (1)**
3:3